**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **POWER EXPECTATIONS, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PUERTO RICO ELECTRIC POWER AUTHORITY,**<br><br>**Defendant.** | **CIVIL NO. 26-cv-01571**<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT**

**TO THE HONORABLE COURT:**

COMES NOW Plaintiff, Power Expectations, LLC ("Power Expectations" or "Plaintiff"), by and through the undersigned counsel, and respectfully ALLEGES, STATES, and PRAYS as follows:

## I. INTRODUCTION

The Puerto Rico Electric Power Authority has once again failed the people of Puerto Rico. At a time where hundreds of thousands of Puerto Ricans experience intermittent blackouts due to the Island's outdated power grid's inability to meet consumer energy demand, PREPA had in its hands the solution to an Island-wide problem and deliberately squandered it. Power Expectations had agreed, with PREPA, to supply 400 megawatts of temporary power generation over a span of ten years, thereby ensuring energy stability for the Puerto Rican people. The agreement was executed in full compliance with the law, after a competitive bidding process, and after Puerto Rico's energy regulator remarked that its covenants were "prudent and reasonable." The Financial Oversight and Management Board for Puerto Rico ("FOMB") blessed the agreement as being consistent with the island's fiscal plan.

The Agreement was extraordinarily one-sided, and deliberately so. The Seller bore every cost and every risk, equipment, permits, construction, fuel, maritime logistics, interconnection,

insurance, indemnity, and all future regulatory change, expressly "at Seller's sole cost and risk." PREPA guaranteed nothing. Its only payment obligation was for "metered and accepted kilowatt-hours," with no minimum-take, no minimum-generation, and no make-whole obligation of any kind. PREPA's primary obligation to Power Expectations was that it would, throughout the term of the agreement, hold "all required governmental, statutory, regulatory, and fiscal approvals under applicable law, including approvals required under PROMESA . . . [and] the FOMB." Power Expectations held up its side of the bargain, it invested millions of dollars in ensuring it had the capacity to meet its contractual obligations and was prepared to immediately deploy the first 40 megawatts of the 400 it had agreed to supply. PREPA, however, did not comply with its obligations.

On the evening of August 18, 2026, eighty-one days before the date by which the temporary power was to be made available to the people of Puerto Rico, before any energy had been sold to PREPA, before PREPA had paid Power Expectations any money, PREPA's Executive Director signed a Notice of Termination, effective immediately, directing Power Expectations to cease all activity under the parties' agreement. The Notice recited two grounds it called "separate and independent." Both are PREPA's own doing, yet Power Expectations is the party bearing the burden of their occurrence.

PREPA claimed Power Expectations was in default of the agreement because it failed to provide a performance bond that was required under the agreement. But Power Expectations had engaged its surety thirteen days before execution of the agreement and asked PREPA in writing on July 9, July 21, August 6, and August 13, 2026, to supply essential language that the sureties' underwriters required to issue the bonds. As late as August 14, 2026, PREPA's Legal Affairs Director, PREPA's outside counsel, the surety broker, and Power Expectations conferred, and the surety advised PREPA directly that it could not issue the bonds until PREPA furnished the

language its underwriters required. The parties agreed to keep working towards a solution. PREPA failed to deliver.

PREPA also claimed the FOMB ordered termination of the agreement because Power Expectations had assigned the interests held by one of its partners in the contract, Enchanted Rock LLC, to another, more capable, and NYSE-listed energy partner, Flotek, Inc. But this assignment was done to the letter of the parties' agreement, which was reviewed and approved by the FOMB. Article XVI of that agreement permitted Power Expectations, with PREPA's consent and approval, to effectuate an assignment of that nature. PREPA had approved that assignment roughly three weeks prior to the termination notice. The duty, if one existed, to furnish information to the FOMB about the assignment was PREPA's. It failed there too.

Nothing about the bond and nothing about Power Expectations' ability to meet its contractual responsibilities changed in the days preceding termination. However, on August 14, 2026, the Oversight Board issued a press release announcing that it had revoked its approval of the contract, and directed PREPA to terminate. The FOMB also claimed to have referred the matter to law enforcement, because Enchanted Rock's parent company had accused Power Expectations of improperly signing the agreement on its behalf.

The accusation was baseless. Enchanted Rock had appointed Power Expectations as its exclusive agent in Puerto Rico on March 19, 2025, in a written agreement that was still in force on the date of execution, expressly authorizing Power Expectations to represent Enchanted Rock in bidding processes and tenders, and obligating Enchanted Rock to honor the commitments made within the scope of that authority. FOMB issued the press release without giving Power Expectations an opportunity to provide any explanation. It has still not been given one. Yet the accusation was published to the Island, and Power Expectations has lived with the reputational consequences ever since.

But accusations do not govern this case. PREPA's irregular conduct and the implications it raises should be the focus of the controversy. PREPA executed an agreement which omitted essential bond language and thereafter refused four written requests to complete it. PREPA also reviewed the Flotek assignment, and approved it in the exercise of the sole discretion the agreement afforded it. PREPA met with Power Expectations and its surety on August 14, 2026, and agreed to keep working on bond language. Yet curiously, four days later, it terminated the agreement precisely due to the absence of that bond language it refused to provide, and for the composition of a Seller group it had already approved. The termination was not prompted by either the bond language or the conduct of Power Expectations. The catalytic event that propelled termination was a public accusation by a stranger to this contract who caused PREPA to act on it. PREPA did act, on one day's notice, when the only provision permitting termination, absent a seller default, required ninety days' notice.

Power Expectations brings this action for breach of contract, for breach of PREPA's continuing warranty that it would secure and maintain every approval required under PROMESA and from the FOMB, for breach of the duty of good faith and fair dealing, and under the doctrine of one's own acts. A party cannot approve an assignment and then terminate despite the approval; it cannot negotiate bond language one week and rely on its absence the next; and cannot execute an exhibit promising a bond form, and after continued noncompliance, characterize the resulting gap an incurable default. Power Expectations also seeks a declaration of the parties' rights under the agreement, damages for the harm caused by PREPA's own conduct, and injunctive relief to keep the Aguirre project from being handed to someone else before this Court can decide whether its termination was lawful.

Power Expectations does not seek any preferential treatment. It seeks an opportunity to fulfill the promise it made to PREPA and the people of Puerto Rico. Power Expectations wants a

fair opportunity to post the bond it has been poised to provide since May. It seeks only to be positioned where it stood on August 17, 2026, when it was bound to a valid contract, ready to perform, and waiting on the information that only PREPA could provide. Puerto Rico still needs the stabilization that the 400 megawatts would bring, and Power Expectations is legally entitled to deliver them.

## II. PARTIES

1. Plaintiff POWER EXPECTATIONS, LLC ("Power Expectations" or "PE") is a limited liability company organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business at Marginal Villamar 9, Manzana CE, Local 1, Carolina, Puerto Rico 00979. Its Chief Operating Officer ("COO") is Landon Gallagher.

2. Defendant PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA") is a public corporation and instrumentality of the Commonwealth of Puerto Rico, with a physical address at 1110 Ave. Ponce de León, Edificio Neos, Piso 8, Ofic. 801, Santurce, Puerto Rico 00907. PREPA is the "Buyer" under the agreement at issue. Its Executive Director is Mary C. Zapata Acosta; its General Counsel and Director of Legal Affairs is Alexis G. Rivera Medina; and its Project Management Office Administrator is Jorge Cotto. PREPA is also a debtor in a pending case under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").

**<u>Other Related Entities, Government Actors and the Officials Involved (Not Parties)</u>**

3. Reyes Contractor Group, Inc. ("Reyes Contractor") is a Puerto Rico general contractor headquartered in Guaynabo, Puerto Rico, with audited financial statements bearing a clean opinion, an active federal SAM.gov registration, and certification as a minority-owned small business. Reyes Contractor is a signatory to the agreement at issue and a member of the Seller group.

4. Enchanted Rock, LLC ("Enchanted Rock") is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business at 1113 Vine Street, Suite 101, Houston, Texas 77002. Its holding company, ERock Inc. ("ERock"), completed an initial public offering and began trading on the New York Stock Exchange under the ticker "EROC" on June 10, 2026.

5. Flotek Industries, Inc. ("Flotek") is a corporation organized and existing under the laws of the State of Texas, with its principal offices at 5775 N. Sam Houston Parkway W., Suite 400, Houston, Texas 77086, and is publicly traded on the New York Stock Exchange under the ticker symbol "FTK." By Assignment and Assumption Agreement dated June 12, 2026, Flotek assumed Enchanted Rock's contractual role within the Seller group, and PREPA granted its express written consent to that substitution under Article XVI of the Power Purchase and Operating Agreement on July 31, 2026.

6. The Third-Party Procurement Office ("3PPO"), defined in Section 1.1 of the agreement as the office "established under the Puerto Rico Public-Private Partnerships Authority (P3A) to manage procurement related to Public-Private Partnerships, including this Agreement," is led by its President, Osvaldo Carlo Linares, Esq. 3PPO issued the solicitation, evaluated the proposals, made the qualification determination, drafted the agreement, and served throughout as the single, exclusive point of contact between the Seller group and the Government of Puerto Rico for RFP No. 3PPO-0314-20-TPG2.

7. The Puerto Rico Public-Private Partnerships Authority ("P3A") is the Commonwealth instrumentality under which 3PPO operates, with a physical address in 300 Avenida José de Diego, San Juan, Puerto Rico, 00911. Its Executive Director, who also serves as Energy Czar, is Josué A. Colón Ortiz. Its General Counsel is Lionel E. Santa-Crispín.

8. The Financial Oversight and Management Board for Puerto Rico (the "Oversight

Board" or "FOMB") is the federal entity created under PROMESA.

## III. JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction pursuant to Section 306(a)(2) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2166(a)(2), which grants the district courts "original but not exclusive jurisdiction of all civil proceedings arising under [Title III], or arising in or related to cases under [Title III]."

10. PREPA is a debtor in a pending debt-adjustment proceeding under Title III of PROMESA. This action is "related to" PREPA's Title III case because its resolution will necessarily determine and alter PREPA's contractual rights, liabilities, obligations, and freedom of action under the Power Purchase and Operating Agreement (Temporary Power Generation), Contract No. 2026-P00107 (the "PPOA"), and therefore has the potential to affect the administration of PREPA's Title III estate.[1]

11. PROMESA's automatic stay does not bar this action. The PPOA is a post-petition contract. It was solicited, negotiated, approved, executed, and administered years after the commencement of PREPA's Title III case, at the direction of PREPA's own regulator and in the ordinary course of PREPA's operations, and it was executed on June 10, 2026. Power Expectations asserts no pre-petition claim, seeks to recover no property of the estate, and seeks no payment on account of any pre-petition obligation. Every act and omission alleged herein occurred after execution. The stay of 11 U.S.C. § 362, as incorporated by Section 301(a) of PROMESA, 48 U.S.C. § 2161(a), does not reach claims arising from post-petition conduct under a post-petition agreement.

12. Nor does Section 305 of PROMESA, 48 U.S.C. § 2165, limit the relief sought. Power Expectations does not ask this Court to interfere with any property or revenues of PREPA,

[1] *See Luma Energy, LLC v. P.R. Elec. Power Auth. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 813 F. Supp. 3d 234, 249–50 (D.P.R. 2025).

or with PREPA's use or enjoyment of any income-producing property. Under the PPOA, PREPA has no payment obligation of any kind except for electric energy actually delivered, metered, accepted, and invoiced, and no minimum-take, minimum-generation, or make-whole obligation of any kind. The relief sought concerns the Parties' respective rights under a written instrument, whether a purported termination was effective, and would leave PREPA in precisely the position it occupied under an agreement it negotiated, executed, and administered.

13. Venue is proper in the United States District Court for the District of Puerto Rico pursuant to Section 307(a)(2) of PROMESA, 48 U.S.C. § 2167(a)(2), which provides that, with respect to a covered territorial instrumentality, venue is proper in "the district court for the territory in which the covered territorial instrumentality is located." PREPA is a public corporation and covered territorial instrumentality located in Puerto Rico.

14. Venue is also appropriate because the PPOA concerns the deployment and operation of temporary generation facilities in Puerto Rico, PREPA executed and terminated the PPOA in Puerto Rico, and a substantial part of the events and omissions giving rise to Power Expectations' claims occurred in this District.

## IV. FACTS

### A. Power Expectations and its Relationship with Enchanted Rock

15. Power Expectations is engaged in the development, structuring, and delivery of electric power generation projects in Puerto Rico, including the sourcing of generation equipment, the assembly of project financing and construction teams, and participation in governmental procurements for generation capacity.

16. Enchanted Rock is a Texas natural-gas power generation and microgrid company founded and led by W. Thomas McAndrew. At all times relevant, Enchanted Rock was in the

business of designing, manufacturing, and deploying natural gas-fueled distributed generation and microgrid systems.

17. Beginning in or about February 2025, Power Expectations and Enchanted Rock worked jointly to develop power generation proposals for Puerto Rico.

18. By March 2025, that collaboration had produced a series of priced equipment plans for an 800-Megawatt ("MW") generation program for the island.

19. On March 5, 2025, Power Expectations and Enchanted Rock entered into a Referral Agreement establishing the commission structure that would govern their commercial relationship.

20. On March 19, 2025, Power Expectations and Enchanted Rock executed a Memorandum of Understanding "[r]egarding Exclusive Agency Representation in Puerto Rico" (the "MOU"), effective the same date.

21. By the MOU, Enchanted Rock appointed Power Expectations as its exclusive agent and representative in Puerto Rico for the marketing, promotion, distribution, and sale of Enchanted Rock's products and services.

22. Enchanted Rock also agreed that during the MOU's term it would not appoint any other representative for Puerto Rico, establish its own sales or distribution presence there, or market its products or services there other than through Power Expectations.

23. Finally, and perhaps most importantly, the MOU authorized Power Expectations to solicit and negotiate contracts with customers in Puerto Rico and to represent Enchanted Rock in bidding processes, tenders, and other commercial opportunities in Puerto Rico, and obligated Enchanted Rock to honor commitments made by Power Expectations within the scope of that authority.

24. Power Expectations was therefore authorized, as of March 19, 2025, and at all times material to this action, to represent Enchanted Rock in the procurement conducted under Request

for Proposals 3PPO-0314-20-TPG2 and to negotiate on Enchanted Rock's behalf in connection with it.

25. The MOU had an initial term of two years from March 19, 2025, subject to automatic renewal, and was in force on June 10, 2026, the date the Agreement was executed.

26. Power Expectations' authority to act for Enchanted Rock in this transaction was therefore actual and written, conferred before the procurement began. That authority was also apparent, having been held out to 3PPO, to PREPA, to the PREB, and to the Oversight Board throughout fifteen months of procurement. And it was ratified by Enchanted Rock's own conduct: by Mr. McAndrew's written letter of support for the bid; by the financial commitment he signed on April 24, 2025 on Enchanted Rock Holdings LLC letterhead confirming support for the issuance of a $57,000,000 Bid Bond; by the joint site visit to Costa Sur in April 2025; by the program titled "Natural Gas Microgrid Delivery", prepared for Puerto Rico and presented to Power Expectations at Enchanted Rock's Houston headquarters in May 2025; and by the communications between the two companies' chief executives concerning execution logistics on or about June 2, 2026. At no time before June 10, 2026, did Enchanted Rock disclaim, limit, or revoke that authority.

## B. <u>Puerto Rico's Energy Emergency and the Parties' Participation in the Competitive Procurement the Energy Bureau Ordered (March – September 2025)</u>

27. In March 2025, following the failure of Aguirre Unit 1 and confronting an anticipated generation shortfall of approximately 700 to 850 MW, the Puerto Rico Energy Bureau ("PREB") directed PREPA to commence an expedited procurement for up to 800 MW of temporary generation, in order to stabilize the reliability of Puerto Rico's electric system.

28. PREB directed that the procurement be conducted by 3PPO, which is an independent office from PREPA.

29. 3PPO issued the first request for proposal ("TPG1"), No. 3PPO-0314-20-TPG, on March 25, 2025.

30. Power Expectations and Enchanted Rock sought to bid on the procurement designated TPG1.

31. Accordingly, Enchanted Rock's founder and CEO, W. Thomas McAndrew, signed a written letter of support for the bidding on TPG1.

32. As part of this process, on April 24, 2025, Mr. McAndrew signed a financial commitment on Enchanted Rock Holdings LLC letterhead, referencing TPG1 and confirming that Enchanted Rock Holdings would be fully supporting the issuance of the Bid Bond in the required amount of USD $57,000,000.

33. Power Expectations, Enchanted Rock and Reyes Contractor Group thereafter proceeded as a joint bidding group on TPG1 (the "Seller Consortium"), and were held out as such to 3PPO, to PREPA, to the PREB and to the Oversight Board throughout the procurement that followed.

34. Two executed instruments recite the terms of a Consortium Operating Agreement governing the Seller Consortium. The Broker Representation Agreement dated June 1, 2025 recites that a Consortium Operating Agreement was executed in connection with the emergency temporary power generation procurement, establishing a special purpose vehicle, and that Article 13 of that agreement, as amended and restated effective April 24, 2025, designates Power Expectations, LLC as "Managing Member and Principal Contractor," holding the primary contractual relationship with the government and any third party, and bearing responsibility for the overall management, coordination, compliance and execution of all obligations and activities related to the PPOA. The corporate resolution adopted by Power Expectations on June 2, 2026, recites the same allocation of authority.

35. Within the Seller Consortium, Reyes Contractor Group would be responsible for the construction phase required by TPG1.

36. To that end, in April 2025, representatives for Power Expectations and Enchanted Rock jointly toured the Costa Sur power plant, walking the access roads, the shoreline perimeter, and the disused tank farm together to gain a better understanding of PREPA's operations and what would be required of the Seller Consortium.

37. In May 2025, the Power Expectations team traveled to Enchanted Rock's Houston headquarters, where Enchanted Rock staff presented a program titled "Natural Gas Microgrid Delivery," prepared for Puerto Rico, and walked Power Expectations team through Enchanted Rock's microgrid operations center.

38. Ultimately, and for matters unrelated to Power Expectations' bid or ability to perform the required work, PREB cancelled TPG1.

39. 3PPO issued a new solicitation, RFP No. 3PPO-0314-20-TPG2 ("TPG2"), on July 15, 2025.

40. In response, the Seller Consortium submitted a combined technical and price proposal satisfying the RFP's mandatory-requirements checklist, sworn anti-corruption certifications, and background-authorization exhibits.

41. 3PPO evaluated the proposals, vetted the different bidders, and deemed the Seller Consortium qualified to meet the requirements of TPG2.

42. By Notice of Award dated September 5, 2025, 3PPO selected the Seller Consortium as the conditional awardee of 400 MW of temporary generation at the Aguirre facility.

43. Upon information and belief, the qualification determination under the RFP was made solely by 3PPO.

**C. <u>PREB's Approval</u>**

44. On November 26, 2025, PREPA submitted its proposed contract with the Seller Consortium to the PREB for regulatory approval (the "Proposed Contract").

45. On December 11, 2025, the PREB reviewed the Proposed Contract, approved the Seller Consortium's provision of 400 MW of temporary generation at the Aguirre site, and ordered PREPA to file the contract with the FOMB.

46. The obligation to place the proposed contract before the FOMB for its consideration and approval was, by regulatory order, PREPA's.

### D. <u>FOMB's Review and Approval Process (January 16-June 2, 2026)</u>

47. Although 3PPO issued its Notice of Award on September 5, 2025, PREPA did not submit the Proposed Contract to the FOMB for review under PROMESA § 204(b)(2) until January 16, 2026.

48. Power Expectations was not responsible for the delay and had no power or ability to accelerate the FOMB's review or approval of the Proposed Contract.

49. Between January 21, 2026, and March 26, 2026, the FOMB issued several requests for information to PREPA, 3PPO, and PREB in relation to the Proposed Contract.

50. Power Expectations cooperated fully in responding to those requests.

51. On May 8, 2026, the FOMB issued its conditional approval of the Proposed Contract.

52. The FOMB required revisions in three areas: (i) project execution and deployment; (ii) performance guarantees; and (iii) fuel structure and fixed-price assurances. Those conditions required, among other things, enforceable project milestones and reporting obligations, liquidated damages and termination remedies tied to commercial operation, and "a defined payment and performance bond structure."

53. On May 29, 2026, 3PPO, on behalf of PREPA, submitted the final execution version of the Proposed Contract incorporating the required revisions to the FOMB. That version identified all three entities that form part of the Seller Consortium as the "Seller": Power Expectations, Reyes Contractor, and Enchanted Rock.

54. On June 2, 2026, the FOMB approved the Proposed Contract for execution.

**E. <u>Execution of the Contract (June 10, 2026)</u>**

55. On or around June 2, 2026, Enchanted Rock's CEO was in communication with Power Expectations' CEO regarding the signature of the PPOA and logistics for execution.

56. However, a few days later, Enchanted Rock abruptly changed its tone and began expressing an unwillingness to proceed with the execution and performance of the Proposed Contract.

57. Upon information and belief, this was because Enchanted Rock's parent company, ERock Inc., was in the process of making an initial public offering and was planning to commence trading on the New York Stock Exchange on June 10, 2026.

58. Power Expectations then faced a choice: allow the PPOA to collapse, thereby abandoning its commitment to supply much needed backup power to Puerto Ricans desperately in need of energy stability, or exercise its authority under the MOU and proceed with its execution. Power Expectations chose to pursue the latter.

59. Prior to the signature, and pursuant to the authority conferred by the MOU with Enchanted Rock, the board of Power Expectations adopted a corporate resolution designating the signatories authorized to execute the contract with PREPA.

60. Power Expectations' corporate resolution designated Jobadiah Sinclair "Jhoby" Weeks as signatory on behalf of Enchanted Rock.

61. That corporate resolution was furnished to 3PPO with the understanding that it would reach PREPA. Power Expectations is unaware if it ever did.

62. On June 10, 2026, PREPA, as Buyer, and the Seller Consortium as Seller, executed the eighty-nine-page Power Purchase and Operating Agreement (Temporary Power Generation), Contract No. 2026-P00107, under RFP No. 3PPO-0314-20-TPG2 (the "PPOA").

**F. <u>The Terms of the PPOA</u>**

63. The PPOA allocated substantially every obligation, cost, and risk of the Project to the Power Expectations, and reserved to PREPA a payment obligation limited to energy actually delivered and accepted.

64. Section 13.3 of the PPOA, entitled "Seller Readiness Obligations," required the Seller to enter into all contracts necessary for the acquisition, lease, or use of the generation equipment; to secure all applicable federal, Commonwealth, and municipal permits, including environmental, interconnection, emissions, and operational approvals; to complete all site preparation, construction, mobilization, and installation activities; to execute all fuel supply, transportation, maritime logistics, port access, and bunkering arrangements; to ensure continuous fuel availability for full-load operation; and to coordinate all technical integrations with PREPA, Genera PR, and LUMA Energy.

65. Notably, Section 13.3 also provides that "[a]ll such readiness obligations **shall be performed at Seller's sole cost and risk**." (Emphasis ours).

66. In addition, the Seller bore all interconnection costs under Section 5.3; all fuel procurement, shipping, storage, and regasification costs under Section 2.4; the obligation to maintain availability levels or pay liquidated damages under Articles VI and VIII; the obligation to procure and maintain all insurance at its sole cost and expense under Article XXXVII; the obligation to indemnify PREPA, Genera PR, and LUMA under Section 9.1; and the obligation to

furnish performance security equal to one hundred percent of the projected construction-phase contract value under Exhibit C.

67. Article XVII of the PPOA placed all future regulatory risk on the Seller. It provides that if any change in applicable law, regulation, rule, directive, permit requirement, or governmental mandate occurs during the Term, "any resulting increase in the cost of performance, compliance, permitting, operation, labor, equipment, or fuel logistics shall be borne solely and exclusively by the Seller," that "[t]he Buyer shall have no obligation to adjust, increase, or modify the Contract Price," and that "[n]o pass-through of costs, surcharges, assessments, or additional fees shall be permitted."

68. PREPA, by contrast, guaranteed nothing. Not one penny.

69. Section 2.1 provides that "Buyer's obligation is limited to paying for metered and accepted kilowatt-hours" and that "[t]his Agreement does not impose any minimum-take requirement, minimum-generation requirement, or make-whole obligation." Section 5.6 provides that "[p]ayment to the Seller shall be based solely on actual power delivered." PREPA's own readiness obligations under Section 13.4 were qualified by a "commercially reasonable efforts" standard.

70. In other words, if PREPA opted not to purchase energy from Power Expectations, it would not have to pay a single cent pursuant to the PPOA.

71. The $5,886,720,000 figure appearing in Section 10.1 of the PPOA is not a committed sum. Section 10.1 states that such figures are "included solely to satisfy Puerto Rico Comptroller requirements and do not modify, limit, or expand any rights or obligations of either Party."

72. Section 13.1 further conditioned PREPA's payment obligations upon a validation the Seller could not procure. It provides that the classification of PREPA's payment obligations as

"Current Expenses" under the PREPA Trust Agreement and Title III of PROMESA "must be validated in writing by the legal and financial professionals designated by PREPA in its Title III proceeding and by the Oversight Board or their authorized designees," and that "[n]o payment shall become due until such written validation is delivered to the Parties."

73. Article XV of the PPOA, entitled "Termination," established the exclusive grounds and procedures for terminating the PPOA. Section 15.1 enumerates nine "Immediate Seller Events of Default" that arise "without opportunity to cure," including "(iv) assignment or transfer of this Agreement in violation of its terms" and "(vii) failure to maintain required insurance coverage, permits, licenses, or Performance Bond requirements."

74. Disapproval by the FOMB was not one of Section 15.1's enumerated bases for termination of the PPOA.

75. By its own terms, however, Section 15.1 applies only "[e]xcept to the extent excused under Section 2.5 or Article XII."

76. Section 2.5 of the PPOA provides that "Seller shall not be deemed in default … to the extent Seller demonstrates that a delay affecting a milestone under Exhibit G or achievement of COD was directly caused by: (i) Buyer's failure to timely provide required site access, interconnection coordination, approvals, information, governmental cooperation, or other actions expressly required to be provided by Buyer under this Agreement; [or] (ii) delays caused by Governmental Authorities under the direct control of the Commonwealth of Puerto Rico or Buyer …," subject to the Seller providing written notice within five Business Days after becoming aware of the delay and demonstrating continued diligent pursuit.

77. Section 15.2 enumerates "curable Seller Events of Default," including failure to comply with the milestone schedule set forth in Exhibit G and failure to provide required reporting information.

78. Upon such a default, PREPA "shall provide written notice describing the applicable deficiency," and the Seller has five business days to commence corrective action and thirty days to cure, with a further allowance where the default "is not reasonably capable of cure within such period" so long as the Seller "is diligently pursuing cure."

79. The PPOA's default provisions are asymmetrical. Nine categories of Seller conduct produce immediate termination without cure. PREPA, by contrast, may be deemed in default under Section 15.3 only upon failure to pay undisputed invoiced amounts or material breach of an express payment obligation, and only after thirty days' written notice and an opportunity to cure.

80. Section 15.5 sets out the exclusive grounds for termination. It provides that "[t]his Agreement may be terminated: (a) by mutual written agreement of the Parties; (b) by Buyer for convenience upon at least ninety (90) days' prior written notice to Seller; (c) by Buyer upon the occurrence of an uncured Seller Event of Default; (d) by Buyer upon the occurrence of an immediate Seller Event of Default under Section 15.1; (e) by Buyer if a Force Majeure Event continues for more than sixty (60) consecutive days …; or (f) by Seller solely upon the occurrence of an uncured Buyer Event of Default under Section 15.3."

81. Disapproval by the FOMB was not one of Section 15.5's enumerated bases for termination of the PPOA.

82. In fact, Section 15.5 does not authorize termination at the direction of any person or entity that is not a Party to the PPOA.

83. Section 15.9, entitled "Exclusive Termination Compensation," provides that upon termination for any reason "Buyer shall have no obligation to pay for any undelivered energy, unused capacity, future availability, stranded investment, financing costs, return on equity, demobilization costs, or lost profits," and that "Seller shall only be entitled to payment for electric

energy actually delivered, metered, accepted, and invoiced prior to the effective date of termination."

84. Power Expectations thus bore virtually all the risks associated with execution of the PPOA.

85. Article XVI of the PPOA, entitled "Novation and Assignment," expressly contemplated that the contractual position of a Seller party ***could be*** transferred to another entity. It provides that "[t]he Seller shall not assign, transfer, pledge, or otherwise convey any of its rights or obligations under this Agreement without the prior written consent of the Buyer, which may be granted, withheld, or conditioned in the Buyer's sole and absolute discretion."

86. Article XVI further provides that "[t]he Buyer may require the Seller to provide all documents necessary to evaluate any assignment request, including financial and legal assurances regarding the proposed assignee."

87. Article XVI therefore establishes a procedure for assignment rather than a prohibition of it. The Seller may assign, subject to the Buyer's written consent; the Buyer is entitled to whatever documentation it requires in order to evaluate the request; and the Buyer decides. Article XVI imposes no requirement that any assignment be submitted to, reviewed by, or approved by any entity other than the Buyer. This approval is also in Buyer's sole discretion.

88. Article XVI was reviewed and approved by the FOMB as part of its consideration of the Proposed Contract prior to the PPOA's execution.

89. PREPA also had the right to assign its interests under the PPOA, but, contrary to Power Expectations, PREPA did not need to seek Seller approval prior to doing so.

90. Article XIII of the PPOA contains PREPA's representations and warranties, which under Section 13.1 apply "as of the Effective Date and throughout the Term" — meaning they are continuing obligations, not one-time statements tied to signing. In that same section, PREPA —

as “a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico” — expressly represented and warranted that it had already obtained every required governmental, statutory, regulatory, and fiscal approval, including anything required under PROMESA, the Fiscal Agency and Financial Advisory Authority, the Oversight Board, and Title III.

91. Nothing in the PPOA imposes upon Power Expectations any obligation to submit the PPOA, or any amendment or modification of it, to the FOMB.

92. Article XXXVI, entitled “Contract Review Policy,” requires only that the Seller reaffirm its submission of the Seller Certification Requirement under Exhibit D. The obligation to obtain and maintain the approvals required under PROMESA and from the FOMB rested, by the express terms of Section 13.1, with PREPA.

### G. Enchanted Rock’s Withdrawal and the Substitution of Flotek (June 12 – July 31, 2026)

93. Upon execution of the PPOA, Power Expectations confronted a circumstance not of its making: it had executed a ten-year agreement with PREPA, and one of the three Seller parties had declined to proceed.

94. As set forth above, Article XVI of the PPOA permitted the transfer of a Seller party’s contractual position with PREPA’s prior written consent.

95. Power Expectations therefore set out to find a substitute capable of assuming Enchanted Rock’s role and to obtain PREPA’s consent to the substitution.

96. Power Expectations promptly secured a commitment from Flotek Industries, Inc. (“Flotek”), an NYSE-listed company with the technical capability to satisfy Enchanted Rock’s role under the Contract, as well as great standing in the energy industry, to assume Enchanted Rock’s interests and contractual position with respect to the PPOA.

97. To that end, on June 12, 2026, Power Expectations entered into an Assignment and Assumption Agreement by which Flotek assumed Enchanted Rock's interests and contractual position as it respects to the PPOA.

98. Power Expectations promptly submitted the proposed Assignment and Assumption to 3PPO for its consideration and approval.

99. Despite the Assignment and Assumption Agreement being pending approval, during this time, Power Expectations continued to fulfill its duties under the PPOA.

100. Specifically, between June 12, 2026, to June 22, 2026, Power Expectations participated in coordination meetings for Project Aguirre and submitted seven interconnection requests for information to PREPA, Genera PR, and Luma Energy. Additionally, its officials met with Luma Energy in person.

101. Furthermore, on July 12, 2026, Power Expectations filed with PREPA a 337-page Milestones Compliance Report. Clearly, Power Expectations was determined to comply with the Commercial Operation Date ("COD") under the PPOA, which was one hundred and fifty (150) days from execution, and set for November 7, 2026.

102. On June 16, 2026, 3PPO issued a request for information to Power Expectations concerning the proposed substitution of Enchanted Rock and the related Assignment and Assumption Agreement.

103. In this request, 3PPO advised Power Expectations that all communications in relation to the approval of the assignment to Flotek "must be directed exclusively to Mr. Alexis Rivera at PREPA" and included Mr. Rivera's information.

104. Ultimately, 3PPO recommended that PREPA approve the assignment.

105. On July 16, 2026, PREPA in turn issued to Power Expectations its own request for information concerning the proposed assignment. PREPA demanded "complete copies of all

communications, correspondence, requests, submissions, electronic mail communications, and any other documents exchanged with the 3PPO" relating to the proposed substitution of Enchanted Rock and the proposed inclusion of Flotek, and afforded five Business Days to respond.

106. Power Expectations responded to PREPA on July 20, 2026, by furnishing all the requested information.

107. PREPA's letter of July 16, 2026, is significant for a second reason. In it, PREPA defined the scope of its own review under Article XVI. PREPA advised Power Expectations that its review was "not limited to determining whether the procedural requirements for an assignment have been satisfied." PREPA stated that it "must also evaluate whether the proposed assignee possesses qualifications, technical capabilities, financial strength, operational experience, and resources that are at least equivalent to those of the original contracting party and whether the proposed substitution is otherwise consistent with the assumptions, representations, and evaluation criteria that formed the basis for the award of the RFP."

108. On July 29, 2026, PREPA, P3A, 3PPO (through Osvaldo Carlo), and Power Expectations held an in-person meeting at which multiple active project items were discussed, including the communication protocol.

109. At that meeting, PREPA and 3PPO directed Power Expectations to submit its request for consent to the Flotek reassignment directly to PREPA by email, with stakeholders copied, and represented to those present that the request would be approved two days later, on Friday, July 31, 2026.

110. PREPA made no mention during that meeting of the fact that it needed the FOMB's approval to validate the assignment in question.

111. Power Expectations complied that same evening, with its counsel transmitting the formal request to PREPA, PREPA's legal and finance personnel, 3PPO, and P3A.

112. By letter dated July 31, 2026, PREPA granted its written consent under Article XVI to the substitution of Flotek Industries, Inc. for Enchanted Rock within the Seller group.

113. PREPA's letter provides that its consent had been granted "[f]ollowing the Third-Party Procurement Office's (3PPO) evaluation of the proposed assignment and PREPA's receipt of its favorable recommendation, and upon completion of PREPA's review of the proposed transaction."

114. Power Expectations thus complied with every step Article XVI required of it. It secured a qualified substitute to provide the services Enchanted Rock had originally agreed to provide; it immediately disclosed the Assignment and Assumption Agreement to 3PPO; it responded to 3PPO's requests for information regarding the assignment; it submitted the assignment to PREPA for review and written consent; and it furnished the documentation PREPA demanded.

115. PREPA, on the other hand, exercised the discretion Article XVI conferred on it by reviewing and approving the assignment to Flotek.

116. Eighteen days after granting that consent, PREPA terminated the PPOA in part because non-party FOMB had reached the opposite conclusion on the matter of the assignment.

117. PREPA has never identified any representation in the Seller's consent request that was inaccurate, incomplete, or false. It has never contended that its own review of July 31, 2026, was deficient. And it has never explained how a non-party's conclusion upon a question the Agreement committed to PREPA's "sole and absolute discretion" could displace the answer PREPA itself had given.

### H. The Performance Security Bond

118. Section C.1 of Exhibit C to the PPOA required Power Expectations to deliver an irrevocable standby letter of credit or on demand performance bond in an amount equal to one hundred percent (100%) of the projected construction-phase contract value ($1,180,000,000).

119. Exhibit C of the PPOA is captioned "FORM OF PERFORMANCE BOND." Section C.6 of that exhibit, entitled "Bond," reads in its entirety: "PERFORMANCE BOND TO BE ATTACHED."

120. But no form, no bond text, and no attachment follows. Page 53 simply ends in a blank space. The exhibit, drafted by 3PPO and presumably intended to carry the operative wording of a $1.18 billion instrument, was executed with the wording omitted.

121. Since May 28, 2026, thirteen (13) days before the PPOA was executed, Power Expectations had already engaged Skyscraper Insurance to begin arranging the performance security that was expected to be required.

122. On July 9, 2026, through counsel, Power Expectations delivered a Formal Notice of Delay to PREPA advising that the sureties had informed them that the security could not be issued until PREPA had formally approved the assignment and assumption to Flotek and requesting an extension of five (5) business days after that approval to submit the security.

123. On July 21, 2026, Power Expectations, through counsel, delivered a supplemental notice to PREPA under Section 2.5 of the PPOA and copied to P3A, PREPA's Legal Affairs Director, and Genera PR. The notice stated that the surety "cannot finalize or issue the Performance Security without that information," and also requested, in numbered terms, that PREPA "provide the Form of Performance Bond, or the exact bond text, intended to be attached to Exhibit C, Section C.6."

124. After ten (10) days, on July 31, 2026, PREPA answered that Section C.6 "is not a placeholder" and that the PPOA "does not impose any obligation on Buyer to draft or provide a form" and did not provide Power Expectations with the bond text.

125. Between August 4 and August 6, 2026, Skyscraper Insurance confirmed that underwriting of the construction-phase security was in progress and reached out to PREPA to hash out details regarding this phase.

126. On August 10, 2026, PREPA declared an immediate Seller Event of Default under Section 15.1 of the PPOA for failure to deliver the very instrument that the unanswered requests from Skyscraper Insurance concerned.

127. On August 13, 2026, Power Expectations, through CJO & Co., delivered to PREPA a signed letter-of-credit commitment and the paperwork needed to finalize it, needing only PREPA to supply two items: the required bank language and its beneficiary bank details. PREPA supplied neither and never responded.

128. On August 14, 2026, four (4) days after PREPA had declared a Seller Event of Default, the Parties convened a working conference call concerning the performance security. The participants included 3PPO, PREPA's Legal Affairs Director, PREPA's outside counsel, P3A's General Counsel, Skyscraper Insurance, Flotek, Reyes Contractor Group, and Power Expectations.

129. On that call, Power Expectations and its surety broker explained that Exhibit C was captioned as a form of performance bond but contained no bond text; that sureties do not issue an instrument of this magnitude without being clear on the operative wording, because the obligations enforceable against the surety are those stated in the bond text itself; and that the letter-of-credit alternative required PREPA to supply operative bank language and its beneficiary bank details, which PREPA had not provided.

130. Stated differently, PREPA needed to provide crucial information before the bond could be issued.

131. PREPA engaged with Skyscraper and Power Expectations and appeared open to issuing the requested information in order to facilitate the bond.

132. The call ended with the Parties in agreement that they would continue working together toward acceptable bond language, and Power Expectations reasonably understood from that exchange that the instrument remained capable of being placed and that the Agreement remained in force.

**I. <u>The Termination Notice</u>**

133. While Power Expectations was diligently complying with its obligations under the PPOA and working with PREPA to sort out the issues with the performance bond, and without prior notice to Power Expectations of any kind, the FOMB issued a media release on August 14, 2026, announcing that "its members voted to revoke the approval of the [PPOA]" and directing PREPA to terminate the PPOA, and referring the contract issues to law enforcement authorities.

134. Per the press release, the FOMB made this determination "following a statement by ERock Inc." — the holding company of Enchanted Rock — that its corporate name and signature had been used without its authorization. The FOMB identified no other basis for the vote.

135. Power Expectations was unaware of the allegations against it that were referred in the FOMB's press release and was not afforded the opportunity to address such allegations. Power Expectations learned of the FOMB's action from the press.

136. To this date, Power Expectations has not received from 3PPO, PREPA, the FOMB or any involved entity, any formal notice of the supposed fraud allegations against it and no opportunity of any kind to be heard.

137. Had the allegation been tested, it would not have survived a reading of the Seller's own governing documents.

138. The allegation referred to P3A and 3PPO, and later announced by the FOMB, was that Enchanted Rock's corporate name and signature had been used without its authorization. The written record establishes that Enchanted Rock had authorized Power Expectations to act for it in exactly this transaction.

139. The March 19, 2025, Memorandum of Understanding, still in force when the PPOA was executed, made Power Expectations Enchanted Rock's exclusive agent in Puerto Rico, expressly authorized it to represent Enchanted Rock in bidding processes and to negotiate the resulting contracts, and obligated Enchanted Rock to honor the commitments Power Expectations made within that authority.

140. No entity — not P3A, not 3PPO, not the FOMB, and not PREPA — requested these documents from Power Expectations before the PPOA was revoked and terminated. P3A and 3PPO had held the allegation since June 16, 2026, and had two months in which to ask.

141. However, the FOMB's stated basis for its revocation of its approval of the PPOA materially shifted.

142. On August 18, 2026, Power Expectations wrote a letter to 3PPO formally objecting to the apparent revocation of the PPOA and the denial of the due process for such action.

143. 3PPO, in a separate but related letter, echoed the due process concerns raised by Power Expectations in their response.

144. Nevertheless, that same evening of August 18, 2026, PREPA's Executive Director signed and transmitted to Power Expectations a Notice of Termination of the PPOA on two separate grounds.

145. The first ground was, supposedly, the Seller's failure to furnish the performance security required by Section C.1 of Exhibit C, characterized as an Immediate Seller Event of Default under Section 15.1 authorizing termination under Section 15.5(d).

146. The second ground was that the FOMB had revoked its approval of the PPOA due to Power Expectations assignment of Enchanted Rock's interest to Flotek and expressly directed PREPA to terminate it.

147. PREPA's termination of the PPOA came eighty-one (81) days before the contractual Commercial Operation Date of November 7, 2026.

148. On August 14, 2026, the FOMB told the public that it had acted following ERock's statement that its name and signature were used without authorization, and that the procurement was on that account "irreparably impaired." The accusation was the announced ground.

149. By August 17, 2026, the FOMB's letter no longer rested on that accusation. It rested on the proposition that the Seller "as presently constituted" no longer satisfied the qualification basis for approval, a conclusion the FOMB stated held "[e]ven on the assumption that Enchanted Rock/ERock validly signed and later withdrew from the Contract."

150. By August 20, 2026, the FOMB's counsel confirmed in writing that the FOMB "did not adjudicate Enchanted Rock/ERock's allegations or make a finding of fraud against Power Expectations."

151. The ground announced to the public on August 14, 2026, was thus recast within three days into a decision made because of Power Expectations' agreement with Flotek. But the public accusation of fraud was never withdrawn, corrected, or explained.

152. Upon information and belief, the FOMB's August 14, 2026, press release and its vote to revoke approval of the PPOA were premised on ERock's alleged statements that its name and signature had been used without authorization.

153. Upon information and belief, after the press release, the FOMB conferred with 3PPO and learned that the fraud allegations were unfounded based on the agreements between Enchanted Rock and Power Expectations. It nonetheless ordered PREPA on August 17, 2026, to terminate the PPOA, this time on pretextual grounds.

**J. Power Expectations did not breach the PPOA.**

154. Upon review, neither ground recited in PREPA's Notice of Termination withstands examination.

155. As to the performance security, PREPA declared an Immediate Seller Event of Default on August 10, 2026, in relation to this matter, but did not terminate the PPOA.

156. PREPA instead spent the following days working with Power Expectations and its surety broker on the terms of the performance bond.

157. On the August 14, 2026, conference call, PREPA was receptive to the Seller's concerns and the Parties agreed to continue working toward mutually acceptable bond language.

158. Power Expectations met its deliverables in that process.

159. Proposed bond language and a five-tranche structure were submitted to PREPA on August 6, 2026; a revised cost basis was submitted on August 11, 2026; obligee-acceptance and Exhibit C clarification materials were submitted on August 12, 2026; and written confirmation of surety capacity to issue the required $236 million tranche was obtained on August 14, 2026.

160. The sequence is undisputed. On August 10, 2026, PREPA declared an Immediate Seller Event of Default premised upon the absence of the performance security, and did not terminate. On August 11, 12, and 13, 2026, the Seller submitted a revised bond cost basis, obligee-acceptance and Exhibit C clarification materials, and a signed letter-of-credit commitment with term sheet requiring only that PREPA supply the operative MT760 language and its beneficiary bank details. On August 14, 2026, PREPA's Legal Affairs Director, PREPA's outside counsel,

P3A's General Counsel, 3PPO, Skyscraper Insurance, Flotek, Reyes Contractor Group, and Power Expectations conferred, and the Parties agreed to continue working toward mutually acceptable bond language. Later that same day, the Oversight Board issued its media release. On August 17, 2026, the Oversight Board directed PREPA to terminate. On August 18, 2026, PREPA terminated effective immediately.

161. Nothing concerning the performance bond changed between August 14 and August 18, 2026. The only intervening event is that, on August 17, 2026, the FOMB directed PREPA to terminate. PREPA terminated the following day, four days after agreeing to keep working on the bond.

162. The performance security did not issue because PREPA withheld information that only PREPA could supply.

163. Exhibit C is titled "FORM OF PERFORMANCE BOND," and Section C.6 consists of the notation "PERFORMANCE BOND TO BE ATTACHED." No form of bond was attached to the executed PPOA, and none was ever furnished.

164. PREPA likewise withheld the MT760 language and beneficiary bank details that the letter-of-credit alternative required. Power Expectations requested these materials in writing on July 9, July 21, August 6, and August 13, 2026. PREPA declined to provide them.

165. Section 15.1 applies only "[e]xcept to the extent excused under Section 2.5." Section 2.5 excuses precisely a delay "directly caused by … Buyer's failure to timely provide required … approvals, information, governmental cooperation, or other actions expressly required to be provided by Buyer."

166. PREPA therefore terminated for a default that PREPA's own omissions made impossible to perform.

167. Independent of Section 2.5, PREPA may not found a default upon a condition its

own conduct prevented. Rights must be exercised and duties fulfilled in accordance with the requirements of good faith. A party may not demand performance of an obligation while withholding information that obligation requires; may not invoke the non-occurrence of a condition it has itself rendered impossible; and may not, having failed to perform its own correlative obligation, exact performance from the other. PREPA required the Seller to deliver an instrument whose operative terms only PREPA could supply, declined to supply them across four written requests, and then terminated for that instrument's absence.

168. As to the FOMB's direction, Section 15.5 of the PPOA enumerates the exclusive grounds for termination, and none authorize termination at the direction of a person or entity that is not a Party.

169. The FOMB is not a Party to the PPOA. The FOMB has said as much itself.

170. The only provision permitting PREPA to terminate absent a Seller default is Section 15.5(b), which required at least ninety (90) days' prior written notice. PREPA gave none. It gave one day.

171. Nor does the premise of the FOMB's direction survive examination. The FOMB revoked its approval on the ground that the Seller "as presently constituted" no longer satisfied the qualification basis on which approval had been granted. The Seller was so constituted because PREPA made it so.

172. On July 31, 2026, PREPA consented in writing to the substitution of Flotek for Enchanted Rock, in the exercise of the "sole and absolute discretion" that Article XVI of the PPOA reserved to PREPA alone. PREPA did so after receiving 3PPO's favorable recommendation and completing its own review.

173. Article XVI was not a provision unknown to the FOMB. It appeared in the PPOA that the FOMB reviewed, conditionally approved on May 8, 2026, and approved for execution on June 2, 2026.

174. If the substitution of Flotek for Enchanted Rock was a material change requiring the FOMB's prior approval, the obligation to obtain that approval was PREPA's and not Power Expectations'. But it is illogical that the FOMB would consent to an assignment clause that only requires PREPA's consent only to later demand that any assignment be previously vetted by the board.

175. Power Expectations was not the submitting party. It had no contractual or statutory channel through which to seek the FOMB's approval, and could not have obtained that approval had it attempted to do so.

176. PREPA's reliance upon the Oversight Board's direction was unreasonable for the further reason that Section 204(b)(2) of PROMESA, 48 U.S.C. § 2144(b)(2), authorizes the Oversight Board to review a proposed contract and to prevent its execution. Power Expectations does not, by this action, seek review of the Oversight Board's determination. It alleges only that PREPA, a sophisticated party, represented by counsel, which had itself warranted under Section 13.1 that all approvals required under PROMESA had been obtained, could not reasonably treat a post-execution direction from a non-party as displacing the exclusive termination grounds the Parties had themselves agreed upon in Article XV.

177. In doing so, PREPA elected to breach its obligations to Power Expectations.

178. Power Expectations did everything that was required of it under the PPOA.

179. Article XVI required the Seller to request PREPA's prior written consent to the assignment. Power Expectations requested that consent, and on July 31, 2026, PREPA granted it.

180. The PPOA was thus terminated because the FOMB disapproved of PREPA exercising its contractual discretion, previously approved by the FOMB, in approving an assignment.

181. Upon information and belief, the grounds recited in PREPA's Notice of Termination were advanced as a pretext to cure the FOMB's misguided press release publicizing unverified and meritless allegations of fraud.

182. Moreover, throughout the contractual process, PREPA and 3PPO represented to Power Expectations that they possessed every governmental approval necessary to make the decisions they were making, including the consent to substitute Flotek for Enchanted Rock.

183. However, it is Power Expectations that is facing the consequences of its agreement being terminated through no fault of its own. That is not termination for cause.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION: BREACH OF CONTRACT

184. The allegations in the preceding paragraphs are incorporated by reference.

185. Under Puerto Rico law, a claim for breach of contract requires: "(1) a valid contract; (2) a breach by one of the parties to the contract; and (3) resulting damages." *Yacht Caribe Corp. v. Carver Yacht LLC*, 270 F. Supp. 3d 547, 555 (D.P.R. 2017); see also *Mega Media Holdings, Inc. v. Aerco Broad. Corp.*, 852 F. Supp. 2d 189, 199–200 (D.P.R. 2012); *Unisys P.R., Inc. v. Ramallo Bros. Printing, Inc.*, 128 D.P.R. 842 (1991).

186. Under the Puerto Rico Civil Code, a contract is perfected when the parties manifest their consent as to its object and cause. 31 L.P.R.A. § 9771. Accordingly, the essential requirements of a valid contract are the parties' consent, a definite object, and cause for the obligations undertaken. See *Yacht Caribe Corp.*, 270 F. Supp. 3d at 555; *Soto v. State Indus. Prods., Inc.*, 642 F.3d 67, 72–73 (1st Cir. 2011).

187. Once formed, the parties' agreement is binding upon them. Article 1233 of the Puerto Rico Civil Code expressly provides that "[w]hat is agreed in contracts has the force of law between the parties." 31 L.P.R.A. § 9754. Correspondingly, the First Circuit has long recognized that contractual obligations "have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." *Markel Am. Ins. Co. v. Díaz-Santiago*, 674 F.3d 21, 31 (1st Cir. 2012) (internal quotations and citations omitted).

188. The terms of the parties' agreement govern where they are clear and unambiguous. Under Article 354 of the Puerto Rico Civil Code, "[i]f the terms of a bilateral juridical act are clear and leave no doubt as to the intention of the parties, the literal meaning of its words shall be observed." 31 L.P.R.A. § 6342; see also *Markel Am. Ins. Co.*, 674 F.3d at 31.

189. A party breaches a contract when it fails to comply with the contractual obligations it undertook. See *Markel Am. Ins. Co.*, 674 F.3d at 31 ("Where a party fails to uphold or abide by the contract's essential obligations, such failure will be deemed a breach of the contract."). Consistent with that principle, Article 1158 of the Puerto Rico Civil Code provides that a person who contravenes the tenor of an obligation must compensate the damages and losses caused by that noncompliance. 31 L.P.R.A. § 9303.

190. Accordingly, "[w]hen the breach of a contractual obligation causes harm to any of the contracting parties, an action for damages for breach of contract lies." *Redondo Constr. Corp. v. Izquierdo*, 929 F. Supp. 2d 1, 12 (D.P.R. 2012) (quoting *Soc. de Gananciales v. Vélez & Asoc.*, 145 D.P.R. 508 (1998)); see also *Markel Am. Ins. Co.*, 674 F.3d at 31.

191. Puerto Rico law permits recovery of damages caused by the breach, including damages that were foreseen or reasonably foreseeable when the obligation was undertaken. 31 L.P.R.A. §§ 9303, 9331–9332.

192. The PPOA constitutes a valid and binding contract between PREPA and the Seller Consortium. It was the product of the competitive procurement conducted by 3PPO, received the required regulatory and fiscal approvals, and was validly executed by PREPA and the Seller parties on June 10, 2026.

193. Power Expectations, for its part, diligently and substantially performed and pursued performance of its obligations under the PPOA. When Enchanted Rock withdrew from the project, Power Expectations promptly secured Flotek Industries, Inc. as a substitute, disclosed the substitution to 3PPO five days after execution of the Assignment and Assumption Agreement, submitted the assignment for PREPA's review, and obtained PREPA's express written consent pursuant to Article XVI of the PPOA.

194. Power Expectations likewise diligently and continuously pursued the performance security required by Section C.1 of the PPOA. It engaged Skyscraper Insurance to begin arranging the required security thirteen days before the PPOA was executed and continued working with its surety representatives throughout the deployment period to obtain and deliver the required instrument.

195. PREPA nevertheless purported to terminate the PPOA, effective immediately, on August 18, 2026, on two purportedly "separate and independent" grounds: first, the Seller's alleged failure to furnish the performance security; and second, the FOMB's revocation of its prior approval and direction that PREPA terminate the PPOA.

196. Neither ground authorized PREPA to terminate the PPOA in the manner it did.

197. As to the FOMB revocation, Section 15.5 of the PPOA expressly identifies the circumstances under which PREPA may terminate the Agreement. Those circumstances include termination for convenience upon ninety days' prior written notice, termination following an uncured Seller Event of Default, termination upon an immediate Seller Event of Default under

Section 15.1, and termination following certain prolonged Force Majeure Events. A subsequent revocation from the FOMB is not among the contractual grounds for termination.

198. The PPOA further confirms that the risk of obtaining the governmental and fiscal approvals necessary to enter into the Agreement had already been addressed. In Section 13.1, PREPA expressly represented that it "has obtained all required governmental, statutory, regulatory, and fiscal approvals under applicable law, including approvals required under PROMESA, the Fiscal Agency and Financial Advisory Authority, the FOMB, and any applicable Title III requirements."

199. PREPA therefore could not convert the FOMB's subsequent revocation of an approval that PREPA had expressly represented was already obtained into an immediate termination right that the PPOA itself does not provide. If PREPA wished to terminate the Agreement in the absence of a contractual default, Section 15.5 provided a mechanism to do so for convenience upon ninety days' prior written notice. PREPA did not invoke or comply with that provision.

200. Independently, PREPA's own reliance on the FOMB's revocation as a basis for termination confirms that PREPA breached its continuing representation and warranty under the PPOA's Section 13.1. Section 13.1 provides that each Party "represents and warrants, as of the Effective Date and throughout the Term," that PREPA had "obtained all required governmental, statutory, regulatory, and fiscal approvals under applicable law, including approvals required under PROMESA, the Fiscal Agency and Financial Advisory Authority, the Oversight Board, and any applicable Title III requirements."

201. Because this representation was made on a continuing basis "throughout the Term," PREPA's own treatment of the FOMB's August 14, 2026, revocation as terminating its authority

to perform necessarily reflects that PREPA no longer possessed the very approvals it warranted itself to hold.

202. This constitutes a separate and independent breach of Section 13.1, apart from PREPA's wrongful termination of the PPOA.

203. Power Expectations and its representatives repeatedly sought from PREPA the operative language and information necessary to finalize the required performance security. Those requests included the form of performance bond or exact bond text contemplated by Exhibit C, as well as the MT760 language and beneficiary banking information required for the alternative standby letter of credit. Despite those repeated requests, PREPA never supplied the requested language or information.

204. Here, the Seller's inability to deliver the performance security did not result from inaction by Power Expectations. The PPOA, as drafted by 3PPO, included an Exhibit C expressly captioned "FORM OF PERFORMANCE BOND," yet Section C.6—entitled "Bond"—contained only the words "PERFORMANCE BOND TO BE ATTACHED," with no bond form, operative language, or attachment following it.

205. Moreover, by July 9, 2026, PREPA had been advised in writing by the Seller's counsel that the sureties could not issue the required security until PREPA formally approved the substitution of Enchanted Rock with Flotek. Power Expectations therefore requested PREPA's consent under Article XVI and an extension tied to that approval. PREPA did not grant its consent until July 31, 2026.

206. Power Expectations and its representatives also repeatedly sought the information and operative language required by the surety market to issue the security. On July 21, 2026, counsel expressly requested that PREPA provide the form of performance bond or exact bond text

intended to accompany Section C.6. PREPA did not respond for ten days and, when it finally did so, refused to provide any bond text.

207. The Seller's efforts nevertheless continued. Its surety broker proposed a structure that would maintain the full $1.18 billion security requirement through multiple bonds, and Power Expectations also secured an alternative standby-letter-of-credit commitment. PREPA did not respond to the proposed bond structure and did not provide the operative information necessary to finalize the standby letter of credit before declaring default and terminating the PPOA.

208. Even after incorrectly declaring default on August 10, PREPA continued working with Power Expectations and its surety representatives regarding the terms and issuance of the performance security, including during the parties' August 14, 2026, conference call. PREPA nevertheless terminated the PPOA four days later, in part, purportedly due to the absence of the very security the parties were still actively working to finalize.

209. Under these circumstances, PREPA was not entitled to invoke the Seller's non-delivery of the performance security as a basis for immediate termination while disregarding its own role in delaying or impeding the issuance of that security.

210. Section 2.5 of the PPOA expressly provides that Seller "shall not be deemed in default…to the extent Seller demonstrates that a delay affecting a milestone under Exhibit G or achievement of the COD was directly caused by…Buyer's failure to timely provide approvals, information, governmental cooperation, or other actions expressly required to be provided by Buyer under this Agreement."

211. Power Expectations' inability to ultimately deliver the performance security in a form acceptable to PREPA was directly caused by PREPA's own failure to provide the bond form, operative bond text, and other beneficiary banking information necessary for Power Expectations' sureties to issue the required instrument.

212. Under Section 2.5, that failure excuses Power Expectations from any resulting default. PREPA's declaration of a Seller Immediate Event of Default on August 10, 2026, and its termination of the PPOA on that basis, therefore independently breached Section 2.5.

213. PREPA therefore breached the PPOA by terminating it without a valid contractual basis and by failing to honor the rights and obligations established by the Agreement.

214. In addition, the FOMB's revocation of its approval is not identified among the exhaustive grounds for termination in Section 15.5 of the PPOA, rendering PREPA's termination a breach of the PPOA, regardless of whether the first ground was otherwise justified.

215. As a direct and foreseeable result of PREPA's breach, Power Expectations has suffered and continues to suffer damages and losses in an amount to be established at trial, including all damages and other relief recoverable under the PPOA and Puerto Rico law.

**WHEREFORE**, Power Expectations respectfully requests that this Court enter judgment against PREPA for breach of contract, declare that PREPA's termination of the PPOA was invalid and without any basis recognized under the Agreement, order the PPOA's reinstatement and award Power Expectations all damages recoverable under the PPOA and Puerto Rico law together with pre- and post-judgment interest, costs, and any equitable relief the Court deems appropriate, and grant such other and further relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION: BREACH OF SECTION 13.1 (CONTINUING REPRESENTATIONS AND WARRANTIES)**

216. The allegations in the preceding paragraphs are incorporated by reference.

217. Section 13.1 of the PPOA provides that PREPA's representations and warranties are made "as of the Effective Date and throughout the Term". They are continuing obligations. They are not one-time statements exhausted at signature.

218. Among those continuing representations and warranties, PREPA — as "a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico" —

represented and warranted that it "has obtained all required governmental, statutory, regulatory, and fiscal approvals under applicable law, including approvals required under PROMESA, the Fiscal Agency and Financial Advisory Authority, the FOMB, and any applicable Title III requirements".

219. By that warranty PREPA allocated to itself, as between the Parties, the risk that a required approval would be absent, withdrawn, or would cease to exist during the Term. That allocation was deliberate, and it was the counterpart to the allocation imposed upon the Seller. The Seller bore every cost, execution, permitting, interconnection, fuel, insurance, indemnity, and regulatory-change risk under Section 13.3 and Article XVII, expressly "at Seller's sole cost and risk". PREPA bore the governmental approvals that PREPA alone controlled, PREPA alone could obtain, and PREPA alone was ordered by the PREB to procure.

220. Nothing in the PPOA imposed upon Power Expectations any obligation to obtain, maintain, or preserve the Oversight Board's approval. Power Expectations was not the submitting party, had no contractual or statutory channel through which to address the Oversight Board, and could not have obtained or preserved that approval had it attempted to do so. Article XXXVI required of the Seller only the reaffirmation of its Seller Certification Requirement under Exhibit D.

221. On August 14, 2026, the Oversight Board revoked its approval of the Agreement. On that date PREPA's continuing representation and warranty under Section 13.1 failed.

222. The failure of a continuing warranty is a breach by the party that gave it. It is not a default by the counterparty to whom it was given. PREPA responded to the failure of its own warranty by terminating the Agreement of the party to whom that warranty ran, four days later, without notice, without cure, and without any of the grounds Section 15.5 requires. The party that warranted an approval cannot shift to its counterparty the consequence of that approval's loss.

223. As a direct and foreseeable result of PREPA's breach of Section 13.1, Power Expectations has suffered and continues to suffer damages and losses in an amount to be established at trial, together with all further relief recoverable under the PPOA and Puerto Rico law.

224. Accordingly, Power Expectations is entitled to judgment against PREPA for breach of Section 13.1 of the PPOA, together with all damages, declaratory and equitable relief, costs, and other remedies available under the PPOA and applicable law.

**WHEREFORE**, Power Expectations respectfully requests that this Court enter judgment against PREPA for breach of Section 13.1 of the PPOA, declare that the representations and warranties contained therein were continuing obligations of PREPA throughout the Term and that PREPA breached them, declare that the failure of an approval PREPA warranted it had obtained and would maintain does not constitute a Seller Event of Default and afforded PREPA no ground to terminate the PPOA, order the PPOA's reinstatement, and award Power Expectations all damages recoverable under the PPOA and Puerto Rico law together with pre- and post-judgment interest, costs, and any equitable relief the Court deems appropriate, and grant such other and further relief as the Court deems just and proper.

## THIRD CAUSE OF ACTION: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

225. The allegations in the preceding paragraphs are incorporated by reference.

226. Good faith is a fundamental requirement governing the exercise of contractual rights and the performance of contractual obligations under Puerto Rico law. Article 15 of the Puerto Rico Civil Code provides that "[r]ights must be exercised and duties must be fulfilled in accordance with the requirements of good faith." 31 L.P.R.A. § 5334. More specifically, Article 1062 provides that both the debtor and the creditor "must act in good faith in the performance of the obligation." 31 L.P.R.A. § 8983.

227. Consistent with these principles, Puerto Rico law recognizes an implied covenant of good faith and fair dealing in contractual relationships. See *Cantellops v. Álvaro-Chapel*, 234 F.3d 741, 744 (1st Cir. 2000). The duty applies to the performance and enforcement of contractual obligations and requires that the parties exercise their contractual rights in a manner consistent with the purposes of their agreement and the legitimate expectations arising from their contractual relationship. See *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 108–09 (1st Cir. 2001); *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 12 (1st Cir. 2002).

228. Good-faith performance requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Adria Int'l*, 241 F.3d at 108 (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). The obligations imposed by good faith therefore depend upon the particular contractual relationship, the terms of the parties' agreement, and the purpose the parties intended that agreement to accomplish. See *Century Packing Corp. v. Giffin Specialty Equip. Co., LLC*, 438 F. Supp. 2d 16, 26 (D.P.R. 2006).

229. Whether a party has violated its duty of good faith is determined in light of the totality of the circumstances surrounding the parties' contractual relationship. *New Comm Wireless*, 287 F.3d at 12. Because "the ethical content of each act must be examined in the light of its particular circumstances," the inquiry does not consider the challenged conduct in isolation. *Id.* Rather, liability may arise where, considering all of the surrounding circumstances, a party's conduct is "arbitrary, deceitful, or animated by some improper purpose." *Id.*

230. Accordingly, the fact that a party purports to act pursuant to a right conferred by the contract does not end the inquiry. Contractual rights themselves must be exercised in good faith. See 31 L.P.R.A. § 5334. Thus, the exercise of an otherwise existing contractual right may violate the duty of good faith when undertaken in a manner inconsistent with the agreement's common purpose, the justified expectations created by the parties' relationship, or the

requirements of fair dealing. See *Adria Int'l*, 241 F.3d at 108–09; *New Comm Wireless*, 287 F.3d at 12.

231. The PPOA created a binding contractual relationship between PREPA and the Seller Consortium that was subject to these duties of good faith and fair dealing. PREPA was therefore required not only to comply with the express provisions of the PPOA, but also to administer and enforce those provisions in a manner consistent with the Agreement's purposes and the justified expectations created by the parties' course of performance.

232. Power Expectations diligently pursued performance of its obligations under the PPOA. When Enchanted Rock withdrew from the project, Power Expectations promptly secured Flotek Industries, Inc. as a substitute, disclosed the substitution to the Government, provided the information requested concerning the proposed assignment, and sought PREPA's written consent pursuant to Article XVI.

233. PREPA, in turn, undertook a substantive review of the proposed substitution. It requested and received information concerning the transaction, obtained 3PPO's favorable recommendation, completed its own review, and, on July 31, 2026, expressly consented to Flotek's assumption of Enchanted Rock's contractual role. PREPA stated that its consent was granted in reliance upon the July 29 request, the Assignment Agreement, the materials furnished during 3PPO's evaluation, and the due-diligence process. PREPA has never identified any representation made by Power Expectations in obtaining that consent as inaccurate, incomplete, or false.

234. PREPA's administration of the performance-security requirement failed to comport with the requirements of good faith and fair dealing. Power Expectations began arranging the required security before execution of the PPOA and repeatedly sought to complete that process. Yet the Government-drafted Exhibit C, captioned "FORM OF PERFORMANCE BOND," contained no bond form or operative bond language, and Power Expectations and its

representatives repeatedly sought from PREPA the language and information necessary to finalize the required security. Power Expectations reasonably informed PREPA of the issue and expected PREPA to furnish the required language for the issuance of the security.

235. PREPA was also advised in writing that the surety could not issue the required security until PREPA approved the substitution of Enchanted Rock with Flotek. PREPA did not grant that consent until July 31, 2026. Its own subsequent Notice of Seller Event of Default acknowledged that, following that consent, "additional time was afforded to allow the current Seller group to jointly arrange and obtain the required bond."

236. During that additional period, Power Expectations and its surety representatives continued actively pursuing the required security. They requested the operative bond language, proposed a structure maintaining the full $1.18 billion security requirement, and secured an alternative standby-letter-of-credit commitment requiring additional information from PREPA to be finalized. PREPA did not provide the requested bond language or the information necessary to finalize the alternative standby letter of credit.

237. PREPA nevertheless declared Seller in an Immediate Event of Default on August 10, 2026, but did not terminate the PPOA. Even after doing so, PREPA continued working with Power Expectations and its surety representatives regarding the terms and issuance of the performance security, including during the parties' August 14, 2026, conference call. Four days later, PREPA terminated the PPOA, in part, because the very security the parties were still actively working to finalize had not been delivered.

238. PREPA's conduct concerning the FOMB revocation further departed from the justified expectations created by the contractual relationship. PREPA had expressly represented in Section 13.1 that it had obtained the governmental, regulatory, fiscal, and PROMESA-related approvals required for the Agreement. PREPA thereafter treated the FOMB's subsequent

revocation of its approval as an independent basis for immediately terminating the PPOA, even though the PPOA did not identify such a revocation as a ground for immediate termination.

239. PREPA's actions were inconsistent with the common purpose of the PPOA and with the justified expectations created by PREPA's own conduct throughout the contractual relationship. PREPA approved the Seller's substitution after review and due diligence, afforded additional time to obtain the performance security following that approval, continued working with the Seller toward issuance of that security even after declaring default, and then abruptly terminated the PPOA while those efforts remained ongoing and without identifying wrongdoing by Power Expectations that justified that result.

240. PREPA's implementation of the FOMB's termination directive further reflects a failure of good-faith contract administration. Notwithstanding FOMB's own statements that it was not taking a position on the dispute between Power Expectations and Enchanted Rock, and without independently assessing whether any ground for termination existed under the PPOA's own terms, without affording Power Expectations notice of FOMB's specific concerns, and without any opportunity for Power Expectations to respond before its contractual rights were extinguished, PREPA proceeded to implement the FOMB's directive.

241. PREPA's unquestioning implementation of a non-party's directive, in the absence of any independent contractual basis and without so much as notifying Power Expectations of the concerns being acted upon, was arbitrary and inconsistent with the good faith and fair dealing PREPA owed Power Expectations under the parties' contractual relationship.

242. Such conduct constitutes an arbitrary and unfair exercise of PREPA's contractual authority and a failure to perform and enforce the PPOA in the good faith required by Puerto Rico law.

243. PREPA's breach of its duty of good faith and fair dealing deprived Power Expectations of the benefit of the contractual relationship and caused Power Expectations damages and losses in an amount to be established at trial.

**WHEREFORE**, Power Expectations respectfully requests that this Court enter judgment against PREPA for breach of the implied covenant of good faith and fair dealing, award Power Expectations all damages and losses recoverable under the PPOA and Puerto Rico law, together with costs, and grant such other and further relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION: DOCTRINE OF ONE'S OWN ACTS**

244. The allegations contained in the preceding paragraphs are reincorporated.

245. Puerto Rico recognizes the equitable doctrine of one's own acts (*doctrina de los actos propios*), pursuant to which a party may not act inconsistently with its prior conduct when that conduct has generated a legitimate expectation upon which another has relied in good faith. See *Corraliza Rodríguez v. Banco Desarrollo Económico*, 153 D.P.R. 161, 171–72 (2001); *Int'l Gen. Elec. v. Concrete Builders of P.R., Inc.*, 104 D.P.R. 871, 877–78 (1976); see also *CMI Capital Mkt. Inv., LLC v. Municipality of Bayamón*, 410 F. Supp. 2d 61, 76–77 (D.P.R. 2006).

246. The doctrine is rooted in the fundamental principle that parties must act in good faith in their legal relations. See *Int'l Gen. Elec.*, 104 D.P.R. at 877–78; *Aponte Valentín v. Pfizer Pharm.*, 208 D.P.R. 263, 287 (2021). Consistent with that principle, the Puerto Rico Civil Code provides that "[r]ights must be exercised and duties must be fulfilled in accordance with the requirements of good faith." 31 L.P.R.A. § 5334. Thus, "[c]ontradictory conduct has no place in the field of law, and must be prevented." *Int'l Gen. Elec.*, 104 D.P.R. at 877–78.

247. Application of the doctrine requires: (1) specific conduct by a party; (2) that such conduct create an apparent situation capable of influencing the conduct of another; and (3) that another party, acting in good faith and in reliance upon that appearance, act in a manner that would

cause it prejudice if its reliance were thereafter frustrated. *Int'l Gen. Elec.*, 104 D.P.R. at 877–78; *Corraliza Rodríguez*, 153 D.P.R. at 171–72; see also *Santiago v. Ecolab, Inc.*, 303 F. Supp. 2d 51, 54 (D.P.R. 2004), vacated and remanded on other grounds sub nom. *Hernández-Santiago v. Ecolab, Inc.*, 397 F.3d 30 (1st Cir. 2005).

248. The doctrine protects the legitimate reliance generated by a party's own conduct and prevents that party from subsequently adopting an incompatible position to the detriment of one who reasonably relied upon the appearance previously created. See *Aponte Valentín*, 208 D.P.R. at 287; *Corraliza Rodríguez*, 153 D.P.R. at 171–72. Its binding force rests upon "the protection of the legitimate confidence generated by the appearance created," which serves both an important social interest and an ideal of justice. See *Aponte Valentín*, 208 D.P.R. at 287.

249. Although analogous in purpose to the common-law doctrine of estoppel, Puerto Rico's doctrine of one's own acts is a distinct and broader civil-law doctrine. *Corraliza Rodríguez*, 153 D.P.R. at 171–72. It does not require that the inconsistent positions arise in judicial proceedings and applies to contradictory conduct occurring outside the litigation context. *Id.* Accordingly, a party that, through its conduct, creates and reinforces a particular legal or factual appearance upon which another reasonably relies may not thereafter repudiate that position when doing so would unfairly prejudice the relying party.

250. PREPA engaged in specific, deliberate, and documented conduct that created an apparent situation upon which Power Expectations relied in good faith, and PREPA has since adopted positions squarely incompatible with that conduct.

251. By letter dated July 31, 2026, PREPA granted its written consent under Article XVI to the substitution of Flotek Industries, Inc. for Enchanted Rock within the Seller group. PREPA did so after demanding, by letter dated July 16, 2026, the complete record relating to the proposed assignment; after receiving 3PPO's evaluation and its favorable recommendation of July 30, 2026;

and, in PREPA's own words, "upon completion of PREPA's review of the proposed transaction." PREPA further stated that its consent was "granted in reliance upon the representations and commitments made in the July 29, 2026, request, the Assignment Agreement, the materials furnished during the 3PPO evaluation, and the due diligence process."

252. That conduct created an apparent situation capable of influencing, and which did in fact influence, the conduct of Power Expectations. PREPA's written consent conveyed that the composition of the Seller group had been reviewed and accepted by the Buyer; that Flotek was bound by and responsible for all obligations of the role formerly held by Enchanted Rock; and that the Agreement would proceed on that basis toward the Commercial Operation Date of November 7, 2026.

253. Power Expectations relied upon that appearance in good faith. It continued to expend resources on interconnection engineering, milestone reporting, permitting, and deployment planning; it continued to hold equipment reservations, subcontractor commitments, and financing arrangements against performance; and it continued to prosecute the underwriting of the performance security, culminating in the surety broker's request to PREPA of August 6, 2026, and the signed funding commitment and term sheet delivered on August 13, 2026.

254. PREPA has since repudiated the appearance it created. Eighteen days after granting its consent, PREPA terminated the PPOA in part upon the ground that the FOMB had revoked its approval on the premise that the Seller "as presently constituted" no longer satisfied the qualification basis for approval. The Seller was so constituted because PREPA had consented to its being so constituted, on PREPA's own review and in the exercise of the discretion Article XVI reserved to PREPA alone.

255. PREPA's conduct with respect to the performance security is contradictory in the same way. Having been advised in writing on July 9, 2026, that the sureties would not issue the

security until PREPA acted upon the assignment, PREPA denied the Seller's requested extension on July 15, 2026, without addressing that condition. PREPA thereafter acknowledged in its own Notice of Seller Event of Default of August 10, 2026, that, "following PREPA's July 31, 2026, consent to the substitution of Enchanted Rock, LLC with Flotek Industries, Inc. within the Seller group, additional time was afforded to allow the current Seller group to jointly arrange and obtain the required bond." PREPA thus adopted, after the fact, the very connection between its consent and the issuance of the security that it had rejected when Power Expectations advanced it.

256. PREPA's conduct following that notice reinforced the same appearance. PREPA did not terminate the Agreement on August 10, 2026. It continued to engage with Power Expectations and its surety broker concerning the terms of the performance security, including on the recorded conference call of August 14, 2026, in which PREPA's own Legal Affairs Director, PREPA's outside counsel, P3A's General Counsel, and 3PPO participated. Power Expectations reasonably understood from that engagement that the instrument remained capable of being placed and that the Agreement remained in force.

257. PREPA created a further apparent situation with respect to Exhibit C. PREPA executed a PPOA containing an exhibit captioned "FORM OF PERFORMANCE BOND" whose operative section stated only "PERFORMANCE BOND TO BE ATTACHED." Power Expectations reasonably understood from that caption and that language that the bond form would be supplied, and requested it in writing on July 9 and again on July 21, 2026. PREPA answered on July 31, 2026, that Section C.6 "is not a placeholder," and thereafter treated the absence of the instrument as an incurable default.

258. PREPA's positions are irreconcilable. PREPA cannot consent to the composition of the Seller group and then terminate because of it. PREPA cannot afford additional time to arrange the security by reason of its consent and then treat the deadline as having expired without

extension. PREPA cannot continue to negotiate the terms of the security on August 14, 2026, and then rely on its absence as of August 18, 2026. And PREPA cannot execute an exhibit that promises a bond form, decline to furnish it when asked four times in writing, and then invoke the resulting absence of the instrument as an event of default without opportunity to cure.

259. Power Expectations acted in good faith throughout. It routed its communications through 3PPO as the Government instructed; it disclosed the Assignment and Assumption Agreement to 3PPO and PREPA, responded to requests for information, and never sought to be relieved of the performance security, but only to obtain the information required to place it.

260. Power Expectations has been prejudiced by the frustration of its reliance. Had PREPA withheld its consent on July 31, 2026, Power Expectations would have known that the composition of the Seller group remained unresolved and could have acted accordingly, including by proposing an alternative substitute, by seeking recourse against Enchanted Rock, or by pressing the matter before the FOMB through the Government. Instead, Power Expectations proceeded, at its own expense and risk, upon an appearance that PREPA created and then disavowed.

261. Contradictory conduct of this character has no place in the field of law and must be prevented. PREPA is therefore precluded from asserting, as a ground for the termination of the Agreement or as a defense to Power Expectations' claims, the composition of the Seller group to which it consented, the expiration of a deadline it acknowledged having extended, or the absence of an instrument it prevented from issuing.

**WHEREFORE**, Power Expectations respectfully requests that this Court declare, pursuant to the doctrine of one's own acts, that PREPA is precluded from asserting, as a ground for termination of the PPOA or as a defense to Power Expectations' claims, the composition of the Seller group to which PREPA consented, the expiration of a security deadline PREPA

acknowledged having extended, or the absence of a bond instrument PREPA itself prevented from issuing, and grant such other and further relief as the Court deems just and proper.

**FIFTH CAUSE OF ACTION: DECLARATORY JUDGMENT**

262. The allegations contained in the preceding paragraphs are reincorporated.

263. "The Declaratory Judgment Act authorizes federal courts to declare the rights of interested parties in a case of actual controversy." *Xynergy Healthcare Cap. II LLC v. Municipality of San Juan*, 516 F. Supp. 3d 137, 144–45 (D.P.R. 2021) (citing *Almonte v. Administracion de Correccion*, 15 F. Supp. 2d 180, 181 (D.P.R. 1998).

264. Thus, "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.A. § 2201.

265. An actual controversy is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Almonte*, 15 F. Supp. 2d at 181 (quoting *Diagnostic Unit Inmate Council v. Films Inc.*, 88 F.3d 651, 653 (8th Cir. 1996)).

266. "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Richmond Steel, Inc. v. Legal and General Assur. Soc., Ltd.*, 799 F. Supp. 234, 237 (D.P.R. 1992)

267. "In determining whether to grant declaratory relief, a court should consider whether a declaratory judgment would "clarify the legal questions at issue and expedite resolution of the controversy." *Xynergy Healthcare Cap. II LLC*, 516 F. Supp. at 145 (citing *Richmond Steel, Inc.*,

799 F. Supp. at 237; which cites *Metro. Property & Liability Ins. Co. v. Kirkwood*, 729 F.2d 61, 62 (1st Cir. 1984)).

268. An actual and substantial controversy of sufficient immediacy and reality exists between Power Expectations and PREPA, parties having adverse legal interests, concerning their respective rights, duties, and legal relations under the PPOA.

269. Power Expectations contends that no Immediate Seller Event of Default arose, that PREPA's purported termination of August 18, 2026, was ineffective and in breach of the Agreement, and that the PPOA remains in force.

270. PREPA contends that the Agreement was validly terminated effective August 18, 2026, has directed Power Expectations to cease all performance, and has asserted that no compensation whatsoever is owed to the Seller. The parties' positions are directly opposed and mutually exclusive.

271. The controversy is neither hypothetical nor contingent. PREPA has issued a written Notice of Termination declaring the Agreement terminated effective immediately upon confirmed receipt, has directed the Seller to cease and refrain from all operations, dispatch, interconnection, fuel-related, and mobilization activities, and has circulated that Notice to the Governor, the Legislature, the FOMB, the PREB, and P3A.

272. The contractual Commercial Operation Date of November 7, 2026, had not arrived when PREPA purported to terminate, and, upon information and belief, PREPA and P3A are proceeding toward a replacement procurement for the same generation capacity.

273. Power Expectations accordingly seeks a judgment declaring the rights and legal relations of the parties under the PPOA and specifically declaring each of the matters set forth below.

274. First, that PREPA's failure to furnish the operative bond text contemplated by Exhibit C excused the Seller's performance of Section C.1. Exhibit C is captioned "FORM OF PERFORMANCE BOND," and Section C.6 of that exhibit, entitled "Bond," states in its entirety "PERFORMANCE BOND TO BE ATTACHED." No form, text, or attachment follows. Section 15.1 applies by its own express terms only "[e]xcept to the extent excused under Section 2.5 or Article XII."

275. Second, and in the alternative, that the Seller's delay in furnishing the performance security was excused under Section 2.5, which relieves the Seller of default where the delay was directly caused by "Buyer's failure to timely provide required site access, interconnection coordination, approvals, information, governmental cooperation, or other actions expressly required to be provided by Buyer under this Agreement." That delay was directly caused by PREPA's failure to act on the Article XVI consent request that the sureties had identified as the precondition to issuance, and by PREPA's failure to supply the bond text, the operative MT760 language, and its beneficiary bank details, each of which Power Expectations requested in writing and none of which PREPA ever provided.

276. Third, that the Seller satisfied Section 2.5's notice condition and diligently pursued the required security throughout, having delivered a formal written Notice of Delay through counsel on July 9, 2026, supplemented it on July 21, 2026, and thereafter continued without interruption through its surety broker, through a revised cost basis, and through a signed funding commitment and term sheet delivered five days before termination.

277. Fourth, that no Immediate Seller Event of Default under Section 15.1 arose, and that PREPA therefore had no right to terminate the PPOA under Section 15.5(d) on the first ground stated in its Notice of Termination.

278. Fifth, that the FOMB's revocation of its approval and its direction to PREPA do not constitute a contractual ground for termination under Article XV of the PPOA. PREPA itself expressly disclaimed adopting any factual allegation or legal conclusion of the FOMB beyond the revocation and the direction to terminate. By this cause of action Power Expectations does not seek review of the FOMB's determination; it seeks a declaration of what the PPOA does and does not authorize PREPA to do.

279. Sixth, that PREPA's written consent of July 31, 2026, under Article XVI is valid, binding, and unrescinded, and that Flotek Industries, Inc. is a Seller party bound by and responsible for all obligations of the contractual role formerly held by Enchanted Rock. PREPA granted that consent in the exercise of the discretion Article XVI reserves to it, after demanding the record it required, after receiving 3PPO's evaluation and favorable recommendation, and upon completion of its own review, and PREPA has never identified any representation in the Seller's consent request that was inaccurate or false.

280. Seventh, that the PPOA was and remains valid and enforceable notwithstanding Enchanted Rock's post-execution withdrawal, and that Power Expectations acted within the scope of the written authority conferred upon it before execution.

281. Eighth, that the obligation to submit the Seller-party substitution to the FOMB under its Contract Review Policy ran to PREPA and to the Government, and not to Power Expectations, which had no channel of communication with the FOMB and was never advised that any such submission was required or missing.

282. Ninth, that the PPOA remains in full force and effect, and that the Seller's obligation to furnish the performance security is subject to a reasonable period running from PREPA's delivery of the operative bond text and beneficiary bank details.

283. A declaratory judgment will serve a useful purpose in clarifying and settling the legal relations in issue. The parties' dispute turns on the construction of discrete provisions of a single written instrument, principally Sections C.1 and C.6 of Exhibit C, Sections 2.5, 15.1 and 15.5(d), and Article XVI, each of which presents a question of contract interpretation susceptible of resolution on a defined documentary record.

284. A declaratory judgment will likewise terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding, and will expedite its resolution. Power Expectations presently does not know whether it holds an enforceable contract, or whether it must release the equipment reservations, financing, surety capacity, and subcontractor commitments it continues to hold against performance, while PREPA directs it to cease all activity and simultaneously asserts that nothing is owed to it. Resolution of the antecedent questions of contract construction will narrow or eliminate the issues remaining for adjudication, including any measure of damages.

285. The declaratory relief sought is available whether or not further relief is or could be sought, and that reservation has particular force here. Sections 3.1.1 and 15.9 of the PPOA purport to foreclose recovery of lost profits, future revenues, expectation damages, financing costs, return on investment, and stranded investment. If those provisions are given the effect PREPA ascribes to them, a declaration of the parties' rights under the PPOA, together with the injunctive relief sought herein, is substantially the only meaningful remedy available to Power Expectations.

**WHEREFORE**, Power Expectations respectfully requests that this Court enter judgment declaring the rights and legal relations of the parties under the PPOA as set forth in the allegations above, including that the PPOA remains valid and in full force and effect, that PREPA's termination was ineffective, and that Power Expectations' performance was excused as alleged

herein, together with such further relief as may be necessary or proper pursuant to 28 U.S.C. § 2202.

**SIXTH CAUSE OF ACTION: DAMAGES**

286. The allegations in the preceding paragraphs are incorporated by reference.

287. Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801, establishes that "[t]he person who through fault or negligence causes damage to another, is obliged to restore [the aggrieved party]."

288. "Breach of duty has, as its name implies, two sub-elements: duty and breach. In most cases, the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." *Id* (citing *Ortiz v. Levitt & Sons of P.R., Inc.,* 1 P.R. Offic. Trans. 407, 101 D.P.R. 290 (1973)).

289. "Foreseeability is a component of the breach [element] because a defendant only breaches [its] duty if [it] acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." *Martinez-Suarez v. Mansiones de Garden Hills Apartments*, 556 F. Supp. 3d 1, 14 (D.P.R. 2021), *appeal dismissed*, No. 21-1808, 2022 WL 1087021 (1st Cir. Jan. 6, 2022).

290. "In other words, a person breaches the duty of reasonable care when his actions create reasonably foreseeable risks. A plaintiff, then, must show the foreseeable risks created by defendant's acts or omissions in order to carry his burden as to this element of a tort claim." *Vazquez-Filippetti*, 504 F.3d at 49.

291. "An actor is negligent if he fails to exercise due diligence to prevent a foreseeable injury." *Ayala v. Kia Motor Corp.* (D.P.R. Sept. 30, 2022); citing *Malave-Felix*, 946 F.2d at 972 ("a person is liable for injuries that a prudent person reasonably could anticipate."); *see Rivera-Santiago v. United States*, Civ. No. 08-1266, 2009 WL 702235, at *3 (D.P.R. Mar. 11,

2009)(holding that "negligence ensues if the injuries could be foreseen or reasonably anticipated by a reasonable and prudent person.").

292. PREPA owed Power Expectations the duty to act as a prudent and reasonable party would under the circumstances, both as the counterparty to the PPOA and as a public corporation and instrumentality of the Commonwealth administering a contract that its own regulator had determined was necessary to address an energy emergency.

293. That duty required, at a minimum, that PREPA respond with reasonable diligence to written communications from Power Expectations and its representatives concerning the performance security; that it not withhold from Power Expectations information within PREPA's exclusive control and necessary to Power Expectations' performance; that it discharge its own regulatory obligations with respect to the Agreement; and that it not exercise its contractual remedies on the basis of a condition it had itself created.

294. PREPA breached that duty. Exhibit C to the PPOA, captioned "FORM OF PERFORMANCE BOND," was executed with Section C.6 left blank, reading only "PERFORMANCE BOND TO BE ATTACHED." No form, text, or attachment followed. PREPA executed the Agreement in that condition and thereafter declined to cure it.

295. PREPA breached that duty again when, having been informed in writing by counsel on July 9, 2026, that the sureties would not issue the performance security until PREPA acted upon the assignment, it neither responded to that notice nor acted upon the assignment, and instead denied the Seller's requested extension on July 15, 2026, without addressing the condition the sureties had identified.

296. PREPA breached that duty again when it allowed ten days to elapse before answering the Seller's July 21, 2026, written request for the bond form or the operative bond text, and then answered that Section C.6 "is not a placeholder" and that the Agreement "does not impose

any obligation on Buyer to draft or provide a form," without supplying the text then or at any time thereafter.

297. PREPA breached that duty again when it did not respond to the Seller's surety broker, which wrote to PREPA directly on August 6, 2026, seeking approval of a structure that maintained the full required amount, and when it did not respond to the signed funding commitment and term sheet delivered on August 13, 2026, or sign the accompanying obligee acceptance, conditioned as that commitment was upon PREPA supplying only the operative MT760 language and its beneficiary bank details.

298. PREPA breached that duty again when, having granted its written consent to the substitution of Flotek on July 31, 2026, in the exercise of its own discretion and upon its own review, it did not submit that modification to the FOMB, notwithstanding that the obligation to do so ran to PREPA and not to Power Expectations, and notwithstanding that the PREB had by order directed PREPA to place the contract before the FOMB.

299. PREPA breached that duty again when, on August 10, 2026, it declared an Immediate Seller Event of Default premised on the absence of the very instrument that PREPA's own omissions had prevented from issuing, four days after the surety broker's request to PREPA went unanswered; when it continued to work with Power Expectations and its broker on the terms of that same instrument through the recorded conference call of August 14, 2026; and when it then terminated the PPOA on August 18, 2026, on that ground.

300. PREPA breached that duty again when it terminated the PPOA on the additional ground of the FOMB's direction, while expressly disclaiming adoption of any factual allegation or legal conclusion of the FOMB, and without itself making any finding that Power Expectations had committed any wrongdoing, having afforded Power Expectations no notice and no opportunity to be heard on the allegations that produced that direction.

301. The harm that followed was plainly foreseeable. A reasonably prudent party in PREPA's position, having been told in writing on July 9, 2026, again on July 21, 2026, again on August 6, 2026, and again on August 13, 2026 that the issuance of the performance security depended upon information within PREPA's sole possession, would have foreseen that withholding that information would prevent the instrument from issuing, that its absence would then be treated as a default, and that the Seller would thereby lose the contract, the project, and everything it had committed to the project's execution.

302. It was equally foreseeable to PREPA that a failure to place the Flotek substitution before the FOMB, after PREPA had consented to that substitution, would expose the Agreement to precisely the objection the FOMB later raised, namely the completeness of the record before it and the composition of the Seller.

303. PREPA's acts and omissions were the direct and proximate cause of the injuries Power Expectations has sustained. But for PREPA's failure to supply the operative bond text and beneficiary bank details, the performance security would have been issued. But for PREPA's failure to submit the consented substitution to the FOMB, the record before the FOMB would have been complete. But for the resulting default and revocation, the PPOA would not have been terminated on August 18, 2026, eighty-one days before the contractual COD.

304. As a direct and proximate result, Power Expectations has sustained damages including, without limitation, the costs it incurred in the competitive procurement and in fifteen (15) months of project development preceding execution; the costs of interconnection engineering, milestone reporting, permitting, and deployment planning undertaken after execution; the costs of surety underwriting, brokerage, financing, and the arrangement of the performance security; sums committed and obligations incurred to equipment suppliers, subcontractors, and consortium

members; and the value of an integrated contractual and regulatory position that cannot be reconstructed.

305. Power Expectations has further sustained damages to its business standing, its financing and surety relationships, and its ability to compete for government work in Puerto Rico and elsewhere, arising from a termination effected upon public allegations that no adjudicative body has ever tested and upon which Power Expectations was never heard.

306. The damages sought by this cause of action are not termination compensation under the Agreement. They are damages for injury caused by PREPA's own fault and negligence, and they are pleaded in the alternative to, and without waiver of, the contractual relief sought herein.

307. Power Expectations is entitled to be made whole for those damages in an amount to be proven at trial, together with interest, costs, and attorneys' fees as permitted by law.

**WHEREFORE**, Power Expectations respectfully requests that this Court enter judgment against PREPA for damages caused by PREPA's fault and negligence as alleged herein, in an amount to be proven at trial, together with interest, costs, and attorneys' fees as permitted by law, pleaded in the alternative to and without waiver of the contractual relief sought in the preceding causes of action, and grant such other and further relief as the Court deems just and proper.

## SEVENTH CAUSE OF ACTION: PRELIMINARY INJUNCTION[2]

308. The allegations in the preceding paragraphs are incorporated by reference.

309. Power Expectations seeks preliminary injunctive relief under Rule 65(a) of the Federal Rules of Civil Procedure preserving the contractual and regulatory status quo pending adjudication of this action, and has moved for that relief contemporaneously herewith, and permanent injunctive relief upon final judgment. A preliminary injunction requires a likelihood of success on the merits, irreparable harm absent relief, a favorable balance of equities, and

[2] Nothing in this section is intended to supersede or override arguments or points raised in Plaintiff's contemporaneous Motion for Preliminary Injunction.

consistency with the public interest. *Broadwell v. Municipality of San Juan*, 312 F. Supp. 2d 132, 136 (D.P.R. 2004); *see also Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). A permanent injunction requires the same showing but with actual success on the merits in place of likelihood, together with the inadequacy of remedies available at law. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Puerto Rico Ass'n of Mayors v. Vélez-Martínez*, 482 F. Supp. 3d 1, 9 (D.P.R. 2020). Because PREPA is a public corporation and instrumentality of the Commonwealth, the balance-of-equities and public-interest inquiries merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

310. Power Expectations is likely to succeed, and will succeed, on the merits. As alleged above, the PPOA is a valid and binding agreement produced by a competitive procurement, approved by the PREB and the Oversight Board, and executed and registered on June 10, 2026. Neither ground recited in PREPA's Notice of Termination authorized the immediate termination PREPA imposed. The Seller's delay in furnishing the performance security was excused under Section 2.5 and therefore did not trigger Section 15.1, which applies by its own terms only "[e]xcept to the extent excused under Section 2.5 or Article XII." And a revocation by the Oversight Board is not among the exclusive grounds enumerated in Section 15.5, which permitted termination absent a Seller default only upon ninety days' prior written notice that PREPA never gave. PREPA independently breached its continuing warranty under Section 13.1, breached its duty of good faith and fair dealing, and is precluded by the doctrine of one's own acts from asserting either the composition of a Seller group to which it consented on July 31, 2026 or the absence of an instrument its own omissions prevented from issuing.

311. Power Expectations has suffered and continues to suffer irreparable injury for which remedies at law are inadequate. The Aguirre project is not a right to receive a fixed sum of money. It is an integrated contractual, regulatory, and commercial position built over fifteen months, comprising the executed and registered PPOA, the regulatory and fiscal approvals

obtained through the procurement, the PREPA-consented substitution, the interconnection process, committed contractor resources, surety capacity, and the equipment deployment window. If the project is re-procured, re-let, or awarded to another proponent, that position will be permanently dispersed and cannot be reassembled by a judgment. The threat is neither remote nor speculative: the Oversight Board's letter of August 17, 2026 expressly urged the Government to pursue "[a] new, expeditious procurement process to secure additional capacity," and PREPA has directed Power Expectations to cease all performance while asserting that no sum whatsoever is owed. Nor can damages redress the loss. Sections 3.1.1 and 15.9 of the PPOA disclaim lost profits, future revenues, expectation damages, financing costs, return on investment, stranded investment, demobilization costs, and compensation for undelivered energy and unused capacity. No energy was ever delivered. Power Expectations surrendered the ordinary measures of expectation damages in exchange for the opportunity to perform; if that opportunity is extinguished, no damages judgment can restore it. The remaining injuries — to Power Expectations' business standing, its financing and surety relationships, and its ability to compete for government work, arising from a termination effected upon public allegations no adjudicative body has tested and upon which Power Expectations was never heard — cannot be measured with reasonable precision or redressed in money.

312. The balance of hardships favors equitable relief decisively. Power Expectations does not seek to be relieved of any obligation under the PPOA, including the performance-security requirement, and does not seek payment for energy it has not delivered. It seeks only the opportunity to perform the contract it lawfully obtained. The prejudice to PREPA is slight: at the time of termination the Commercial Operation Date of November 7, 2026 had not arrived, no Notice to Proceed had issued, no energy had been delivered or invoiced, and PREPA has confirmed that it made no payment to the Seller. An injunction would restore PREPA to the position it

occupied under an agreement it negotiated, executed, and administered, under which it remains obligated to pay only for energy actually delivered and accepted.

313. The public interest would be advanced, not disserved. The Commonwealth's independent energy regulator determined that the PPOA's terms were "prudent and reasonable and align with the public interest" and approved 400 MW of temporary generation at Aguirre. The Oversight Board concluded during its own review that the PPOA placed primary financial risk on the Seller and limited direct fiscal exposure to PREPA and to ratepayers. And following termination, the Commonwealth's own Energy Czar acknowledged that the resource-adequacy outlook had become more uncertain. Allowing the project to be irretrievably re-awarded while this litigation is pending would risk rendering any judgment ineffectual and could require the Commonwealth to begin yet another expedited procurement for capacity its own regulators have determined is urgently needed.

314. The relief sought is tailored to the injury and no more burdensome to PREPA than necessary to afford complete relief. Power Expectations does not seek to enjoin PREPA's administration of the Agreement, its exercise of remedies upon any future default, or its conduct of unrelated procurements. It seeks only to prevent PREPA from giving irreversible effect to an unlawful termination, and to restore the parties to the contractual relationship that existed before it.

**WHEREFORE**, Power Expectations respectfully requests that this Court (a) enter a preliminary injunction, pending final adjudication of this action, (i) suspending the effectiveness of and enjoining PREPA from implementing, enforcing, or otherwise giving effect to the August 18, 2026 termination of the PPOA; (ii) enjoining PREPA, its officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the order, from initiating, soliciting, participating in, evaluating, recommending, approving,

executing, or submitting for regulatory or fiscal approval any re-procurement, re-letting, replacement award, or replacement agreement for temporary generation capacity at the Aguirre facility that would displace the Seller's position under the PPOA; (iii) enjoining PREPA from rescinding, withdrawing, qualifying, or treating as ineffective its written consent of July 31, 2026 under Article XVI, and from asserting the composition of the Seller group as a ground of default, termination, or defense during the pendency of this action; and (iv) directing PREPA to furnish the operative bond text contemplated by Exhibit C, Section C.6, together with the MT760 language and beneficiary bank details, or to confirm in writing its acceptance of the language the Seller has already submitted, and tolling the Seller's obligations under Section C.1, the Exhibit G milestones, and the Commercial Operation Date accordingly.

**EIGTH CAUSE OF ACTION: PERMANENT INJUNCTION**

315. The allegations in the preceding paragraphs are incorporated by reference.

316. A permanent injunction is an extraordinary equitable remedy that is not awarded as a matter of course. To obtain permanent injunctive relief, a plaintiff must first establish actual success on the merits of its underlying claim. See *CoxCom, Inc. v. Chaffee*, 536 F.3d 101 (1st Cir. 2008). This requirement distinguishes permanent injunctive relief from a preliminary injunction, which requires only a likelihood of success on the merits. *Id.*; see also *Animal Welfare Inst. v. Martin*, 623 F.3d 19 (1st Cir. 2010).

317. Once success on the merits has been established, a plaintiff seeking a permanent injunction must demonstrate: “(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.” *Puerto Rico Ass’n of Mayors v. Vélez-Martínez*, 482 F. Supp. 3d 1, 9 (D.P.R. 2020); see also *eBay*

*Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Esso Standard Oil Co. v. López-Freytes*, 522 F.3d 136 (1st Cir. 2008).

318. The irreparable-injury requirement demands a concrete injury that cannot be adequately remedied through monetary or other legal relief. See *Animal Welfare Inst.*, 623 F.3d 19. Speculative or hypothetical harm is insufficient. Rather, the injury must be of a nature for which an award of damages would not provide an adequate remedy.

319. Closely related, the adequacy-of-legal-remedies inquiry asks whether monetary damages or other relief available at law can sufficiently compensate the plaintiff for the injury suffered. See *eBay*, 547 U.S. at 391; *Esso Standard Oil*, 522 F.3d 136. Where the injury cannot be accurately measured, fully compensated, or effectively remedied through an award of damages, equitable relief may be warranted.

320. The Court must also consider the respective hardships that granting or denying the injunction would impose upon the parties and determine whether the balance of those hardships favors equitable relief. *eBay*, 547 U.S. at 391; see also *Esso Standard Oil*, 522 F.3d 136. The inquiry therefore requires consideration of the injury the plaintiff would sustain if relief were withheld against the hardship the defendant would experience if the injunction were entered.

321. Finally, the requested permanent injunction must not disserve the public interest. *eBay*, 547 U.S. at 391; *Puerto Rico Ass'n of Mayors*, 482 F. Supp. 3d at 9. The Court must therefore consider the practical public consequences of granting or withholding the requested equitable relief.

322. Even where the foregoing requirements are satisfied, the scope of permanent injunctive relief must be tailored to the injury established. An injunction should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff. See *Esso Standard Oil*, 522 F.3d 136.

323. Accordingly, where a plaintiff has prevailed on the merits, has suffered an injury for which legal remedies are inadequate, and demonstrates that the balance of hardships and the public interest favor equitable relief, a permanent injunction may issue to afford complete and effective relief.

324. Power Expectations will establish actual success on the merits of its underlying claims. The PPOA was the product of a competitive procurement conducted by 3PPO, was approved by the PREB as having terms and conditions that were "prudent and reasonable and align with the public interest," was reviewed and approved by the FOMB, and was validly executed by PREPA and the Seller parties on June 10, 2026.

325. As to Enchanted Rock, it was an active and documented participant in the procurement, and its involvement was known to the Government throughout the process.

326. Pursuant to the MOU, Power Expectations possessed written authority to act as Enchanted Rock's exclusive representative and agent in Puerto Rico, including authority to solicit and negotiate contracts and to represent and bind Enchanted Rock in bidding processes, tenders, and other commercial opportunities. Enchanted Rock's active participation is further evidenced by the fact that its officers and personnel directly participated in the development and negotiation of the Aguirre project for more than a year.

327. When Enchanted Rock subsequently withdrew from the project, Power Expectations promptly secured Flotek Industries, Inc. as a substitute. On June 12, 2026, the Seller parties executed the Assignment and Assumption Agreement pursuant to which Flotek assumed Enchanted Rock's contractual position. Five days later, Power Expectations disclosed the executed Assignment and Assumption Agreement to 3PPO, the Government's designated point of contact throughout the procurement, and thereafter submitted the assignment to PREPA for its review and written consent pursuant to Article XVI of the PPOA.

328. Power Expectations will further establish that no Immediate Seller Event of Default arose. Exhibit C to the PPOA, captioned "FORM OF PERFORMANCE BOND," was executed with Section C.6 left blank; Power Expectations and its representatives advised PREPA in writing on July 9, on July 21, on August 6, and on August 13, 2026 that the security could not issue without information within PREPA's exclusive control; PREPA supplied neither the bond text, nor the operative MT760 language, nor its beneficiary bank details; and Section 15.1 applies by its own express terms only to the extent the Seller is not excused under Section 2.5.

329. Power Expectations will further establish that PREPA's second stated ground for termination was contractually unfounded, the FOMB having expressly disclaimed any determination of the underlying factual dispute, having made no finding of wrongdoing against Power Expectations, and having afforded Power Expectations no notice and no opportunity to be heard, and PREPA itself having disclaimed adoption of any of the FOMB's factual allegations or legal conclusions.

330. Power Expectations has suffered and continues to suffer irreparable injury. The terminated PPOA was not a right to receive a fixed sum of money. It was the culmination of approximately fifteen months of procurement, regulatory review, project development, contracting, interconnection work, financing, surety underwriting, and deployment planning for a unique 400 MW emergency-generation project that our Island's crumbling power infrastructure desperately needed.

331. That injury is concrete and not speculative. PREPA has declared the PPOA terminated, has directed Power Expectations to cease all performance, has confirmed that it regards no sum as owing, and, upon information and belief, is proceeding with P3A toward a replacement procurement for the same capacity. If the Aguirre temporary-generation opportunity is re-procured, re-let, or awarded to another proponent, the regulatory approvals, the executed and

registered Agreement, the PREPA-consented substitution, the interconnection process, the committed contractor resources, the surety capacity, and the equipment deployment window will be permanently dispersed and cannot be reassembled.

332. Remedies available at law are inadequate to compensate that injury. Sections 3.1.1 and 15.9 of the PPOA disclaim, among other things, lost profits, future revenues, expectation damages, financing costs, return on investment, stranded investment, demobilization costs, and compensation for undelivered energy and unused capacity. Power Expectations bargained away the ordinary measures of expectation damages in exchange for the opportunity to perform. A damages judgment therefore cannot restore what the termination took.

333. The inadequacy of legal remedies is compounded by the character of the remaining injuries. The harm to Power Expectations' business standing, to its financing and surety relationships, and to its ability to compete for government work, arising from a termination effected upon public allegations that no adjudicative body has tested and upon which Power Expectations was never heard, cannot be measured with reasonable precision or fully redressed in money.

334. The balance of hardships favors equitable relief. Power Expectations does not seek to be relieved of any obligation under the PPOA, including the obligation to furnish performance security, and does not seek payment for energy it has not delivered. It seeks only the opportunity to perform the contract it lawfully obtained. Withholding relief would extinguish that opportunity permanently and irreversibly.

335. The hardship to PREPA is comparatively slight. At the time PREPA terminated the PPOA, the contractual Commercial Operation Date of November 7, 2026 had not arrived, no Notice to Proceed had issued, no energy had been delivered or invoiced, and PREPA itself confirmed that it had made no payment to the Seller. An injunction would restore PREPA to the

position it occupied under an agreement it negotiated, executed, and administered, under which it remains obligated to pay only for energy actually delivered and accepted.

336. The public interest would not be disserved by a permanent injunction. It would be advanced. Puerto Rico's independent energy regulator determined that the Agreement's terms were prudent, reasonable, and aligned with the public interest, and approved the procurement of 400 MW of temporary generation at Aguirre. The FOMB concluded during its own review that the Agreement placed primary financial risk on the Seller and limited direct fiscal exposure to PREPA and to ratepayers.

337. Following the termination, Puerto Rico's Energy Czar, Josué A. Colón Ortiz, who also serves as Executive Director of the P3A, expressly recognized that the Commonwealth's resource-adequacy position had become more uncertain because the project "would have added 400MW of generation with LNG to the system." The Commonwealth's own officials have thus acknowledged both the continuing need for generation capacity and the contribution this project was to make toward meeting it.

338. The relief Power Expectations seeks is tailored to the injury established and is no more burdensome to PREPA than necessary to afford complete relief. Power Expectations does not seek to enjoin PREPA's administration of the Agreement, its exercise of remedies upon any future default, or its conduct of unrelated procurements. It seeks only to prevent PREPA from giving irreversible effect to a termination that was itself unlawful, and to restore the parties to the contractual relationship that existed before it.

**WHEREFORE**, Power Expectations respectfully requests that this Honorable Court enter a permanent injunction (i) declaring the termination of August 18, 2026 void and of no effect and reinstating the PPOA; (ii) enjoining PREPA from implementing or giving further effect to that termination; (iii) enjoining PREPA from re-procuring, re-letting, re-awarding, or otherwise

transferring the Aguirre temporary-generation opportunity to any other party; (iv) directing PREPA to furnish the operative bond text and beneficiary bank details required for issuance of the performance security, and affording Power Expectations a reasonable period thereafter to deliver it; and (v) granting such further equitable relief as the Court deems necessary to afford complete relief.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via CM/ECF to all appearing parties or their attorneys of record by way of their designated email addresses on this 2nd day of September of 2026.

**RESPECTFULLY SUBMITTED** in San Juan, Puerto Rico on September 2nd, 2026.

***Counsel for Plaintiff Power Expectations***

**DMR Law**
Capital Center Building
Suite 1101
239 Arterial Hostos
San Juan, PR 00918

*s/Maria A. Dominguez*
Maria A. Dominguez
USDC-PR No. 210908
m.dominguez@dmrpr.com

*s/ Javier F. Micheo Marcial*
Javier F. Micheo Marcial
USDC-PR No. 305310
j.micheo@dmrpr.com

*s/Juan C. Ramos-Rosado*
Juan C. Ramos-Rosado
*Pro Hac Vice Admission Pending*
j.ramos@dmrpr.com

*s/ Julian R. Rodriguez-Muñoz*
Julian R. Rodriguez-Muñoz
USDC-PR No. 308301
j.rodriguez@dmrpr.com

Vinesign Document ID: A5244F23-7BEF-4968-8C24-3F28B3AC125C

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746 IN SUPPORT OF VERIFIED COMPLAINT**

I, Landon Gallagher, of legal age, married, Chief Operating Officer of Power Expectations, LLC, and a resident of Puerto Rico, declare under penalty of perjury under the laws of the United States of America as follows:

1. I am competent to make this Declaration. I have served as Chief Operating Officer of Power Expectations, LLC at all times relevant to this action and am duly authorized to make this Declaration on its behalf.
2. In that capacity, I have personal knowledge of the matters set forth in the Verified Complaint, and I am familiar with the books, records, and correspondence that Power Expectations maintains in the ordinary course of its business concerning the matters alleged therein.
3. I have carefully read the Verified Complaint in its entirety.
4. The factual allegations set forth in the Verified Complaint are true and correct to the best of my knowledge, information, and belief. Those allegations made upon information and belief are based on the records of Power Expectations and on information received in the ordinary course of its business, and I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 2, 2026, in San Juan, Puerto Rico.

**Landon Gallagher**
Chief Operating Officer
Power Expectations, LLC

The signed document can be validated at https://app.vinesign.com/Verify