**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **POWER EXPECTATIONS, LLC,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**PUERTO RICO ELECTRIC POWER AUTHORITY.**<br><br>**Defendants.** | **CIVIL NO. 26-cv-01571** |

**MOTION FOR PRELIMINARY INJUNCTION**

**TO THE HONORABLE COURT:**

COMES NOW Plaintiff Power Expectations, LLC ("Power Expectations" or "Plaintiff"), through the undersigned counsel, and pursuant to Rule 65(a) of the Federal Rules of Civil Procedure respectfully moves this Honorable Court for entry of a preliminary injunction against Defendant Puerto Rico Electric Power Authority ("PREPA"), and in support thereof states as follows:

## I. INTRODUCTION & RELEVANT BACKGROUND[1]

The controversy before the Court transcends the immediate dispute between the parties and implicates a matter of vital importance to the people of Puerto Rico: an acute and ongoing power-generation emergency that continues to threaten the reliability of the Island's electrical system.

To address that emergency and alleviate the resulting generation shortfall, the Puerto Rico Energy Bureau ("PREB") directed Defendant Puerto Rico Electric Power Authority ("PREPA") to procure additional temporary generation capacity, and the Third-Party Procurement Office ("3PPO") thereafter initiated a competitive bidding process for up to 800 MW of emergency power generation. Following that competitive procurement process, during which Plaintiff Power

[1] Power Expectations incorporates its recently filed Verified Complaint (Docket No. 1) as if its allegations were fully set forth herein.

Expectations, LLC ("Power Expectations") submitted and developed its proposal in response to the Government's requirements, 3PPO issued a Notice of Award on September 5, 2025, selecting Power Expectations to provide 400 MW of temporary generation capacity at PREPA's Aguirre facility.

Following the award, the proposed project and contract underwent approximately nine months of further development, negotiation, regulatory review, and fiscal oversight. PREB approved the proposed 400 MW Aguirre contract in December 2025, and, following an extensive review and revision process, the Financial Oversight and Management Board for Puerto Rico (the "FOMB") determined on June 2, 2026 that its conditions for approval had been satisfied and authorized the parties to proceed with execution. Eight days later, on June 10, 2026, PREPA and the Seller Consortium (composed of Power Expectations, LLC, Enchanted Rock, LLC and Reyes Contractor, LLC) executed the Power Purchase and Operating Agreement (Temporary Power Generation), Contract No. 2026-P00107 (the "PPOA" or "Agreement"). See, **Exhibit A**.

From the moment it was notified of the award, Power Expectations has diligently, faithfully, and responsibly devoted substantial effort and resources not merely to satisfy its contractual obligations, but to bring the project to fruition and help address Puerto Rico's urgent need for reliable generation capacity. For instance, even before execution of the PPOA, Power Expectations had already undertaken substantial preparations to perform the project, including developing the technical configuration for the Aguirre facility, assembling detailed staffing and work plans for deployment, and taking concrete steps to secure the substantial financial guarantees the project required. On May 21, 2026, twenty days before execution, Power Expectations transmitted 248 pages of staffing and work plans for the project, including Reyes Contractor's 193-page Aguirre staffing and work plan. After execution, that work continued without

interruption: between June 12 and June 22, 2026, Power Expectations participated in project coordination meetings, submitted seven interconnection requests for information to PREPA, Genera PR, and LUMA Energy, and met with LUMA in person; and on July 12, 2026, it filed with PREPA a 337-page Milestones Compliance Report. And on May 28, 2026, thirteen days before the PPOA was executed, Power Expectations retained Skyscraper Insurance to begin arranging the $1.18 billion performance bond required for the project.

Power Expectations' good-faith and diligent efforts did not cease once the PPOA was executed. To the contrary, when Enchanted Rock, LLC ("Enchanted Rock"), a Texas-based natural-gas power-generation and microgrid company that had participated in the bid process as a member of the Seller Consortium and contributed technical and operational expertise to the development of the Aguirre project, unexpectedly withdrew from the project, Power Expectations acted immediately to protect the project and keep the promised 400 MW of generation on track. Rather than abandon the undertaking, Power Expectations promptly secured Flotek Industries, Inc. ("Flotek"), a publicly traded company listed on the New York Stock Exchange with substantial technical capability and industry standing, to assume Enchanted Rock's contractual role.

On June 12, 2026, an Assignment and Assumption Agreement was executed pursuant to which Flotek assumed Enchanted Rock's role, and Power Expectations promptly disclosed the executed agreement to 3PPO. Flotek's qualifications were thereafter independently evaluated by 3PPO, which issued a favorable recommendation, and by PREPA itself, which, following its own review and due-diligence process, formally consented to Flotek's substitution and authorized it to

assume Enchanted Rock's technical, operational, financial, bonding, safety, compliance, warranty, and performance obligations under the PPOA.

As to Enchanted Rock, it bears emphasis that, prior to its withdrawal, it was an active and documented participant in the procurement, and its involvement was known to the Government throughout the process. Pursuant to the Memorandum of Understanding Regarding Exclusive Agency Representation in Puerto Rico, executed by Power Expectations and Enchanted Rock on March 19, 2025 (the "MOU"), Power Expectations possessed written authority to act as Enchanted Rock's exclusive representative in Puerto Rico, including authority to solicit and negotiate contracts and to represent and bind Enchanted Rock in bidding processes, tenders, and other commercial opportunities. Enchanted Rock's active participation is further evidenced by the fact that its officers and personnel directly participated in the development and negotiation of the Aguirre project for more than a year.

As to the validity of Flotek's substitution, PREPA exercised the sole discretion expressly reserved to it under Article XVI of the PPOA. By letter dated July 31, 2026, PREPA granted its written consent to Flotek's assumption of Enchanted Rock's contractual role "[f]ollowing the Third-Party Procurement Office's (3PPO) evaluation of the proposed assignment and PREPA's receipt of its favorable recommendation, and upon completion of PREPA's review of the proposed transaction." PREPA further stated that its consent was "granted in reliance upon the representations and commitments made in the July 29, 2026, request, the Assignment Agreement, the materials furnished during the 3PPO evaluation, and the due diligence process." PREPA has

never identified any representation made by Power Expectations in connection with that consent as inaccurate, incomplete, or false.

Notwithstanding Power Expectations' sustained, documented efforts to perform responsibly and advance the project in accordance with the PPOA, PREPA did not reciprocate with the same degree of diligence, cooperation, and good faith. Instead, at critical junctures in the project's implementation, PREPA failed to provide information and approvals necessary to facilitate performance, delayed in responding to requests bearing directly on performance, and ultimately invoked circumstances in which its own conduct had played a material role as grounds to terminate the Agreement.

The PPOA requires the Seller Consortium to furnish substantial performance security for the project. As previously stated, as far back as May 28, 2026 – thirteen days before the Agreement was even executed – Power Expectations engaged Skyscraper Insurance to begin arranging the required security. That process continued after execution, and Power Expectations and its surety representatives worked continuously to obtain an irrevocable standby letter of credit or on-demand performance bond satisfying the PPOA's $1.18 billion requirement. The Government-drafted PPOA, however, left a critical component of that process unresolved. Exhibit C is expressly captioned "FORM OF PERFORMANCE BOND," yet Section C.6, entitled "Bond," contains only the words "PERFORMANCE BOND TO BE ATTACHED." No form, bond text, operative language, or attachment follows.

What followed was not a lack of diligence by Power Expectations. To the contrary, Power Expectations and its surety representatives continuously pursued the necessary bond and standby

letter of credit, while PREPA delayed responding to requests, declined to provide requested bond language, and failed to furnish information needed to finalize the proposed instruments.

Power Expectations nevertheless continued its efforts. On August 4, 2026, Skyscraper Insurance confirmed in writing that underwriting of the construction-phase security remained underway. On August 6, Skyscraper wrote directly to PREPA and proposed a structure consisting of five $236 million bonds, thereby maintaining the full $1.18 billion security requirement while dividing the obligation into instruments capable of placement in the commercial surety market. Skyscraper also sought PREPA's approval of language defining the surety's exposure consistently with the construction-phase character of the security. PREPA did not respond to the proposal.

Rather than respond to the surety's August 6 proposal and continue working toward issuance of the full $1.18 billion security, PREPA issued a Notice of Seller Event of Default only four days later, on August 10, 2026, based on the absence of that very security.

Undeterred, Power Expectations continued diligently pursuing the required performance security even after PREPA issued the Notice of Seller Event of Default. On August 11, Power Expectations submitted a revised cost basis for the construction-phase security. Then, on August 13, CJO & Co. delivered to PREPA a signed commitment to issue a $236 million irrevocable ISP98 standby letter of credit — the first of the five equal tranches proposed to PREPA on August 6, which together preserved the full $1.18 billion requirement — together with a term sheet setting forth the proposed alternative security. Finalization of that instrument required PREPA to provide the operative MT760 language and its beneficiary banking information. PREPA provided neither.

The parties were still actively attempting to resolve the security issue the following day. On August 14, 2026 – four days after PREPA declared default – Power Expectations, PREPA, 3PPO, P3A, Reyes Contractor, counsel, and Skyscraper Insurance participated in a videocall

concerning the performance security. During that call, Skyscraper explained that there was no generic standard form for an instrument of this kind and that the bond language had to be tailored to the particular contract. Power Expectations again raised the absence of the operative bond text contemplated by Exhibit C and the MT760 information necessary to complete the standby-letter-of-credit process. Thus, even after declaring default, PREPA remained engaged in discussions directed toward finalizing the very security whose absence it had invoked as a default. PREPA, the surety, and Power Expectations closed the call by agreeing to work together on this issue. Four days later, on August 18, PREPA terminated the PPOA.

The chronology therefore reflects sustained and escalating efforts by Power Expectations to furnish the required security in the face of obstacles that PREPA itself materially contributed to create or prolong. PREPA declined to provide the operative bond language requested by the surety; failed to respond to the proposed $1.18 billion multi-bond structure; failed to furnish the information necessary to finalize the alternative standby letter of credit; and then terminated the PPOA while the parties were still actively working to resolve those very same issues.

While Power Expectations and PREPA were still actively working to resolve the performance-security issue, on August 14, 2026 – the very same day the conference call took place – the FOMB issued a press release announcing that its members had voted to revoke approval of the PPOA and direct PREPA to terminate the Agreement. According to the release, the FOMB acted following an August 7 statement by ERock Inc. ("ERock"), the holding company of Enchanted Rock, asserting that ERock was not a party to the project and that its name and signature had been used without authorization. Based exclusively on that assertion, and without undertaking any apparent effort to corroborate or independently verify it, the FOMB concluded that the

procurement had been irreparably impaired, even while expressly declining to take a position on the underlying dispute between Power Expectations and Enchanted Rock.

On August 17, 2026, the FOMB's Executive Director issued a formal letter to the Governor, the Energy Czar, PREPA, and 3PPO confirming the FOMB's decision to revoke its approval of the PPOA and expressly directing PREPA to terminate the Agreement. In doing so, however, the FOMB expressly disclaimed any determination of the underlying factual dispute between Power Expectations and Enchanted Rock, made no finding of fraud or misconduct by Power Expectations, and identified no false statement made by Power Expectations to the FOMB. Power Expectations was afforded no notice or opportunity to respond before the FOMB revoked its approval.

On August 18, 2026, PREPA purported to terminate the PPOA effective immediately on two "separate and independent" grounds: first, Power Expectations's alleged failure to furnish the required performance security; and second, the FOMB's revocation of its approval and express direction that PREPA terminate the Agreement. Significantly, PREPA expressly declined to adopt the factual allegations or legal conclusions underlying the FOMB's action. Its Notice of Termination stated: "Nothing in this Notice constitutes PREPA's adoption of any factual allegation or legal conclusion in the August 17 Revocation Letter beyond the Oversight Board's revocation of approval and express direction to terminate the Agreement."

No communication, finding, or determination by the FOMB or any other governmental entity identifies any breach of the PPOA or lack of compliance by Power Expectations as the basis for the FOMB's revocation of its approval. To the contrary, Power Expectations disclosed the executed Assignment and Assumption Agreement to 3PPO on June 17, 2026, responded to the Government's requests for information, formally sought PREPA's consent, and obtained that

consent after 3PPO issued a favorable recommendation and PREPA completed its own review and due-diligence process. Thus, to the extent the Flotek substitution was not timely presented to the FOMB, that failure arose within the Government's own channels and was not attributable to any breach or lack of compliance by Power Expectations.

In any event, the FOMB's revocation of its approval is not a valid cause of termination under the PPOA. Section 15.5 expressly identifies the circumstances in which PREPA may terminate the Agreement: for convenience upon ninety days' notice, for an uncured Seller Event of Default, for an Immediate Seller Event of Default under Section 15.1 or following certain prolonged Force Majeure Events. None of those circumstances occurred here.

There was simply no valid basis for PREPA to terminate the PPOA in the manner it did. If that termination is allowed to stand – or, at the very least, is not enjoined while its validity is adjudicated – the resulting harm will be irreparable, not only to Power Expectations, which will permanently lose the unique contractual, regulatory, and commercial position it obtained through more than a year of competitive procurement and project development, but also to the people of Puerto Rico, who continue to face the very generation emergency the PPOA was designed to address. Indeed, the Commonwealth's own Energy Czar, Josué A. Colón Ortiz, who also serves as Executive Director of the P3A, has acknowledged that termination of the Power Expectations contract increased uncertainty concerning Puerto Rico's resource adequacy because the project "would have added 400MW of generation with LNG to the system."

That timing highlights the need for prompt judicial intervention. PREPA terminated the PPOA eighty-one (81) days before the contractual Commercial Operation Date of November 7, 2026, before a single kilowatt-hour of energy was due, and while Power Expectations' equipment, financing, and surety arrangements remained in place and ready to proceed. Restarting the bidding

process would take months, if not years. Puerto Rico's electrical system cannot absorb that delay while a project already procured, approved and substantially prepared for deployment sits idle. Resolving this dispute now, by contrast, would allow the Aguirre generation to come online on a timeline that is far more closely aligned with the Island's urgent and ongoing need for reliable power, rather than the months or years a re-procurement would require. The Court should therefore preserve the subject matter of this controversy and prevent PREPA from taking irreversible steps to reprocure the project to another proponent while the validity of PREPA's termination is adjudicated.

## II. LEGAL STANDARD

"The preliminary injunction standard requires a trial court confronted with a motion for preliminary injunction to consider four (4) elements: 1) the probability of the movant's success on the merits; 2) the prospect of irreparable harm absent the injunction; 3) the balance of the relevant equities[2]; and 4) the effect of the court's action on the public interest." *Broadwell v. Municipality of San Juan*, 312 F. Supp. 2d 132, 136 (D.P.R. 2004) (citing *Rosario-Urdaz v. Rivera-Hernandez,* 350 F.3d 219, 221 (1st Cir. 2003)); see also *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

These factors "are not of equal prominence in the preliminary injunction calculus." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). The most important factor is whether the movant has demonstrated a likelihood of success on the merits, which the First Circuit has described as the "sine qua non" of the preliminary-injunction inquiry. *Id.* (citing *Ryan v. ICE*, 974

---

[2] "i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues…" *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996).

F.3d 9, 18–19 (1st Cir. 2020)); *see also New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

At the preliminary-injunction stage, however, the Court "need not predict the eventual outcome on the merits with absolute assurance." *Ross-Simons*, 102 F.3d at 16. Rather, it is both the Court's prerogative and duty "to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." *Id.* at 17 (quoting *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir. 1988)).

The movant also bears the burden of demonstrating that denial of interim injunctive relief would result in irreparable harm. *Ross-Simons*, 102 F.3d at 18 (citing *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). The burden is substantial, but it is possible to overstate its dimensions. *Id.* For instance, to establish irreparable harm, a plaintiff is not required to show that denial of injunctive relief would be fatal to its business. *See General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 591 (7th Cir. 1984). Ordinarily, it is sufficient to demonstrate that the available legal remedies are inadequate. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S. Ct. 1798, 1803, 72 L. Ed. 2d 91 (1982) (collecting cases); *Lopez v. Garriga*, 917 F.2d 63, 68 (1st Cir. 1990). Where a plaintiff faces a substantial injury that cannot be accurately measured or adequately remedied through monetary damages, irreparable harm follows naturally. *See, e.g., K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989); *Danielson v. Local 275, Laborers Int'l Union*, 479 F.2d 1033, 1037 (2d Cir. 1973). Accordingly, a cognizable threat of such injury may support the issuance of a restraining order.

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749,

173 L.Ed.2d 550 (2009). When considering the balance of the equities, the Court must weigh "the hardship that will befall the nonmovant if the injunction issues [...] with the hardship that will befall the movant if the injunction does not issue." *Mercado-Salinas v. Bart Enterprises Int'l, Ltd.*, 671 F.3d 12, 19 (1st Cir. 2011); *see also Esso Std. Oil Co. v. Monroig–Zayas*, 445 F.3d 13, 17–18 (1st Cir. 2006). On the other hand, with respect to the public interest, the First Circuit has explained that "[t]he public interest that is referred to in the test for a preliminary injunction means the public's interest in the issuance of the injunction itself." *Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 45 (1st Cir. 2010). Accordingly, the public-interest inquiry necessarily takes into account "the practical effects of granting or denying preliminary injunctive relief." *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 15 (1st Cir. 2004); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

The relief sought here is simple. Power Expectations asks the Court to prevent PREPA from taking irreversible steps that would place that state of affairs beyond restoration. That is the paradigmatic office of a preliminary injunction. The status quo a preliminary injunction preserves is the last peaceable, uncontested state of affairs preceding the dispute, which, in this case constitutes the parties' positions on August 17, 2026, when the PPOA was in force, PREPA had consented in writing to the composition of the Seller Consortium, the parties were jointly working toward issuance of the performance security, no energy had been delivered, no payment had been made, and the Commercial Operation Date remained eighty-two days away.

To the extent any component of the requested relief is characterized as mandatory, the showing set forth below satisfies any heightened standard. The components of relief are severable,

and the Court may grant the prohibitory relief that preserves its own remedial authority without reaching the balance.

## III. ARGUMENT

### A. Power Expectations Has Demonstrated a Substantial Likelihood of Success on the Merits

Power Expectations has demonstrated a probability of success on the merits. The PPOA is a written and binding agreement that resulted from a competitive governmental procurement, received the required regulatory and fiscal approvals, and was executed by PREPA and the Seller Consortium. PREPA nevertheless purported to terminate the Agreement immediately on two "separate and independent" grounds: Power Expectations's alleged failure to furnish the required performance security and the FOMB's subsequent revocation of its approval and direction that PREPA terminate the Agreement. As set forth below, neither ground provided a valid basis for PREPA to terminate the PPOA in the manner it did.

#### 1. *Power Expectations Is Likely to Prevail on Its Breach-of-Contract Claims*

Under Puerto Rico law, a claim for breach of contract requires "(1) a valid contract; (2) a breach by one of the parties to the contract; and (3) resulting damages." *Yacht Caribe Corp. v. Carver Yacht LLC*, 270 F. Supp. 3d 547, 555 (D.P.R. 2017); *see also Mega Media Holdings, Inc. v. Aerco Broad. Corp.*, 852 F. Supp. 2d 189, 199–200 (D.P.R. 2012); *Unisys P.R., Inc. v. Ramallo Bros. Printing, Inc.*, 128 D.P.R. 842 (1991).

Under the Puerto Rico Civil Code, a contract is perfected when the parties manifest their consent as to its object and cause. 31 L.P.R.A. § 9771. Accordingly, the essential requirements of a valid contract are the parties' consent, a definite object, and cause for the obligations undertaken.

See *Yacht Caribe Corp.*, 270 F. Supp. 3d at 555; *Soto v. State Indus. Prods., Inc.*, 642 F.3d 67, 72–73 (1st Cir. 2011).

Once formed, the parties' agreement is binding upon them. Article 1233 of the Puerto Rico Civil Code expressly provides that "[w]hat is agreed in contracts has the force of law between the parties." 31 L.P.R.A. § 9754 (our translation). Correspondingly, the First Circuit has recognized that contractual obligations "have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." *Markel Am. Ins. Co. v. Díaz-Santiago*, 674 F.3d 21, 31 (1st Cir. 2012) (internal quotations and citations omitted).

The terms of the parties' agreement govern where they are clear and unambiguous. Under Article 354 of the Puerto Rico Civil Code, "[i]f the terms of a bilateral juridical act are clear and leave no doubt as to the intention of the parties, the literal meaning of its words shall be observed." 31 L.P.R.A. § 6342 (our translation); see also *Markel Am. Ins. Co.*, 674 F.3d at 31.

A party breaches a contract when it fails to comply with the contractual obligations it undertook. See *Markel Am. Ins. Co.*, 674 F.3d at 31 ("Where a party fails to uphold or abide by the contract's essential obligations, such failure will be deemed a breach of the contract."). Consistent with that principle, Article 1158 of the Puerto Rico Civil Code provides that a person who contravenes the tenor of an obligation must compensate the damages and losses caused by that noncompliance. 31 L.P.R.A. § 9303.

The PPOA plainly satisfies the first element. It constitutes a valid and binding agreement between PREPA and the Seller Consortium. This point is not in dispute.

Power Expectations, for its part, diligently and faithfully performed its obligations under the PPOA. When Enchanted Rock withdrew, Power Expectations promptly secured Flotek as a substitute, disclosed the substitution to the Government, submitted it for PREPA's review, and

obtained PREPA's express written consent pursuant to Article XVI, which included a finding that Flotek was technically capable of providing the services that would have been provided by Enchanted Rock. Power Expectations likewise diligently and continuously pursued the performance bond required by Section C.1. It retained Skyscraper Insurance thirteen days before execution of the PPOA and continued working with its surety representatives thereafter to obtain and deliver the required security, but it was unable to do so due to PREPA's refusal to provide the bond language necessary to underwrite the bond.

PREPA nevertheless purported to terminate the PPOA on August 18, 2026, effective immediately, on two "separate and independent" grounds: the Seller's alleged failure to furnish the required performance security and the FOMB's revocation of its prior approval and express direction that PREPA terminate the PPOA.

Neither ground provided a valid basis for the immediate termination PREPA of the PPOA.

**a. *The FOMB's Subsequent Revocation Was Not a Contractual Ground for Immediate Termination.***

Section 15.5 of the PPOA expressly identifies the circumstances under which PREPA may terminate the Agreement: termination for convenience upon ninety days' prior written notice, termination following an uncured Seller Event of Default, termination upon an Immediate Seller Event of Default under Section 15.1, and termination following certain prolonged Force Majeure Events. A subsequent revocation by the FOMB is not among the contractual grounds for termination.

Section 13.1 reinforces that conclusion. There, PREPA expressly represented that it "has obtained all required governmental, statutory, regulatory, and fiscal approvals under applicable law, including approvals required under PROMESA, the Fiscal Agency and Financial Advisory Authority, the Oversight Board, and any applicable Title III requirements." Having expressly

represented that the required approvals had been obtained, PREPA could not later transform the FOMB's subsequent revocation of its approval into a termination right that the PPOA does not support.

This is particularly significant because Power Expectations fully complied with the procedures and requirements applicable to the assignment. When Enchanted Rock withdrew from the project, Power Expectations acted immediately to ensure continued performance under the PPOA. It promptly secured Flotek as a substitute, disclosed the executed Assignment and Assumption Agreement to 3PPO, formally sought PREPA's consent pursuant to Article XVI, and obtained that consent after 3PPO issued a favorable recommendation and PREPA completed its own review and due-diligence process. PREPA then expressly approved the substitution without conditioning its consent on any further FOMB review or advising Power Expectations that any additional submission to the FOMB was required. Accordingly, any issue concerning whether or when the substitution was thereafter presented to the FOMB arose within PREPA's and the Government's own review and communication process, not from any act or omission by Power Expectations.

PREPA could not then rely on the FOMB's revocation as a basis to terminate the Agreement because the PPOA did not provide such a ground for termination. The mere assertion of the FOMB's revocation of support on account of the assignment is a breach of the PPOA. More importantly, having itself approved the Flotek substitution pursuant to Article XVI, PREPA could not convert a subsequent issue arising within the Government's own review process into a contractual basis for termination.

Weighing the plaintiff's probability of success does not require the Court to evaluate if it must overturn the FOMB's decision or finally resolve the separate questions concerning the factual

and legal basis for that decision. The requested relief is independently warranted by PREPA's exercise of its purported termination rights under the PPOA. Whatever disputes remain concerning the FOMB's action, PREPA's authority to terminate the Agreement was governed by Article XV, and that provision does not identify a subsequent revocation by the FOMB as a ground for immediate termination. PREPA itself drew a distinction between the FOMB's action and its own when it expressly declined to adopt any factual allegation or legal conclusion underlying the revocation beyond the FOMB's direction that the Agreement be terminated.

**b. *PREPA's Reliance on the Performance Security Likewise Does Not Support the Immediate Termination*.**

PREPA's reliance on the performance-security issue fares no better.

Any delay in the delivery of the performance security was not the product of inaction or lack of diligence by Power Expectations, but was instead entirely attributable to PREPA. To the contrary, Power Expectations began pursuing the required performance security thirteen days before the PPOA was executed by retaining Skyscraper Insurance, and thereafter diligently and continuously worked with its surety representatives to obtain and deliver that security through the date of termination.

The Government-drafted PPOA, however, left a critical component of the performance-security process unresolved. Exhibit C is expressly captioned "FORM OF PERFORMANCE BOND," yet Section C.6 – entitled "Bond" – contains only the words "PERFORMANCE BOND TO BE ATTACHED." No form, bond text, operative language, or attachment follows.

Power Expectations nevertheless continued working with its surety representatives to obtain the required security and repeatedly sought from PREPA the information necessary to finalize it. On July 21, 2026, counsel expressly advised PREPA that the surety "cannot finalize or issue the Performance Security without that information" and requested that PREPA provide "the

Form of Performance Bond, or the exact bond text, intended to be attached to Exhibit C, Section C.6." PREPA did not respond for ten days and, when it finally responded on July 31, declined to provide any bond language. Later, when Power Expectations pursued an alternative standby letter of credit, finalization required PREPA to provide the operative MT760 language and beneficiary banking information. PREPA provided neither.

PREPA also knew that its own approval of the Flotek substitution was necessary to issuance of the security. By July 9, 2026, counsel for Power Expectations had formally advised PREPA that the sureties had informed Power Expectations that the required security "cannot be issued until PREPA had formally approved the assignment" of Enchanted Rock's contractual role to Flotek.

PREPA's own August 10 Notice of Seller Event of Default expressly acknowledged the relationship between its July 31 approval and the ongoing security process, stating that, "following PREPA's July 31, 2026 consent to the substitution of Enchanted Rock, LLC with Flotek Industries, Inc. within the Seller group, additional time was afforded to allow the current Seller group to jointly arrange and obtain the required bond."

Power Expectations continued diligently pursuing the required security during that period. On August 6, Skyscraper Insurance proposed directly to PREPA a structure consisting of five $236 million bonds, thereby maintaining the full $1.18 billion security requirement through instruments capable of placement in the commercial surety market. PREPA did not respond to that proposal. And on August 13, CJO & Co. delivered a signed commitment to issue a $236 million irrevocable standby letter of credit as an alternative form of security, the finalization of which required

operative MT760 language and beneficiary banking information from PREPA. PREPA provided neither.

Power Expectations' efforts continued well after PREPA issued the Notice of Seller Event of Default. On August 14, four days after PREPA declared default, Power Expectations, PREPA, 3PPO, P3A, Reyes Contractor, counsel, and Skyscraper Insurance participated in a conference call concerning the performance security. The parties were thus still actively working to finalize the very security PREPA had invoked as a default. In fact, the meeting closed with the parties agreeing to continue to work towards resolving the issue of the bond language. Four days later, PREPA terminated the PPOA.

Any delay in delivering the performance security was not the product of inaction or lack of diligence by Power Expectations but rather resulted from PREPA's own conduct. PREPA delayed approving the Flotek substitution after being expressly advised that surety issuance depended upon that approval. PREPA declined to provide the operative bond language requested by the surety; failed to respond to the proposed five-tranche structure that preserved the full $1.18 billion requirement; and failed to furnish the MT760 language and beneficiary bank information necessary to finalize the alternative standby letter of credit. PREPA could not then invoke the resulting non-delivery of the performance security as a basis for immediate termination.

i. **Section 15.1 Does Not Apply by Its Own Terms Because Power Expectations' Performance Was Excused Under Section 2.5**

PREPA declared an Immediate Seller Event of Default under Section 15.1 and eight days later terminated under Section 15.5(d). But Section 15.1 operates by its own express terms only "[e]xcept to the extent excused under Section 2.5 or Article XII." The parties therefore agreed, in

the very provision PREPA invoked, that the immediate-default machinery would not engage where Section 2.5 excuses the Seller's delay.

Section 2.5 provides that the Seller "shall not be deemed in default … to the extent Seller demonstrates that a delay affecting a milestone under Exhibit G or achievement of COD was directly caused by: (i) Buyer's failure to timely provide required site access, interconnection coordination, approvals, information, governmental cooperation, or other actions expressly required to be provided by Buyer under this Agreement; [or] (ii) delays caused by Governmental Authorities under the direct control of the Commonwealth of Puerto Rico or Buyer," subject to written notice within five Business Days and continued diligent pursuit.

Each element is satisfied on the documentary record. As to PREPA's failure to provide approvals: on July 9, 2026, counsel advised PREPA in writing that the sureties would not issue the security until PREPA approved the Flotek substitution; PREPA denied the requested extension on July 15 without addressing that condition, and did not grant consent until July 31.

As to PREPA's failure to provide information: on July 21, 2026, counsel requested the form of performance bond or exact bond text contemplated by Exhibit C, Section C.6; PREPA responded ten days later that Section C.6 "is not a placeholder" and that the Agreement "does not impose any obligation on Buyer to draft or provide a form," and furnished nothing. On August 6, Power Expectations' surety broker sought PREPA's approval of proposed bond language and a five-tranche structure preserving the full $1.18 billion requirement; PREPA did not respond. As mentioned before, on August 13, Power Expectations delivered a signed letter-of-credit

commitment requiring only PREPA's operative MT760 language and beneficiary bank details; PREPA supplied neither.

Power Expectations also satisfied Section 2.5's conditions. It delivered a formal written Notice of Delay through counsel on July 9, 2026, and supplemented it on July 21, 2026, each within five Business Days of the circumstance noticed. And it pursued the instrument without interruption. It engaged its surety thirteen days before execution, submitted a revised cost basis on August 11, obligee-acceptance and Exhibit C clarification materials on August 12, and a signed commitment and term sheet on August 13.

Power Expectations' delay was therefore excused under Section 2.5, Section 15.1 did not engage, and, as a consequence, Section 15.5(d) supplied no termination right. PREPA's declaration of an Immediate Seller Event of Default on August 10, 2026 was itself a breach of Section 2.5.

Power Expectations has therefore demonstrated a substantial likelihood of establishing that PREPA terminated the PPOA without a valid contractual basis and thereby breached the Agreement.

#### c. *Power Expectations is Likely to Prevail on its Claim for Breach of Section 13.1 of the PPOA*

Independent of PREPA's breach in terminating the Agreement without a valid contractual basis, Power Expectations is likely to succeed on its separate claim that PREPA breached Section 13.1 of the PPOA.

Section 13.1 provides that PREPA's representations and warranties are made "as of the Effective Date **and throughout the Term**." (emphasis ours). They are continuing obligations and not one-time statements exhausted at signing. Among those continuing representations, PREPA — "a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico" — represented and warranted that it "has obtained all required governmental, statutory, regulatory,

and fiscal approvals under applicable law, including approvals required under PROMESA, the Fiscal Agency and Financial Advisory Authority, the FOMB, and any applicable Title III requirements."

By that warranty, PREPA allocated to itself, as between the Parties, the risk that a required approval would be absent, would be withdrawn, or would cease to exist during the Term. Power Expectations relied on that representation. That allocation was deliberate, and it was the counterpart to the allocation imposed upon Power Expectations, which bore every cost, execution, permitting, interconnection, fuel, insurance, indemnity, and regulatory-change risk under Section 13.3 and Article XVII, expressly "at Seller's sole cost and risk." PREPA, by contrast, bore the risk of the governmental approvals that PREPA alone controlled, PREPA alone could obtain, and PREPA alone was ordered by the PREB to procure. Nothing in the PPOA imposed upon Power Expectations any obligation to obtain, maintain, or preserve the FOMB's approval; Power Expectations was not the submitting party, had no contractual or statutory channel through which to address the FOMB, and could not have obtained or preserved that approval had it attempted to do so.

On August 17, 2026, the FOMB sent PREPA a letter informing it of its decision to revoke its approval of the Agreement due to allegedly not knowing about the assignment from Enchanted Rock to Flotek. At that moment, PREPA's continuing representation and warranty under Section 13.1 failed. The failure of a continuing warranty is a breach by the party that gave it but it is not a default by the counterparty to whom it was given. PREPA nevertheless responded to the failure of its own warranty by terminating the Agreement of the party to whom that warranty ran, four days later, without notice, without an opportunity to cure, and without any of the grounds Section 15.5

requires. Having warranted that it possessed the approval, PREPA cannot now shift to Power Expectations the consequence of that approval's loss.

Power Expectations has therefore demonstrated a substantial likelihood of success on its independent claim that PREPA breached Section 13.1 of the PPOA.

**2. *PREPA's Conduct Also Supports Power Expectations' Claim for Breach of the Duty of Good Faith and Fair Dealing***

Good faith is a fundamental requirement governing the exercise of contractual rights and performance of contractual obligations under Puerto Rico law. Article 15 of the Puerto Rico Civil Code provides that "[r]ights must be exercised and duties must be fulfilled in accordance with the requirements of good faith." 31 L.P.R.A. § 5334 (our translation). More specifically, Article 1062 provides that both the debtor and the creditor "must act in good faith in the performance of the obligation." 31 L.P.R.A. § 8983 (our translation).

Consistent with these principles, Puerto Rico law recognizes an implied covenant of good faith and fair dealing in contractual relationships. *See Cantellops v. Álvaro-Chapel*, 234 F.3d 741, 744 (1st Cir. 2000). The duty applies to the performance and enforcement of contractual obligations and requires that the parties exercise their contractual rights in a manner consistent with the purposes of their agreement and the legitimate expectations arising from their contractual relationship. See *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 108–09 (1st Cir. 2001); *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 12 (1st Cir. 2002).

Good-faith performance requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Adria Int'l*, 241 F.3d at 108 (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). The obligations imposed by good faith therefore depend upon the particular contractual relationship, the terms of the parties' agreement,

and the purpose the parties intended that agreement to accomplish. See *Century Packing Corp. v. Giffin Specialty Equip. Co., LLC*, 438 F. Supp. 2d 16, 26 (D.P.R. 2006).

Whether a party has violated that duty is determined in light of the totality of the circumstances. *New Comm Wireless*, 287 F.3d at 12. Because "the ethical content of each act must be examined in the light of its particular circumstances," the challenged conduct is not considered in isolation. *Id.* Rather, liability may arise where, considering the surrounding circumstances, a party's conduct is "arbitrary, deceitful, or animated by some improper purpose." *Id.*

Accordingly, the fact that a party purports to act pursuant to a right conferred by the contract does not end the inquiry. Contractual rights themselves must be exercised in good faith. See 31 L.P.R.A. § 5334.

PREPA's conduct in performing and enforcing the PPOA must be measured against that standard.

First, PREPA reviewed and expressly approved Flotek's substitution pursuant to Article XVI after 3PPO issued a favorable recommendation and PREPA completed its own review and due-diligence process. Having done so, PREPA's subsequent treatment of the approved substitution must be evaluated in light of the expectations its own conduct created.

Second, PREPA's own conduct materially affected the performance-security process. As discussed above, PREPA delayed an approval it knew was necessary to surety issuance, declined to provide requested bond language, and failed to provide information necessary to finalize the alternative security being pursued. Its subsequent invocation of the resulting non-delivery as a

basis for default and termination likewise bears directly on whether PREPA exercised its contractual rights consistently with its obligation of good faith.

Third, PREPA itself acknowledged after granting the Flotek substitution that additional time was needed for the reconstituted Seller group to arrange the required security. That acknowledgment is difficult to reconcile with PREPA's decision shortly thereafter to invoke the absence of that same security as a basis for default and termination.

Fourth, even after declaring default on August 10, PREPA continued working with Power Expectations and its surety representatives to finalize the required security through August 14. Yet only four days later, PREPA terminated the PPOA in part because that same security had not been delivered.

Fifth, PREPA expressly represented in Section 13.1 that the required governmental, fiscal, PROMESA, and FOMB approvals had been obtained. Its subsequent reliance on the FOMB's revocation as an independent basis for immediate termination – despite the absence of any such termination right in the PPOA – further bears on whether PREPA exercised its contractual rights consistently with the requirements of good faith.

Sixth, the stated basis for the action PREPA elected to take shifted materially within days and was never reconciled. On August 14, 2026, the FOMB told the public it acted following ERock's assertion that its name and signature had been used without authorization, and that the procurement was irreparably impaired on that account. By August 17, 2026, the FOMB's letter no longer rested on that assertion; it rested instead on the proposition that the Seller Consortium "as presently constituted" no longer satisfied the qualification basis for approval, a conclusion the Board stated held "[e]ven on the assumption that Enchanted Rock/ERock validly signed and later withdrew from the Contract." By August 20, the Board's counsel confirmed in writing that the

Board "did not adjudicate Enchanted Rock/ERock's allegations or make a finding of fraud against Power Expectations." The accusation published to the Island on August 14, 2026, was never withdrawn, corrected, or explained.

PREPA acted on the matter of Flotek's assignment. Yet the Seller Consortium was constituted as it was because PREPA had reviewed and consented to that constitution on July 31, 2026, in the exercise of the sole and absolute discretion Article XVI reserved to PREPA alone. PREPA has never identified any representation in Power Expectations' consent request as inaccurate, incomplete, or false, and has never contended that its own July 31 review was deficient.

Viewed in their totality, PREPA's actions were inconsistent with the common purpose of the PPOA and with the justified expectations created by its own conduct throughout the contractual relationship. PREPA approved the substitution after review and due diligence, afforded additional time to obtain the performance security following that approval, continued working with Power Expectations toward issuance of that security even after declaring default, and then abruptly terminated the PPOA while those efforts remained ongoing and without identifying any misconduct by Power Expectations that warranted that result.

Those circumstances establish that PREPA exercised its contractual rights arbitrarily, inconsistently, and unfairly, and thereby violated the duties of good faith that governed its performance and enforcement of the PPOA under Puerto Rico law.

### 3. *PREPA's Own Conduct Further Supports Relief Under Puerto Rico's Doctrine of One's Own Acts*

Puerto Rico recognizes the equitable doctrine of one's own acts (*doctrina de los actos propios*), pursuant to which a party may not act inconsistently with its prior conduct when that conduct has generated a legitimate expectation upon which another has relied in good faith. See *Corraliza Rodríguez v. Banco Desarrollo Económico*, 153 D.P.R. 161, 175–76 (2001); *Int'l Gen.*

*Elec. v. Concrete Builders of P.R., Inc.*, 104 D.P.R. 871, 876–78 (1976); see also *CMI Capital Mkt. Inv., LLC v. Municipality of Bayamón*, 410 F. Supp. 2d 61, 76–77 (D.P.R. 2006).

The doctrine is rooted in the fundamental principle that parties must act in good faith in their legal relations. *See Int'l Gen. Elec.*, 104 D.P.R. at 877–78; *Aponte Valentín v. Pfizer Pharm.*, 208 D.P.R. 263, 287 (2021). Consistent with that principle, the Puerto Rico Civil Code provides that "[r]ights must be exercised and duties must be fulfilled in accordance with the requirements of good faith." 31 L.P.R.A. § 5334 (our translation). Thus, "[c]ontradictory conduct has no place in the field of law, and must be prevented." *Int'l Gen. Elec. v. Concrete Builders,* 104 D.P.R. 871, 4 P.R. Offic. Trans. 1221, 1230 (May 19, 1976).

Application of the doctrine requires: (1) specific conduct by a party; (2) that such conduct create an apparent situation capable of influencing the conduct of another; and (3) that another party, acting in good faith and in reliance upon that appearance, act in a manner that would cause it prejudice if its reliance were thereafter frustrated. *Int'l Gen. Elec.*, 104 D.P.R. at 877–78; *Corraliza Rodríguez*, 153 D.P.R. at 171–72; see also *Santiago v. Ecolab, Inc.*, 303 F. Supp. 2d 51, 54 (D.P.R. 2004), vacated and remanded on other grounds sub nom. *Hernández-Santiago v. Ecolab, Inc.*, 397 F.3d 30 (1st Cir. 2005).

PREPA engaged in deliberate and documented conduct that created legitimate expectations upon which Power Expectations relied in good faith and thereafter adopted positions inconsistent with that conduct.

Most significantly, PREPA expressly approved Flotek's substitution pursuant to Article XVI after 3PPO issued a favorable recommendation and PREPA completed its own review and due-diligence process. That approval confirmed that PREPA had accepted the Seller Consortium as reconstituted with Flotek and that performance of the PPOA would proceed on that basis. Power

Expectations reasonably relied on that determination and continued devoting substantial resources and efforts to performance of the Agreement.

PREPA defined the scope of its own review. By letter dated July 16, 2026, PREPA advised Power Expectations that its Article XVI review was “not limited to determining whether the procedural requirements for an assignment have been satisfied,” and that PREPA “must also evaluate whether the proposed assignee possesses qualifications, technical capabilities, financial strength, operational experience, and resources that are at least equivalent to those of the original contracting party and whether the proposed substitution is otherwise consistent with the assumptions, representations, and evaluation criteria that formed the basis for the award of the RFP.” PREPA then conducted that evaluation and, on July 31, 2026, resolved it in Power Expectation and Flotek’s favor. The FOMB’s stated ground that the Seller Consortium “as presently constituted” no longer satisfied the qualification basis on which approval had been granted is thus the precise question PREPA had already answered, under a standard PREPA itself articulated, eighteen days earlier.

PREPA also created the expectation directly and in person. On July 29, 2026, PREPA, P3A, 3PPO, and Power Expectations met, and PREPA and 3PPO directed Power Expectations to submit its request for consent to the Flotek substitution to PREPA by email with stakeholders copied, and represented to those present that the request would be approved two days later, on Friday, July 31, 2026. PREPA made no mention at that meeting of any need for FOMB’s approval of the substitution. Power Expectations complied that same evening, and PREPA consented on July 31 exactly as represented.

Power Expectations also had no channel through which to address the FOMB itself. By request for information dated June 16, 2026, 3PPO instructed Power Expectations that all

communications concerning approval of the assignment "must be directed exclusively to Mr. Alexis Rivera at PREPA." And the obligation to place the contract before the FOMB was PREPA's by regulatory order.

PREPA thereafter took a fundamentally inconsistent position. Eighteen days after approving the Flotek substitution, it terminated the PPOA in part based on the FOMB's determination that, because Enchanted Rock was no longer a member of the Seller Consortium, and the Seller Consortium "as presently constituted" no longer satisfied the qualification basis upon which the contract had been approved. Yet the Seller Consortium was presently constituted with Flotek precisely because PREPA itself had reviewed and expressly approved Flotek's substitution for Enchanted Rock pursuant to Article XVI of the PPOA.

PREPA's conduct concerning the performance security reflects the same inconsistency. PREPA acknowledged that additional time had been afforded following its July 31 consent so that the reconstituted Seller group could arrange the required security, and it continued working with Power Expectations and its surety representatives toward issuance of that security even after declaring default. Power Expectations reasonably proceeded on the basis of PREPA's own conduct while continuing its efforts to satisfy the requirement. PREPA then abruptly terminated the Agreement in part because that same security had not yet been delivered.

PREPA cannot, consistent with the legitimate expectations created by its own acts, approve the composition of the Seller Consortium after review and due diligence and then invoke a governmental revocation arising from that same composition as a basis for immediate termination. Nor can it afford additional time to obtain the required security, continue working toward its issuance, and then invoke its non-delivery while those efforts remained ongoing. Power Expectations, by contrast, acted consistently throughout: it complied with the Government's

prescribed process, obtained PREPA's approval of the Flotek substitution, and continuously pursued performance of its obligations under the PPOA.

The doctrine of one's own acts therefore independently supports Power Expectations' substantial likelihood of success in establishing that PREPA could not repudiate the legitimate expectations created by its own prior conduct and terminate the PPOA on materially inconsistent grounds.

### B. Power Expectations Will Suffer Immediate and Irreparable Harm Absent Preliminary Relief

Power Expectations faces immediate and irreparable harm if PREPA is permitted to give effect to its termination of the PPOA while this action is pending.

The Aguirre project is not merely a contractual right to receive a fixed sum of money. It is the culmination of more than a year of competitive procurement, regulatory and fiscal review, project development, contracting, interconnection work, financing, surety underwriting, and deployment planning for a unique 400 MW emergency-generation project. Through that process, Power Expectations obtained a contractual, regulatory, and commercial position that cannot simply be recreated.

The inadequacy of legal remedies here is not a matter of measurement difficulty. It is a matter of contractual foreclosure. Section 15.9, entitled "Exclusive Termination Compensation," provides that upon termination for any reason "Buyer shall have no obligation to pay for any undelivered energy, unused capacity, future availability, stranded investment, financing costs, return on equity, demobilization costs, or lost profits," and that "Seller shall only be entitled to

payment for electric energy actually delivered, metered, accepted, and invoiced prior to the effective date of termination." Section 3.1.1 disclaims further categories of recovery.

If PREPA is permitted to re-procure the project, Power Expectations' position will be permanently lost. The executed PPOA, the approvals obtained through the procurement process, PREPA-approved Flotek substitution, interconnection process, committed contractor resources, surety capacity, and equipment deployment arrangements are all part of that position. Once PREPA reinitiates procurement of this vital project, that integrated contractual and regulatory position cannot simply be reassembled. A later judgment cannot restore Power Expectations.

That threat is neither remote nor speculative. The FOMB's August 17 communication expressly urged the Government to pursue alternatives, including "[a] new, expeditious procurement process to secure additional capacity." Thus, absent a preliminary injunction, the very project that is the subject of this litigation may be re-procured or awarded to another proponent before the Court has an opportunity to adjudicate whether PREPA lawfully terminated the PPOA.

Power Expectations also faces continuing harm to its business goodwill, industry standing and its relationships with financing sources, sureties, contractors, and prospective governmental counterparties as a result of the public controversy surrounding the termination and the referrals to Commonwealth and federal law-enforcement authorities. Those injuries are inherently difficult to quantify and cannot be remedied through an award of money damages.

Put simply, if this injunction is not issued, Power Expectations will cease to exist as we know it. It put everyting into this contract, only to have the rug pulled from under it. Preliminary relief is therefore necessary to preserve the subject matter of this controversy and the Court's

ability to provide meaningful relief, and the irreparable-harm factor weighs strongly in Power Expectations' favor.

**C. The Balance of Equities Decisively Favors Preservation of the Status Quo**

The balance of equities strongly favors preserving Power Expectations' contractual position while the validity of PREPA's termination is adjudicated.

Power Expectations does not seek to avoid its obligations under the PPOA, including the performance-security requirement, nor does it seek payment for energy that has not been delivered. It seeks only to prevent PREPA from taking irreversible steps to re-procure the 400 MW Aguirre project while this dispute remains pending.

Absent relief, Power Expectations risks permanently losing the unique contractual, regulatory, and commercial position it obtained through more than a year of procurement and project development.

By contrast, the prejudice to PREPA from preserving that position pending judicial review is limited. The Commercial Operation Date had not yet arrived at the time of termination, and PREPA had made no payment to Power Expectations under the PPOA and is not responsible for any unpaid invoices. The requested injunction would therefore impose no obligation on PREPA to pay for undelivered energy, accept generation not yet delivered, or excuse Power Expectations

from performance. It would simply prevent PREPA from taking irreversible action. The balance of equities therefore weighs decisively in favor of preliminary relief.

**D. Preliminary Relief Serves the Public Interest**

The public interest strongly favors preliminary relief. This dispute concerns a 400 MW temporary-generation project procured specifically to address Puerto Rico's acute and continuing generation emergency.

PREB, the Commonwealth's independent energy regulator, determined that the proposed Aguirre contract's "terms and conditions are prudent and reasonable and align with the public interest" and approved 400 MW of temporary generation at the Aguirre facility. The FOMB likewise recognized that the PPOA placed primary financial risk on Power Expectations, limited direct fiscal exposure to PREPA and ratepayers, and required PREPA to pay only for energy actually delivered, without any minimum take-or-pay requirement or guaranteed payment obligation.

The need for that generation has not disappeared. To the contrary, after termination of the PPOA, Puerto Rico's Energy Czar expressly acknowledged that the Commonwealth's resource-adequacy outlook had become "more uncertain" because the Power Expectations contract "would have added 400MW of generation with LNG to the system."

Preliminary relief would therefore preserve the availability of an already-procured and PREB-approved 400 MW generation project while the Court determines whether PREPA lawfully terminated the PPOA. Allowing PREPA instead to initiate yet another procurement while this

action remains pending risks permanently displacing that project and delaying the generation capacity the Commonwealth's own officials continue to recognize is urgently needed.

The public interest therefore weighs decisively in favor of preserving the project while the validity of PREPA's termination is adjudicated.

## IV. RELIEF REQUESTED

Power Expectations seeks to preserve its contractual position while the Court determines whether PREPA lawfully terminated the PPOA. To accomplish that purpose, the August 18, 2026 termination should not be permitted to take effect while its validity remains before the Court.

Accordingly, Power Expectations respectfully requests that the Court suspend the effectiveness of PREPA's August 18, 2026 termination and preliminarily enjoin PREPA from enforcing, implementing, or otherwise giving effect to that termination during the pendency of this action. Such relief should include, without limitation, enjoining PREPA from initiating a replacement procurement, re-procuring or re-letting the 400 MW temporary-generation project at the Aguirre facility, making a replacement award, or entering into a replacement agreement with another proponent.

The components of the requested relief are severable, and the Court may grant any of them without granting all. Accordingly, Power Expectations respectfully requests that the Court:

(a) Suspend and enjoin the termination. Suspend the effectiveness of PREPA's August 18, 2026 Notice of Termination and preliminarily enjoin PREPA from enforcing, implementing, or otherwise giving effect to that termination during the pendency of this action.

(b) Preserve the subject matter of the controversy. Preliminarily enjoin PREPA, its officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the Order, from initiating, soliciting, participating in, evaluating,

recommending, approving, executing, submitting for regulatory or fiscal approval, or otherwise giving effect to any replacement procurement, re-letting, replacement award, or replacement agreement for temporary generation capacity at the Aguirre facility that would displace Power Expectations' position under the PPOA, without prior leave of this Court.

(c) Preserve the Article XVI consent. Preliminarily enjoin PREPA from rescinding, withdrawing, qualifying, or treating as ineffective its written consent of July 31, 2026 to the substitution of Flotek Industries, Inc. for Enchanted Rock, LLC within the Seller Consortium, and from asserting the composition of the Seller Consortium as a ground of default, termination, or defense during the pendency of this action, without prior leave of this Court.

(d) Set the matter for expedited hearing. Set this motion for an evidentiary hearing on an expedited basis, and enter an interim order preserving the status quo pending that hearing and the Court's ruling.

The requested relief would preserve Power Expectations' ability to obtain meaningful relief without requiring PREPA to pay for undelivered energy or excusing Power Expectations from contractual performance.

Power Expectations remains prepared to perform its obligations under the PPOA, including the performance-security requirement, upon PREPA's delivery of the operative language necessary for issuance. Separately, Power Expectations is prepared to post such security under Federal Rule of Civil Procedure 65(c) as the Court deems appropriate, and respectfully submits that a nominal amount is appropriate for the reasons stated above.

**WHEREFORE**, Power Expectations respectfully requests that this Honorable Court grant its Motion for Preliminary Injunction and grant such other and further relief as the Court deems just and proper.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via CM/ECF to all appearing parties or their attorneys of record by way of their designated email addresses on this 2nd day of September of 2026.

**RESPECTFULLY SUBMITTED** in San Juan, Puerto Rico on September 2nd, 2026.

**DMR Law**
***Counsel for Plaintiffs***
Capital Center Building
Suite 1101
239 Arterial Hostos
San Juan, PR 00918

*s/Maria A. Dominguez*
Maria A. Dominguez
USDC-PR No. 210908
m.dominguez@dmrpr.com

*s/ Javier F. Micheo Marcial*
Javier F. Micheo Marcial
USDC-PR No. 305310
j.micheo@dmrpr.com

*s/ Juan C. Ramos-Rosado*
Juan C. Ramos-Rosado
*Pro Hac Vice* Pending
j.ramos@dmrpr.com

*s/ Julian R. Rodriguez-Muñoz*
Julian R. Rodriguez-Muñoz
USDC-PR No. 308301
j.rodriguez@dmrpr.com