Docusign Envelope ID: 712D28C1-3039-8DE2-82C2-5A0347969379



# Power Purchase and Operating Agreement

***Temporary Power Generation***

**Power Expectations, LLC,**
**Enchanted Rock, LLC and**
**Reyes Contractor, LLC**
**as Seller**
**and**

**Puerto Rico Electric Power Authority**

**as Buyer**

**Dated June 10, 2026**

## Emergency Temporary Power Generation RFP 3PPO-0314-20-TPG2
### Power Purchase and Operating Agreement Table of Contents

Article I – Definitions and Interpretation
Article II – Sale and Purchase
Article III – Term and Conditions
Article IV – Generation Performance and Quality Standards
Article V – Operational Planning and Power Delivery
Article VI – Seller's Performance Shortfall
Article VII – Measurement, Testing, and Operations
Article VIII – Liquidated Damages
Article IX – Risk and Indemnity
Article X – Invoicing and Payment
Article XI – Duties, Taxes and Charges
Article XII – Force Majeure
Article XIII – Representations, Warranties, and Liabilities
Article XIV – Confidentiality
Article XV – Termination
Article XVI – Novation
Article XVII – Change in Law
Article XVIII – Applicable Law
Article XIX – Code of Ethics
Article XX – Settlement of Disputes
Article XXI – Non-Waiver
Article XXII – Confidentiality and Cybersecurity Obligations
Article XXIII – Notices
Article XXIV – Contingent Fees
Article XXV – Addresses for Notices
Article XXVI – Business Practices and Foreign Corrupt Practices Act
Article XXVII – Transfer of Funds
Article XXVIII – Conflict of Interest
Article XXIX – Unfair Labor Practice
Article XXX – Discrimination
Article XXXI – Compliance with Commonwealth of Puerto Rico Contracting Requirements
Article XXXII – Public Officers or Employees
Article XXXIII – Dispensation
Article XXXIV – Rules of Professional Ethics
Article XXXV – Anti-Corruption Code for a New Puerto Rico
Article XXXVI – Contract Review Policy
Article XXXVII – Insurance
Article XXXVIII – General

**Exhibits**

A – Scope of Work and Service Deliverables
B – Price Proposal and Rate Schedule
C – Performance Bond
D – Seller Certifications and Required Declarations
E – Technical Specifications and Delivery Points
F – Liquidated Damages Summary Schedule
G – Timeline

THIS POWER PURCHASE AND OPERATING AGREEMENT is made this 10 of June, 2026 (the **"Effective Date"**) BETWEEN:

Initial LG

Initial DR

Initial JW

1. **Power Expectations, LLC** (hereinafter called the "Seller"); and a limited liability company organized under the laws of Puerto Rico, with its principal office at Suite 12 654 Plaza Ave Luis Munoz Rivera, San Juan Puerto Rico 00918, and authorized to do business in the Commonwealth of Puerto Rico and herein represented by Landon Gallagher, COO, of legal age, married or single, and a resident of San Juan, Puerto Rico who is duly authorized to enter into this Agreement as certified by the Resolution dated 6/10/2026.

2. **Enchanted Rock, LLC** (hereinafter called the "Seller"); and a limited liability company organized under the laws of Texas, with its principal office at Suite 101, 1113 Vine St., Houston Texas 77002, and authorized to do business in the Commonwealth of Puerto Rico and herein represented by Jhoby Weaks, COO-Caribbean Operations, of legal age, married or single, and a resident of the state of Texas who is duly authorized to enter into this Agreement as certified by the Resolution dated 6/10/2026.

3. **Reyes Contractor, LLC** (hereinafter called the "Seller"); and a limited liability company organized under the laws of Puerto Rico, with its principal office at 66 Calle Carazo, Altos, Guaynabo, PR 00969, and authorized to do business in the Commonwealth of Puerto Rico and herein represented by Denis Reyes, President, of legal age, married or single, and a resident of San Juan, Puerto Rico who is duly authorized to enter into this Agreement as certified by the Resolution dated 6/10/2026

4. **PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA") (**hereinafter called the "Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by an Act of 2 May 1941, No. 83, as amended, with its principal place of business at 1110 Ponce de Leon Avenue, San Juan, Puerto Rico, represented its Executive Director, Mary C. Zapata Acosta, of legal age, married, professional engineer and resident of San Juan, Puerto Rico.

MCZA

Seller and Buyer shall each be a "Party" and, together, the "Parties."

## WITNESSETH

**(A) WHEREAS,** on January 24, 2023, the Puerto Rico Public-Private Partnerships Authority ("P3A"), the Puerto Rico Electric Power Authority ("PREPA"), and Genera PR LLC ("Genera") entered into the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (the "Generation O&M Agreement"), whereby Genera became the operator of the Legacy Generation Assets (as defined therein) as agent of PREPA;

**(B) WHEREAS,** PREPA, by virtue of Act No. 83 of May 2, 1941, as amended ("Act 83"), has the authority to engage services necessary and convenient to pursue its programs and responsibilities;

**(C) WHEREAS,** pursuant to the Generation O&M Agreement, PREPA designated and appointed Genera as its agent;

**(D) WHEREAS,** the Third-Party Procurement Office ("3PPO") was established under the P3A, as mandated by the Puerto Rico Electric System Transformation Act (Act No. 120-2018) and the Puerto Rico Public-Private Partnerships Act (Act No. 29-2009), to carry out procurement actions for public-private partnership initiatives where official conflicts of interest may arise, including procurement actions related to PREPA;

Initial LG

**(E) WHEREAS,** the Puerto Rico Energy Bureau ("PREB"), through Resolution NEPR-MI-2023-0004, identified a potential conflict of interest in connection with Genera's role and therefore authorized and instructed the 3PPO to act as the procurement entity for the temporary emergency generation project and to issue the corresponding Request for Proposals;

Initial DR

**(F) WHEREAS,** although it was initially contemplated that Genera would execute the power purchase agreement, further legal and contractual review confirmed that Genera, in its capacity as operator under the Generation O&M Agreement, is not authorized to contract for the purchase of power on its own behalf, and thus, PREPA must serve as the signatory party to this Power Generation Sale and Purchase Agreement;

Initial JW

**(G) WHEREAS,** federal funds may potentially be sought through FEMA Project Worksheets for Aguirre or if applicable any Additional Site under the mitigation program to cover interconnection-related costs. Accordingly, PREPA and the 3PPO have followed applicable federal procurement and cost principles and have opted to itemize the interconnection costs independently, in case FEMA ultimately agrees to fund those costs;

**(H) WHEREAS,** the proposed power generation solutions must utilize proven, high-efficiency technology, such as combined cycle or reciprocating engines, and include state-of-the-art environmental control and monitoring systems. The system must meet a minimum annual equivalent availability factor of 95% of the COP which is the power availability requirement;

**(I) WHEREAS,** the SELLER shall provide an emergency response plan detailing how their solution withstands hurricanes, including specific resistance to wind speeds and storm surge levels. The plan shall outline sustained operation capabilities, procedures for temporary deployment, and the time required to restore full operational capacity after a hurricane event. The units must integrate into Puerto Rico's Transmission & Distribution (T&D) infrastructure without requiring significant upgrades. The project must fully comply with all procurement and operational guidelines established by the 3PPO. Additionally, the project must comply with environmental regulations, including, but not limited to: the Clean Water Act, Clean Air Act, New Source Performance Standards, Hazardous Air Pollutant Standards, Spill Prevention Control & Countermeasure requirements, Facility Response Plans, waste disposal regulations, construction and operating permits, and any future permits and modifications required under local and federal plans. The proponent must also adhere to the PREB's requirement for competitive procurement to secure the most favorable economic and technical conditions for PREPA, ensuring transparency and best value for ratepayers;

**(J) WHEREAS,** PREPA requires secure temporary Power Generation units to support the Puerto Rico grid; and

**(K) WHEREAS,** to address such requirement, and with the express authorization by the PREB, the 3PPO issued Request for Proposals 3PPO-0314-20-TPG2, in which it sought bids to deliver Power Generation solutions to the requested sites, provide for the vaporization of such LNG in Regas Equipment (as defined below), and deliver Power Generation to the Generation Units, and Seller was selected to deliver LNG, secure use of

Docusign Envelope ID: 713D2B61-3039-BD57-82C2-5A1247969370



the required Regas Equipment, and supply such Power Generation to Buyer at the Delivery Points pursuant to the form of Power Generation Sale and Purchase Agreement published as part of the 3PPO-0314-20-TPG2 to supply and operate modular, temporary power generation facilities totaling 400 MW.

Initial LG

**(L) WHEREAS,** the Puerto Rico Energy Bureau ("PREB") has determined that a firm capacity of 3,000 megawatts (MW) is essential to stabilize the electric system and ensure the reliable delivery of electricity, particularly during periods of emergency, forced outages, elevated demand, scheduled maintenance of generation units, and overall grid stress.

Initial DR

**NOW, THEREFORE,** Seller and Buyer hereby agree as follows:

Initial JW

## ARTICLE I – DEFINITIONS AND INTERPRETATION

### 1.1 Definitions

In this Agreement, unless the context otherwise requires, the following terms shall have the meanings set forth below

**"3PPO"** means the Third-Party Procurement Office, established under the Puerto Rico Public-Private Partnerships Authority (P3A) to manage procurement related to Public-Private Partnerships, including this Agreement.

**"Actual Diesel Cost"** means the documented and verifiable total cost actually incurred by Buyer in connection with diesel-based operation of the Facility during the applicable period, including, without limitation: (i) the actual delivered cost of diesel fuel; (ii) transportation, logistics, trucking, handling, storage, and delivery costs; (iii) fuel additives and treatment costs; (iv) temporary fuel infrastructure and operational support costs; (v) incremental operation and maintenance costs attributable to diesel operation; and (vi) any taxes, fees, or surcharges directly associated with diesel procurement or use, all as reasonably supported by invoices, purchase orders, operational records, or other supporting documentation."

**"Additional Site"** means the generation site proposed in the Municipality of Yabucoa, Puerto Rico, which may be incorporated into this Agreement upon review and approval by the Puerto Rico Energy Bureau (PREB). The inclusion, activation, and use of the Additional Site shall not be effective unless and until such PREB approval is obtained, and all related regulatory, technical, and operational requirements applicable to the Site have been satisfied.

**"Affiliate"** means in relation to a Party, any company, corporation, partnership, or other legal entity that (a) is directly or indirectly controlled by such Party; (b) directly or indirectly controls such Party; or (c) is directly or indirectly controlled by an entity that also, directly or indirectly, controls such Party.

**"Agreement"** means this Power Purchase and Operating Agreement, together with all Exhibits, Annexes, Schedules, and Amendments, as may be modified from time to time.

**"Aguirre Power Plant and if applicable any additional site"** means the existing generation facilities and/or greenfield locations in Puerto Rico where the Seller is required to deploy and integrate the Land-Based Power Generation Solution into the 115 kV or 230 kV switchyards.

**"Applicable Law"** means any statute, treaty, convention, regulation, rule, permit, directive, order, or decree issued by any Governmental Authority applicable to the performance of this Agreement, including, but not limited to: The Puerto Rico Electric Power Authority Revitalization Act; The Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA); The Clean Air Act, Clean Water Act, and other applicable environmental regulations.

**"Availability Penalty"** means the financial penalty payable by Seller to Buyer when Seller's Power Availability falls below the required threshold, calculated in accordance with Section 8.3 of this Agreement.

**"Business Day"** means a day other than Saturday, Sunday, or a public holiday in Puerto Rico or United States.

**"Buyer"** means the Puerto Rico Electric Power Authority (PREPA).

**"COD"**: means the date on which the power generation system is fully deployed, tested, and supplying power to the grid.

**"COP"** means the Continuous Operating Power, defined as the maximum power output that the generator set is capable of delivering continuously while supplying a constant electrical load, when operated for an unlimited number of hours per year under the agreed operating conditions and subject to the applicable maintenance intervals.

**"Control"** means the beneficial ownership, either directly or indirectly, of 50% or more voting rights in an entity, or the ability to direct its management and policies.

**"Delivery Point"** means the physical location where the power generation units interconnect with the Buyer's transmission infrastructure, specifically at the 230 kV switchyard at Aguirre or an Additional Site option at 115 kV or 230 kV switchyard.

**"Deployment Delay Liquidated Damages"** means the liquidated damages payable by Seller to Buyer for each day that COD is delayed beyond the Deployment Period, calculated in accordance with Section 8.2 of this Agreement.

**"Deployment Period"** means the period of ninety (90) to one hundred fifty (150) days following the execution of this Agreement, during which the Seller shall use commercially reasonable best efforts to have the COP-rated power generation solution fully deployed, operational, and interconnected to the Buyer's transmission grid.

**"Dispute"** means shall have the meaning set forth in Article XX (Settlement of Disputes).

**"Effective Date"** means the date on which this Agreement is executed and becomes legally binding.

**Eligible Demobilization Costs**" means Seller's actual, reasonable, documented, and unavoidable out-of-pocket costs directly incurred to dismantle, disconnect, remove, transport, and demobilize the Temporary Power Generation Units from the Project Site following a Buyer Termination for Convenience occurring during the first thirty-six (36) months following COD. Eligible Demobilization Costs shall be limited strictly to direct demobilization-related expenses and shall expressly exclude any lost profits, future revenues, remaining contract value, return on investment, financing costs, breakage costs, internal overhead, corporate allocations, expectation damages, penalties owed to subcontractors or affiliates unless previously approved in writing by Buyer, costs associated with replacement projects or redeployment of equipment, costs already amortized,

Docusign Envelope ID: [illegible]



recovered, reimbursed, or otherwise included in the Contract Rate, and any mark-up, fee, contingency, or profit component of any kind.

Initial LG

**"Environmental Compliance"** means adherence to all applicable federal, state, and local environmental regulations, including but not limited to the requirements of the EPA, NOAA, and Puerto Rico environmental authorities.

**"EPA"** means the United States Environmental Protection Agency, which enforces environmental protection standards applicable to power generation projects.

Initial DR

**"Equipment"** means the power generation units, transformers, switchgear, fuel storage facilities, and all ancillary infrastructure necessary to provide 400 MW of COP-rated generation capacity at Aguirre and if applicable at the additional site.

Initial JW

**"Event of Default"** means the occurrence of any event expressly identified in Article XV as constituting an Event of Default. **"Facility"** means the temporary power generation system, together with all associated infrastructure, deployed at Aguirre and if applicable at the additional site under this Agreement.

**"Force Majeure"** means subject to Article XII, any event or circumstance beyond the reasonable control of the affected Party (the "Affected Party") and not resulting from the fault or negligence of the Affected Party claiming the Force Majeure, which wholly or partially prevents the Affected Party from performing any of its obligations under this Agreement, but only if and to the extent that: (1) the Affected Party could not have prevented, avoided, or removed such circumstance, despite the exercise of reasonable diligence consistent with its obligations under this Agreement; (2) the Affected Party has taken all reasonable precautions, due care, and reasonable alternative measures in order to (i) avoid the effect of such event or circumstance on the Affected Party's ability to perform such obligation under this Agreement, and (ii) mitigate the consequences thereof; (3) such event or circumstance did not directly or indirectly arise out of the breach by the Affected Party of any of its obligations under this Agreement or the fault or negligence of the Affected Party; and the Affected Party has given the other Party ("Non-Affected Party") notice of such event or circumstance in accordance with Article XXIII.

MCOB

**"Fuel Supply"** means the fuel required for power generation, whether provided by the Buyer or Seller, as specified in the Agreement.

**"Genera PR"** means Genera PR LLC, acting as the authorized agent of PREPA under the Generation O&M Agreement.

**"Generation O&M Agreement"** means the contract entered into by PREPA, Genera PR, and the Puerto Rico Public-Private Partnerships Authority (P3A) for the operation and maintenance of PREPA's Legacy Generation Assets.

**"Governmental Authority"** means any federal, state, or municipal agency, including but not limited to: The Commonwealth of Puerto Rico; The Financial Oversight and Management Board for Puerto Rico; the Federal Energy Regulatory Commission (FERC).

**"Grid Connection"** means the interconnection of the power generation solution to the 115 kV and/or 230 kV switchyards at Aguirre and or if applicable any Additional Site, in compliance with the technical standards established by PREPA, LUMA, and Genera PR.

**"Hazardous Materials"** means any substance classified as hazardous or toxic under EPA, OSHA, or Puerto Rico environmental laws.

**"Independent Engineer"** means a third-party expert appointed to verify the Seller's compliance with performance standards and certify technical deliverables under this Agreement.

Initial LG

**"Infrastructure Support"** means all necessary electrical, structural, and civil works required to integrate the power generation solution with the Buyer's transmission network.

**"kWh"** means kilowatt-hour, a unit of energy measurement used for billing under this Agreement.

Initial DR

Initial JW

**"Liquidated Damages"** means any pre-agreed financial compensation owed as a result of a Party's failure to meet its contractual obligations, including, without limitation, delayed deployment or failure to maintain the required operational uptime. The Parties acknowledge and agree that the Liquidated Damages set forth herein constitute reasonable forecasts of the actual harm that would result from such breaches, and that the nature of such harm would be difficult or impracticable to accurately quantify at the time of contracting.

**"LUMA"** means LUMA Energy, LLC, acting as the authorized agent of PREPA under the transmission and distribution (T&D) O&M Agreement.

**"Monthly Billing Period"** means the standard invoicing period based on metered energy delivered to the grid.

**"NOAA"** means the National Oceanic and Atmospheric Administration, which oversees marine and coastal environmental compliance.

**"Operating Plan"** means the detailed procedures, maintenance schedules, and operational protocols for the power generation operations at Aguirre and or if applicable any Additional Site.

**"Operational Rate"** means the fixed rate of US$0.160 per kWh payable to Seller for electric energy generated and delivered to Buyer under this Agreement, exclusive of any fuel cost, fuel reimbursement, fuel adjustment, pass-through fuel charge, taxes, penalties, liquidated damages, or other separate charges. The Operational Rate is intended to compensate Seller for the non-fuel components of power generation, including operation, maintenance, equipment, labor, and other costs associated with making the generation facility available and producing energy, as applicable under this Agreement.

MCG

**"Performance Bond Triggering Event"** means any of the events specified in Exhibit C that entitle Buyer to call or execute the Performance Bond.

**"Performance Standard"** means the key performance indicators (KPIs) used to evaluate the Seller's operational efficiency, uptime, fuel efficiency, and compliance with grid regulations.

**"Permits"** means all necessary licenses, approvals, and environmental authorizations required for contract execution.

**"Power Availability"** means Seller's readiness and capability to deliver power in compliance with Buyer dispatch instructions and scheduled generation. The system must meet a minimum annual equivalent availability factor of 95% of the COP.

**"Power Generation Shortfall"** means the positive difference, if any, between (a) the Scheduled Generation for any period and (b) the actual power delivered by Seller at the Delivery Point during such period, excluding shortfalls directly caused by (i) Force Majeure

Events, (ii) Buyer-directed curtailment or dispatch adjustments, (iii) conditions solely attributable to the Buyer or the transmission system operator, or (iv) pre-approved Scheduled Maintenance.

**"Power Purchase and Operating Agreement" or "PPOA"** means this Agreement pursuant to which Seller shall own, operate, maintain, and make available the Temporary Power Generation Units and sell electric energy to Buyer at the Delivery Point, with compensation based on metered and accepted kilowatt-hours delivered in accordance with the terms and operational requirements of this Agreement. Operational availability, dispatch compliance, and performance obligations are incidental and necessary to Seller's energy delivery obligations under this Agreement.

**"Prime Rate"** means the Wall Street Journal (WSJ) Prime Rate.

**"Project Site"** means the designated locations at Aguirre and if applicable at the additional site where the power generation systems will be deployed.

**"Regulatory Compliance"** means full adherence to all environmental, technical, and operational requirements as mandated by the Agreement.

**"Scheduled Generation"** means the quantity of power (in MW) that Seller is required to make available and deliver at the Delivery Point during any given period, as determined by Buyer or its operator pursuant to Article V, subject to the Power Availability requirement. In the absence of specific dispatch instructions, Scheduled Generation shall equal 95% of 400 MW COP (380 MW) for each hour. Scheduled Generation shall in no event exceed the amount of power the Facility is physically capable of delivering at the time of dispatch, taking into account then-existing operating conditions and any Force Majeure Event.

**"Scheduled Maintenance"** means planned service and inspections necessary to ensure continuous operation.

**"Seller"** means, collectively, Power Expectations, LLC, Enchanted Rock, LLC, and Reyes Contractor LLC, which shall be jointly and severally liable for all obligations, representations, and warranties under this Agreement. The Seller is responsible for the design, deployment, operation, and maintenance of the temporary power generation solution as awarded under this Agreement.

**"Seller Fuel Default"** means any failure by Seller to supply, deliver, or maintain adequate LNG inventory to operate the Temporary Power Generation Units at the required Power Availability level, except where such failure is directly caused by a Force Majeure Event or a Buyer-directed action.

**"Site Coordination Protocol"** means the procedures established pursuant to Section 2.6 of this Agreement governing the demarcation, placement, and operation of equipment at Project Sites where multiple Sellers or third parties may operate.

**"Temporary Power Generation Unit"** means a non-permanent generation asset installed at Aguirre or if applicable any Additional Site under this Agreement.

**"Termination Payment"** means solely the amount of any undisputed payment obligations accrued for electric energy actually delivered, metered, accepted, and invoiced by Seller prior to the effective date of termination, to the extent such amounts remain unpaid; provided, however, that in the event of a Buyer Termination for Convenience occurring

during the first thirty-six (36) months following COD, Buyer shall also reimburse Seller for Eligible Demobilization Costs solely to the extent expressly provided in Section 3.1.1(c). For the avoidance of doubt, Termination Payment shall not include lost profits, future revenues, remaining contract value, stranded costs, financing costs, return on investment, expectation damages, or any form of make-whole compensation unless expressly stated otherwise in this Agreement.

**"Transmission System"** means the network of high-voltage lines and associated infrastructure used to deliver electricity from the power generation units to PREPA's transmission grid.

### 1.2 Interpretation

In this Agreement, unless the context requires otherwise:

(a) **References to Article and Exhibits –** References to Article and Exhibits refer to those within this Agreement. The Exhibits hereto are incorporated by reference and form an integral part of this Agreement.

(b) **References to a Person –** References to a Person shall include such Person's successors and permitted assigns.

(c) **Article and Exhibit Headings –** The headings of Article and Exhibits are for convenience only and shall not affect the construction or interpretation of this Agreement.

(d) **Singular, Plural, and Gender Usage** – Words denoting singular include the plural and vice versa. Words denoting a specific gender (masculine, feminine, neuter) shall be interpreted to include all genders or bodies corporate.

(e) **Interpretation of "Include" and "Including" –** The terms "include" and "including" shall be construed as "including without limitation".

(f) **References to Agreement and Obligations –** The words "agree," "agrees," and "agreed" refer to a written agreement that has been executed and delivered by the Parties.

(g) **Party Consent and Reasonable Efforts –** If either Party's consent or agreement is required to not be unreasonably withheld, it includes the obligation to not unreasonably delay granting such consent or agreement.

(k) **Statutory References –** References to any law, statute, or statutory provision shall be construed as a reference to such law as amended, modified, or re-enacted, and shall include any subordinate legislation issued under that provision.

(l) **Replacement of Prime Rate –** If, at any time during the Supply Period, the Prime Rate becomes unavailable or inappropriate, the Parties shall promptly meet to discuss and attempt to agree in writing upon a suitable replacement benchmark rate. If the Parties are unable to agree, either Party may refer the matter to an Expert for determination, in accordance with Article XX (Settlement of Disputes).

## ARTICLE II – POWER SALE, PURCHASE, AND OPERATIONS

### 2.1 Power Generation Sale and Delivery

Seller shall own, install, operate, maintain, and make available the Temporary Power Generation Units and shall sell electric energy generated therefrom to Buyer at the designated Delivery Points, and Buyer agrees to purchase such delivered electric energy in accordance with the terms of this Agreement.

All delivered power shall meet the quality and operational standards set forth in Article IV.

The amount of power delivered, and the related delivery schedules, shall be determined in accordance with Article V. Buyer's obligation is limited to paying for metered and accepted kilowatt-hours in accordance with Article X and Article VII. This Agreement does not impose any minimum-take requirement, minimum-generation requirement, or make-whole obligation unless expressly stated in Exhibit B.

Title to and risk of loss for electric energy delivered under this Agreement shall transfer from Seller to Buyer at the Delivery Point.

### 2.2 Delivery Method and Interconnection Requirements

The Seller shall deploy, install, and operate the Temporary Power Generation Units necessary to supply power at the Project Site. The Seller shall comply with all interconnection, protection, telemetry, SCADA, and dispatch requirements established by LUMA.

The Seller is responsible for all infrastructure required to interconnect the generation systems at the 115 kV or 230 kV switchyards, including transformers, switchgear, auxiliary systems, and all associated equipment. The Seller shall obtain and maintain all permits and approvals necessary for installation, operation, environmental compliance, and interconnection.

The Buyer shall provide reasonable access to the Project Site and designate the areas where the Temporary Power Generation Units will be installed. The Buyer shall make commercially reasonable efforts to support and expedite permitting and interconnection processes without assuming liability for delays attributable to the Seller or third parties.

### 2.3 Operation and Maintenance

The Seller shall be fully responsible for operating and maintaining the Temporary Power Generation Units, including preventive maintenance, corrective maintenance, planned outages, and forced outages. The Seller shall comply at all times with operational directives issued by LUMA and Genera PR.

The Seller shall maintain real-time monitoring capabilities for power output, operational status, environmental compliance (when applicable), and outage events. The Seller shall submit operational reports to the Buyer, LUMA, and any regulatory authority upon request. Each report shall include generation records, outage information, corrective actions taken, and relevant operational data consistent with LUMA's reporting format.

### 2.4 Fuel Responsibilities and Fuel Options

For the Aguirre Power Plant, LNG shall be the designated primary fuel for all operations under this Agreement. The Seller shall procure all Liquefied Natural Gas (LNG) required to

operate the Temporary Power Generation Units and shall be responsible for LNG delivery, storage, regasification, associated infrastructure, and environmental and safety compliance. As a condition precedent to achievement of COD, Seller shall demonstrate to Buyer, LUMA, and Genera PR that: (i) all LNG procurement, supply, transportation, storage, regasification, and delivery infrastructure is fully operational and tested; (ii) binding LNG supply and logistics agreements are in place sufficient to support sustained operation at 95% Power Availability; and (iii) all permits, licenses, and approvals required for LNG-based operation have been obtained and are in good standing. Failure to satisfy these conditions precedent by the Deployment Period (Day 150) shall constitute grounds for Performance Bond execution and termination pursuant to Articles VIII and XV.

Initial LG

Initial DR

Initial JW

LNG shall be the primary fuel for all operations under this Agreement. Diesel-based operation is secondary and limited exclusively to the following contingency scenarios: (i) a documented Seller Fuel Default as defined herein; (ii) a duly documented Force Majeure Event that prevents, restricts, or materially delays Seller's ability to supply LNG; or (iii) a grid emergency or reliability event declared in writing by Buyer, LUMA, or Genera PR. Outside of these contingencies, the Facility shall operate exclusively on LNG. When diesel operation is triggered under one of the foregoing scenarios, Buyer shall supply the diesel fuel and its delivery infrastructure, pricing applicable to diesel operation shall be as set forth in Exhibit B and Section 2.4.3, and the Seller shall operate the generation units on diesel upon written instruction from the Buyer.

### 2.4.1 Diesel Compensation Upon Seller Fuel Default

If Seller fails to supply, deliver, or maintain adequate LNG to operate the Temporary Power Generation Units at the required Power Availability level (a "Seller Fuel Default"), and the Buyer or its operator elects to utilize diesel fuel to maintain power generation, the following compensation provisions shall apply:

(a) Buyer shall be entitled to procure diesel fuel at its discretion to maintain power generation at the Project Sites;

(b) During any Seller Fuel Default period in which Seller operates using diesel fuel, Seller shall be compensated at a rate of $0.160/kWh for operational costs for each kWh generated. In addition, Seller shall reimburse Buyer for the diesel fuel costs incurred in connection with such generation during the Seller Fuel Default period;(d) Such reimbursement may be offset by Buyer against any payments otherwise due to Seller under Article X.

MCG

### 2.4.2 Diesel Price Reference Index

For purposes of calculating the Actual Diesel Cost Rate, the Delivered Diesel Price per Gallon shall be determined by reference to:

(a) The U.S. Energy Information Administration (EIA) Weekly Retail On-Highway Diesel Price for the Gulf Coast (PADD 3) region, multiplied by a Puerto Rico Delivery Adjustment Factor of 1.12 to account for transportation and logistics costs; or

(b) Actual invoiced diesel costs if Buyer procures diesel directly, supported by documentation.

### 2.4.3 Diesel Operation During Seller Fuel Default or Force Majeure

If, as a result of (i) a documented Seller Fuel Default not attributable to a Force Majeure Event or to Buyer, or (ii) a duly documented Force Majeure Event that prevents, restricts, or materially delays Seller's ability to supply LNG to the Facility, Buyer elects to operate the Facility using diesel fuel in lieu of LNG, the following shall apply

Initial LG

Initial DR

Initial JW

(a) Diesel Operation During Seller Fuel Default (Non-Force Majeure) If diesel operation occurs as a result of a documented Seller Fuel Default not attributable to Force Majeure or Buyer, Seller shall be compensated at a rate of US$0.160 per kWh solely for operational costs for each kWh generated during such diesel operation. In addition, Seller shall reimburse Buyer for the diesel fuel costs incurred in connection with such generation during the Seller Fuel Default period.

Seller's reimbursement obligation under this Section shall be limited to diesel operation for up to five hundred forty-eight (548) operating hours per month and, in all events, shall not exceed US$500,000 per month.

(b) Diesel Operation During Force Majeure If diesel operation occurs as a direct result of a duly documented Force Majeure Event affecting Seller's ability to supply LNG, and Buyer supplies and pays for the diesel fuel used during such diesel operation, including any related storage and logistics costs, Seller shall be compensated solely at the Non-Fuel Rate of US$0.160 per kWh for energy generated during such diesel operation.

(c) Limitation on Seller Compensation During Force Majeure Diesel Operation For the avoidance of doubt, during any period described in subsection (c), Seller shall not be entitled to:

(i) the Contract Rate;

(ii) reimbursement of diesel fuel costs; or

MCGA

(iii) any other fuel-related compensation Seller's compensation during such period shall be limited exclusively to the Non-Fuel Rate set forth above.

(d) Buyer Mitigation

Buyer shall use commercially reasonable efforts to minimize diesel usage and associated costs during any period of diesel operation under this Section, consistent with maintaining grid reliability and operational requirements.

(e) Application of this Section

This Section shall apply solely during:

(i) a documented Seller Fuel Default not excused by Force Majeure; or

(ii) a duly documented Force Majeure Event affecting Seller's ability to supply LNG and shall not apply to any diesel operation elected by Buyer for operational, economic, reliability, or system-related reasons unrelated to Seller Fuel Default or Force Majeure.

For the avoidance of doubt, the compensation framework set forth herein is intended to distinguish between:

(x) Seller-attributable performance failures; and

Initial
LG

(y) non-attributable Force Majeure events

Initial
DR

### 2.5 Deployment and Commissioning

Initial
JW

The Seller shall mobilize, install, and commission the Temporary Power Generation Units within the Deployment Period established in this Agreement. Seller shall submit (i) daily deployment status reports to the Buyer until commissioning is complete, and (ii) Milestone Compliance Reports in accordance with Exhibit G, demonstrating compliance with each milestone set forth therein and identifying any deviations, delays, risks, or anticipated impacts together with the corrective and mitigation measures being implemented.

Milestone Compliance Reports shall be delivered to Buyer on a bi-weekly basis commencing on the second Monday following the Contract Execution Date and continuing through Day 90 of the Deployment Period. Beginning on Day 91 and continuing until COD is achieved, Seller shall provide weekly Milestone Compliance Reports every Monday by 5:00 p.m. AST. Such reports shall identify milestone status, deviations, delays, risks, mitigation measures, recovery actions, and any anticipated impacts to the schedule set forth in Exhibit G.

Seller acknowledges that timely achievement of the milestones set forth in Exhibit G and achievement of COD are material obligations under this Agreement. Seller further acknowledges that obtaining permits, approvals, licenses, authorizations, interconnection coordination, and regulatory compliance necessary for the Project constitutes a core obligation of Seller. Ordinary permitting timelines, foreseeable regulatory review periods, incomplete submissions, deficient applications, failure to timely respond to agency requests, or delays resulting from Seller's acts, omissions, negligence, lack of diligence, or failure to properly manage subcontractors, consultants, or suppliers shall not constitute Force Majeure or otherwise excuse compliance with the Deployment Period.

Notwithstanding the foregoing, Seller shall not be deemed in default, nor shall Deployment Delay Liquidated Damages accrue under Article VIII, to the extent Seller demonstrates that a delay affecting a milestone under Exhibit G or achievement of COD was directly caused by: (i) Buyer's failure to timely provide required site access, interconnection coordination, approvals, information, governmental cooperation, or other actions expressly required to be provided by Buyer under this Agreement; (ii) delays caused by Governmental Authorities under the direct control of the Commonwealth of Puerto Rico or Buyer after Seller has timely and diligently submitted all required applications, supporting documentation, studies, and materials necessary for the applicable permit, approval, authorization, or interconnection process; or (iii) Buyer-directed scope changes, operational modifications, sequencing changes, or scheduling adjustments that materially impact the approved deployment schedule.

As a condition to any relief under this Section, Seller shall: (a) provide written notice to Buyer within five (5) Business Days after becoming aware of the applicable delay; (b) demonstrate continued diligent pursuit of the affected milestone or COD; (c) implement commercially

reasonable mitigation and acceleration efforts; (d) provide supporting documentation reasonably requested by Buyer; and

(e) submit a recovery schedule identifying the measures being implemented to minimize the delay and restore compliance with Exhibit G and the approved project schedule, including: (i) the milestones affected; (ii) the estimated duration of the delay; (iii) the actions being taken to mitigate and recover the delay; (iv) the revised expected date for achievement of each affected milestone; and (v) the revised expected Commercial Operation Date (COD), together with supporting documentation demonstrating the basis for such revised schedule.

(f) Seller shall submit a written request for schedule relief together with the recovery schedule required under subsection (e).

(g)Buyer shall have the right, in its reasonable discretion, to approve, conditionally approve, partially approve, or deny the requested schedule adjustment under subsection (f). Buyer shall issue its written determination within ten (10) Business Days after receipt of Seller's complete request. If Buyer reasonably requests additional information, the review period shall be tolled until such information is provided. No schedule adjustment, extension of any milestone, extension of the Deployment Period, extension of COD, or relief from Deployment Delay Liquidated Damages shall be effective unless approved by Buyer in writing.

Exhibit GAny schedule adjustment granted pursuant to this Section shall be limited solely to the actual period of demonstrated delay directly attributable to the applicable circumstances, shall apply only to the affected milestone or obligation, shall not constitute a waiver of any other contractual obligation of Seller, and shall not entitle Seller to additional compensation, equitable adjustment, increased pricing, demobilization costs, financing costs, lost profits, or any other damages or payments not expressly provided under this Agreement.

Except as otherwise expressly provided under this Section or Article XII, any delay affecting the milestone schedule or achievement of COD shall subject Seller to the applicable Liquidated Damages, Performance Bond remedies, suspension rights, termination rights, offsets, and other remedies set forth in this Agreement.

### 2.6 Site Coordination Protocol

Given that multiple Sellers and third-party operators (including LUMA Energy and Genera PR) may operate at or near the Project Sites, the following coordination requirements shall apply:

(a) Site Demarcation Plan: Seller shall identify, evaluate, and propose the areas necessary for its equipment placement, staging, storage, and operations. Seller shall coordinate with LUMA Energy and/or Genera PR regarding site conditions, operational restrictions, access requirements, safety protocols, and operational compatibility with existing facilities and operations. Buyer shall collaborate with Seller, LUMA Energy, and Genera PR in connection with such coordination efforts and shall provide reasonably available information in its possession.

(b) Operational Coordination: Seller shall coordinate all operational activities, including equipment movements, maintenance schedules, and fuel deliveries, with LUMA Energy and Genera PR to minimize disruption to ongoing site operations.

## ARTICLE III – TERM AND CONDITIONS

### 3.1 Agreement Term

Initial LG

This Agreement becomes effective upon execution by both Parties and shall remain in effect for an initial term of ten (10) years beginning on the Commercial Operation Date ("COD") of the Facility at the Project Site. This term applies only to Agreements with a ten-year duration. Agreements with shorter durations shall follow term provisions separately agreed by the Parties.

Initial DR

The Agreement shall remain in force for the full duration of the Initial Term unless earlier terminated in accordance with Article XV (Termination). Early termination shall be permitted only under the specific circumstances and procedures established in this Agreement.

Initial JW

#### 3.1.1 Termination for Convenience

If Buyer elects to terminate this Agreement for convenience during the first thirty-six (36) months following COD, Buyer shall:

pay undisputed amounts owed for electric energy actually delivered, metered, accepted, and invoiced prior to the effective termination date; and

After the expiration of the first thirty-six (36) months following COD, Buyer shall have no obligation to reimburse Seller for any demobilization, removal, stranded, transition, or termination-related costs.

Seller shall not be entitled to lost profits, future revenues, expectation damages, financing costs, return on investment, make-whole compensation, or any other termination-related compensation unless expressly provided in this Agreement.

Seller shall submit detailed supporting documentation for all claimed Eligible Demobilization Costs, including invoices, contracts, receipts, and payment evidence. Buyer shall have full audit rights with respect to any demobilization reimbursement claim. No reimbursement shall be owed for unsupported, estimated, contingent, affiliate, or internally allocated costs.

### 3.2 Extension of Term

The Buyer may elect to extend the Initial Term. To initiate an extension, the Buyer shall send written notice to the Seller at least thirty (30) days before the expiration of the current Term. The Seller shall provide a written response within fifteen (15) days of receiving the request. Any approved extension shall be referred to as an Extension Term.

### 3.3 Performance Period

The Performance Period begins on the first day of the Initial Term and continues for the entire duration of the Agreement, including any Extension Terms, unless the Agreement is earlier terminated in accordance with Article XV.

### 3.4 End-of-Term Purchase Option

#### 3.4.1 Purchase Right

The Buyer shall have the exclusive right to purchase the equipment used in performing this Agreement at its Fair Market Value by providing written notice to the Seller no later than 120

Initial LG

days prior to the expiration of the Term (including any extensions). If the Buyer timely exercises this right, the Seller shall retain the equipment at the project site (or another agreed location) until the purchase is finalized. If the determination of Fair Market Value or the closing of the purchase extends past the expiration of the Term, the Seller's right to dispose of the equipment shall be tolled until the purchase process is completed or explicitly terminated by the Buyer

### 3.4.2 Exclusion

Initial DR

The purchase option does not apply if the Buyer terminates the Agreement for reasons other than the Seller's documented default.

### 3.4.3 Fair Market Value Determination

Initial JW

Fair Market Value shall be determined as follows:

(a) The Parties shall attempt to mutually agree on an independent appraiser experienced in valuing similar equipment; the Buyer shall bear the appraisal cost.

(b) If no agreement is reached within thirty (30) days, each Party shall select an appraiser, and the two selected appraisers shall jointly select a third appraiser. The third appraiser's valuation shall be final and binding.

(c) The valuation shall consider the age, condition, market demand, comparable sales, and other relevant factors.

### 3.4.4 Notice of Intent to Purchase

The Buyer shall provide written notice to the Seller at least 120 days before the end of the Term indicating its intent to exercise the purchase option.

### 3.4.5 Payment Terms

Payment for the equipment at the determined Fair Market Value shall be made by the Buyer within fifteen (15) days of reaching agreement on the price.,

MCDG

## ARTICLE IV – GENERATION PERFORMANCE AND OPERATIONAL STANDARDS

### 4.1 Power Generation Performance Standards

The Seller shall ensure that all power generated and supplied to the Buyer at the Delivery Point (115 kV or 230 kV switchyard at the Aguirre and or if applicable any Additional Site) complies fully with the operational and regulatory requirements established in Exhibit E (Technical Specifications and Measurement Standards).

The Seller shall maintain continuous and stable power generation capacity of 400 MW COP at the Aguirre site and or if applicable any Additional Site, subject to the Power Availability requirements established under this Agreement. All generated power shall meet the applicable grid performance standards, including frequency stability at 60 Hz with allowable deviation, and voltage stability consistent with 115 kV and 230 kV system requirements.

The Seller shall integrate real-time telemetry and operational data with LUMA's Energy Control Center, including automated reporting of generation output, system status, availability, fuel consumption (if applicable), and compliance indicators. Monthly performance reports shall be submitted to the Buyer and LUMA, detailing actual energy delivered in MW

and kWh, operational availability, outage events, and any variance from the performance obligations.

The Seller shall comply at all times with all environmental, occupational safety, and regulatory requirements applicable to power generation facilities, including EPA emissions standards, OSHA safety standards, and NOAA or U.S. Coast Guard requirements applicable to maritime-based equipment. Full regulatory compliance is a condition of continued operation. The Seller shall notify the Buyer within twenty-four (24) hours of any actual or suspected violation, non-compliance, or regulatory enforcement action.

### 4.2 Reserved

### 4.3 Non-Compliance with Performance Standards

If the Seller is unable to meet any performance standard required under this Agreement, the Seller shall immediately notify the Buyer, identifying the nature, cause, expected duration, and corrective measures being implemented.

If a Power Generation Shortfall occurs, the Buyer may procure substitute power from alternative sources, adjust system dispatch, activate emergency reserves, or implement any action necessary to preserve service continuity. The Seller shall coordinate with the Buyer and its operators to minimize impacts and restore full service.

If power output at either site falls below the required 400 MW COP (as adjusted by any applicable Power Availability requirements), the Seller shall submit a corrective action plan within twenty-four (24) hours. The plan shall describe the cause of the deficiency, the specific corrective steps, the recovery timeline, and the expected date of full restoration. If the Seller fails to restore output within a reasonable time determined by the Buyer, the Buyer may require deployment of backup generation assets or temporary configuration changes. The Seller shall cooperate fully with all such directives.

### 4.4 Dispute Resolution for Performance Measurement

Any dispute relating to the measurement, testing, or reporting of power generation performance shall be resolved pursuant to Article XX (Settlement of Disputes). The Parties shall first attempt resolution through good-faith discussions. If no resolution is reached, the matter may be referred to an Independent Engineer or Third-Party Auditor to verify performance data and evaluate compliance.

The Independent Engineer or Auditor shall review operational data, metering records, and system conditions to determine whether the Seller has met its contractual performance obligations. Findings of the Independent Engineer or Auditor shall be final and binding for purposes of determining compliance with this Article.

## ARTICLE V – DISPATCH, OPERATIONS, AND POWER DELIVERY

### 5.1Power Generation Planning and Dispatch Coordination

The Seller shall provide power generation services in alignment with the operational and dispatch requirements of the Buyer and LUMA, ensuring continuous, reliable, and flexible generation throughout the Performance Period. The Buyer or its operator shall define required output levels on a daily and weekly basis, and the Seller shall maintain full

readiness to comply with all dispatch instructions while meeting the Power Availability requirement.

The Buyer, through its operator, shall issue a weekly operational forecast identifying anticipated power requirements for the following seven-day period. The Seller shall coordinate its fuel logistics, maintenance activities, and operational planning to ensure uninterrupted service. The forecast may be amended at any time to reflect real-time grid conditions, and the Seller shall promptly implement all required adjustments.

Any changes requested by the Buyer or its operator, including modifications to output, operating hours, or other delivery requirements, shall be implemented immediately by the Seller and shall not limit the Seller's obligation to maintain operational readiness or to comply with performance standards.

### 5.2 Performance-Based Dispatch Adjustments

The Buyer or its operator may modify power delivery requirements at any time based on grid conditions or energy demand. The Seller shall respond immediately to all dispatch instructions and adjust generation accordingly. The Seller shall maintain full operational availability and must be capable of increasing or decreasing power output up to the contracted capacity.

If the Buyer or its operator requires dispatch of power, the Seller shall make commercially reasonable efforts to meet the requested level. If the Seller cannot provide the requested output, it shall notify the Buyer immediately, specify the cause of the shortfall, and provide a firm timeline for restoring the required level of service.

### 5.3 Infrastructure and Grid Integration for Power Delivery

The Seller is responsible for integrating its power generation system with the Buyer's transmission and dispatch network and shall comply with all applicable interconnection standards and protocols set by the Buyer and coordinated with LUMA. The Seller shall connect its system at the 115 kV and/or 230 kV switchyard at Aguirre and if applicable to any Additional Site shall operate and maintain all auxiliary facilities, including transformers, switchgear, and related equipment, in full working condition throughout the Performance Period.

The Seller shall maintain an operational plan that ensures rapid response to dispatch adjustments and includes real-time communication with the Buyer's control center. This plan shall incorporate continuous data sharing regarding generation levels, system status, maintenance activities, and any performance deviations affecting grid operations.

LUMA is responsible for providing guidance and specifications for the electrical interconnection process, including technical reviews, interconnection studies, system approvals, and required coordination with the transmission and distribution system.

The Seller is responsible for all interconnection costs.

### 5.4 Curtailment and Adjustments to Power Delivery

If the Buyer or its operator determines that generation must be reduced or suspended due to grid conditions, the Seller shall comply with the curtailment order immediately. The Seller shall maintain readiness to resume full output as soon as requested by the Buyer or its operator.

Following any curtailment, the Seller shall coordinate with the Buyer or its operator to restore full generation promptly. If the Buyer or its operator requires generation above the contracted capacity, the Seller may propose additional capacity subject to technical feasibility and mutually agreed compensation, provided that no such proposal diminishes the Seller's obligations under this Agreement.

Initial LG

### 5.5 Operational Monitoring and Reporting

Initial DR

The Seller shall implement real-time monitoring systems to track power output, availability, grid compliance, and system stability and shall ensure continuous data access for the Buyer. The Seller shall provide a monthly performance report confirming actual power delivered, operational availability, corrective actions taken to address deviations, and environmental and regulatory compliance status.

Initial JW

In the event of a Power Generation Shortfall or service interruption, the Seller shall immediately notify the Buyer or its operator, document the event, state the cause, and describe the corrective measures being implemented.

### 5.6 Performance-Based Payment Adjustments

Payment to the Seller shall be based solely on actual power delivered under Article X. If the Seller fails to meet operational or performance obligations, the Buyer may adjust payments to reflect the actual level of service received.

If the Seller fails to deliver the required output, the Buyer may require the Seller to submit a Performance Correction Plan within ten days of written notice. The plan must include detailed corrective actions and a firm timeline for restoring compliance, which shall not exceed thirty days unless extended by the Buyer in writing.

If the Seller fails to submit or execute an acceptable Performance Correction Plan, the Buyer may procure substitute power from other sources, and any incremental cost shall be deducted from payments otherwise due to the Seller.

### 5.7 Service Adjustments and Long-Term Planning

MCog

The Buyer and Seller shall conduct quarterly service reviews to evaluate performance, assess necessary operational adjustments, and determine whether long-term scheduling or infrastructure modifications are required. These reviews shall support Puerto Rico's broader energy security and system planning needs. Any adjustment affecting scheduling, dispatch coordination, or service provision shall be formalized through a written amendment approved by the Buyer.

## ARTICLE VI – GENERATION AVAILABILITY SHORTFALL

### 6.1 Failure to Meet Power Delivery and Availability Requirements

The Seller is obligated to deliver the scheduled quantity of power and to maintain the contractually required Power Availability at Aguirre or if applicable to any Additional Site. A Power Generation Shortfall occurs whenever the Seller fails to (i) deliver the required power output at the Delivery Point, or (ii) comply with the Power Availability requirement, except where such failure is directly caused by (a) a Force Majeure Event, (b) a Buyer-directed operational adjustment, or (c) conditions solely attributable to the Buyer or the transmission system operator.

If a Power Generation Shortfalls occurs, the Buyer shall have the unilateral right to determine the operational and financial impacts of such deficiency and to require Seller to take immediate corrective actions, including adjustments to equipment, operations, staffing, fuel management, and scheduling. Buyer may issue corrective action instructions, and Seller shall comply without delay.

Initial LG

If the Seller diverts power, capacity, or LNG fuel committed under this Agreement to any other buyer or third party without Buyer's prior written consent, such conduct shall constitute a material breach, and Buyer shall be entitled to pursue all remedies available under this Agreement and under Applicable Law

Initial DR

### 6.1.1 Shortfall Measurement

Initial JW

Power Generation Shortfall shall be measured on a daily basis by comparing: (a) the Scheduled Generation for such day (which, absent specific dispatch instructions, shall be 380 MW for each hour, representing 95% of 400 MW COP), against (b) the actual metered power delivered at the Delivery Point during such day. Any positive difference constitutes a Power Generation Shortfall subject to the remedies set forth in this Article and Article VIII (Liquidated Damages).

### 6.1.2 Shortfall Consequences

Upon determination of a Power Generation Shortfall, the following consequences shall apply:

(a) Buyer may offset amounts owed to Seller pursuant to Section 6.2;

(b) Availability Penalties shall accrue pursuant to Section 8.3;

(c) Persistent or material shortfalls may trigger Performance Bond execution pursuant to Exhibit C; and

(d) Repeated or uncured shortfalls may constitute grounds for termination pursuant to Article XV.

### 6.2 Buyer's Right to Recover Costs and Implement Offsets

Following any Power Generation Shortfall, the Buyer shall be entitled to recover all costs, expenses, losses, and damages arising from Seller's failure to meet contractual performance requirements. Such recoverable costs may include, without limitation, the cost of replacement power, ancillary services, system stabilization measures, operational impacts at the Site, and any additional technical or administrative burdens imposed on Buyer or the grid operator.

Any amounts owed by Seller may be offset by Buyer against payments otherwise due under Article X, without need for further notice or demand.

### 6.3 Corrective Action and Remedial Obligations

Upon notice from Buyer, the Seller shall promptly submit and implement a corrective action plan acceptable to Buyer. Persistent, recurring, or uncorrected deficiencies shall constitute grounds for suspension or termination under Article XV.

### 6.4 Acknowledgment of Seller's Operational Responsibility

Seller acknowledges that its obligations regarding continuous power delivery, operational readiness, fuel management, and system availability are essential to the operation of PREPA's grid. Seller further acknowledges that failures to meet these requirements impose direct and measurable impacts on grid stability, operational logistics, and system reliability. Nothing in this Article limits Buyer's right to pursue termination, injunctive relief, suspension, or any other contractual remedy.

Initial LG

Initial DR

## ARTICLE VII – MEASUREMENT, TESTING, AND OPERATIONS

### 7.1 Measurement and Verification of Power Generation

Initial JW

The Seller shall ensure that all power generation output delivered at the Aguirre Project Sites or if applicable to any Additional Site is accurately measured, monitored, and reported at the Delivery Points in accordance with this Agreement. All metering equipment and associated systems shall conform to the technical standards set forth in Exhibit E, including applicable NERC, FERC, IEEE 1547, and ANSI accuracy requirements.

Because LNG is the required priority fuel and the basis for operational and performance calculations under this Agreement, all measurements, verifications, and operational reporting shall expressly document, at all times, LNG-based generation and establish whether any deviation from LNG usage has occurred. Failure to provide such documentation will be considered a material breach.

The Buyer shall have unrestricted rights, at any time and without limitation, to conduct independent inspections, audits, validation tests, and system verifications at either Site or remotely through telemetered systems. Seller shall provide full and immediate access to operational data, metering logs, telemetry files, calibration records, emissions data, and any other documentation requested by the Buyer. Refusal or failure to provide such access constitutes a material breach of this Agreement.

### 7.2 Power Measurement Standards

All power delivered to the Buyer shall be measured in kilowatt-hours (kWh) and megawatts (MW) using metering equipment compliant with ANSI C12.20 accuracy standards. All meters shall record output at a base frequency of 60 Hz and at the voltage levels corresponding to the Delivery Points (115kV or 230kV).

All power output measurements shall be continuously logged, time-stamped, stored electronically, and retained in compliance with FERC Order 760 and all applicable NERC performance and transparency requirements. Seller shall provide the Buyer real-time telemetry and operational data through a protocol compliant with IEEE 1815 (DNP3).

If metering data is lost, compromised, corrupted, or otherwise unavailable, the Buyer shall determine the replacement values based on validated historical data, established operational models, or other appropriate calculations consistent with ISO 50001. In the event of a disagreement, the Buyer's determination shall govern unless overturned in accordance with Article XX.

### 7.3 Metering Equipment and Calibration Requirements

The Buyer has installed ultrasonic meters and associated systems at each Delivery Point. The Seller shall be responsible for operating, maintaining, calibrating, securing, and ensuring the accuracy and integrity of these meters at all times, including cyber protection of metering data and telemetry pathways. Calibration shall follow ISO/IEC 17025 standards.

If any metering equipment is found to be inaccurate, inoperable, compromised, or otherwise unreliable, the Buyer shall apply corrections based on calibration tests, validated historical operational data, or third-party meter verification. If insufficient data exists to determine the adjustment period, the default period shall equal one-half of the time elapsed since the most recent valid calibration.

Seller must immediately notify Buyer of any suspected or confirmed metering discrepancy and must provide a corrective action plan without delay.

### 7.4 Verification and Performance Testing

Seller shall conduct monthly verification tests in accordance with ANSI C12.1 standards and shall provide results to the Buyer immediately upon completion. The Buyer may require third-party verification at any time on written notice.

If any discrepancy greater than one percent (1%) is identified, all relevant data shall be corrected and all billing statements reconciled in accordance with FERC Order 757. Repeated discrepancies, repeated calibration failures, or failure to correct inaccuracies promptly shall constitute a breach and may trigger the remedies available under Articles VI and XV.

### 7.5 Operational Data and Availability of Records

Seller shall provide the Buyer, no later than the end of each monthly billing period, all metering, operational, and compliance records for that month. Such records shall include hourly and daily generation data consistent with NERC GADS, grid frequency and voltage stability records demonstrating compliance with IEEE 1547, and environmental and emissions compliance reports, including all EPA CEMS files.

Seller shall also identify all deviations, outages, curtailments, alarms, disturbances, or reductions attributable to non-LNG fuels. Seller must maintain all operational records for at least three (3) years and shall provide immediate access to Buyer upon request.

Failure to timely provide operational data constitutes a breach.

### 7.6 Alternative Measurement Methods for Non-Metered or Non-Operational Sites

If any Project Site lacks functional metering, becomes non-metered, or experiences meter failure, power delivered shall be determined using validated historical operating data adjusted for system load, efficiency, and LNG usage, and supported by fuel consumption data compliant with EPA 40 CFR Part 75. Buyer may require independent third-party verification consistent with ISO 9001.

Any deviation from agreed measurement methods must be documented by Seller and approved by Buyer, whose approval may be withheld at its sole discretion.

### 7.7 Periodic Inspections and System Audits

Seller shall conduct quarterly inspections and system audits of all metering and operational systems in accordance with ISO 50001 energy audit principles and FERC/NERC operational protocols. Seller must provide Buyer with full documentation of audit results and implement corrective actions immediately if deviations, inaccuracies, or operational weaknesses are identified. If deficiencies persist, Buyer may require an independent audit at Seller's cost.

Initial LG

Persistent failures may trigger Buyer remedies under Articles VI and XV, including suspension or termination

Initial DR

## ARTICLE VIII – LIQUIDATED DAMAGES

### 8.1 Purpose and Acknowledgment

Initial JW

The Parties acknowledge that Seller's failure to meet its deployment, availability, and operational obligations under this Agreement, including without limitation the logistics, fuel supply, transportation, and delivery arrangements as set forth in Exhibit G , would cause substantial harm to Buyer and the Puerto Rico electrical grid, including but not limited to increased costs for replacement power, grid instability, regulatory consequences, and harm to ratepayers. The Parties further acknowledge that the actual damages resulting from such failures would be difficult or impracticable to quantify at the time of contracting. Accordingly, the Parties agree that the liquidated damages set forth in this Article VIII represent a reasonable forecast of the harm that would result from such failures and are not intended as a penalty.

### 8.2 Deployment Delay Liquidated Damages

If Seller fails to achieve COD by the end of the Deployment Period (Day 150 after Contract execution or any revised Commercial Operation Date approved in writing by Buyer (Section 2.5)), Seller shall pay to Buyer Deployment Delay Liquidated Damages as follows:

(a) **Rate:** $5,000 per day;

(b) **Trigger:** Liquidated Damages begin accruing on Day 151 after Contract execution or any revised Commercial Operation Date approved in writing by Buyer (Section 2.5) and continue for each day thereafter until the COD is achieved;

MCaf

(c) Termination Right: If COD is not achieved by Day 150 or any revised Commercial Operation Date approved in writing by Buyer (Section 2.5) after Contract execution (representing the expiration of the Deployment Period), Buyer may terminate this Agreement for cause pursuant to Article XV without further liability other than payment of any undisputed amounts owed for electric energy actually delivered, metered, accepted, and invoiced prior to the effective date of termination, in addition to recovering all accrued Deployment Delay Liquidated Damages and exercising any other remedies expressly provided under this Agreement or Applicable Law.

For the avoidance of doubt, Deployment Delay Liquidated Damages shall cease to accrue upon achievement of COD. Following COD, Seller's performance shall be governed by the Availability Penalty provisions of Section 8.3, the Performance Bond provisions of Exhibit C, and the default and termination remedies set forth in Article XV.

Deployment Delay Liquidated Damages and other schedule-related remedies shall be suspended solely during the period of any approved Force Majeure delay or schedule adjustment granted pursuant to Section 2.5 or Article XII affecting the applicable milestone obligations.

Initial LG

### 8.3 Availability Penalty

If Seller's Power Availability falls below the required 95% of COP (380 MW) during any calendar month, Seller shall pay to Buyer an Availability Penalty as follows:

Initial DR

(a) **Rate:** $250 per MW per day for each MW that Seller's average daily availability falls below 380 MW;

Initial JW

(b) **Calculation:** The daily shortfall shall be calculated as (380 MW minus Average Daily Availability in MW). If Average Daily Availability equals or exceeds 380 MW, no penalty accrues for that day;

(c) **Monthly Cap:** The maximum Availability Penalty for any calendar month shall not exceed five percent (5%) of the invoice amount for that month;

(d) **Annual Cap:** The maximum aggregate Availability Penalty for any Contract Year shall not exceed three percent (3%) of the estimated annual contract value

### 8.4 Fuel Diversion Liquidated Damages

If Seller diverts LNG fuel, power capacity, or generation committed under this Agreement to any third party without Buyer's prior written consent, Seller shall pay to Buyer liquidated damages equal to one hundred fifty percent (150%) of the value of the diverted fuel or power, calculated at the Contract Rate of $0.224/kWh. This provision shall apply in addition to, and not in lieu of, any other remedies available to Buyer under this Agreement or Applicable Law.

### 8.5 Abandonment of Liquidated Damages

At any time and from time to time during the Term, if Seller abandons service for more than five (5) consecutive days without substantial efforts to resume operations (as determined by Buyer in its reasonable discretion), Seller shall pay to Buyer a one-time abandonment liquidated damage of $1,000,000 per occurrence. Each separate instance of abandonment following a resumption of service shall trigger a separate liquidated damages assessment, in addition to all other remedies available under this Agreement, including Performance Bond execution.

### 8.6 Regulatory Violation Liquidated Damages

If Seller commits a material violation of any environmental, safety, or operational regulation that remains uncured for more than thirty (30) days after written notice from Buyer or the applicable regulatory authority, Seller shall pay to Buyer liquidated damages of $50,000 per day until the violation is cured, for a maximum period of sixty (60) days. After sixty (60) days, Buyer may terminate this Agreement for cause and execute the Performance Bond.

### 8.7 Corrective Action Plan Failure

If Seller fails to submit an acceptable corrective action plan within the timeframes specified in Articles IV or VI, or fails to implement an approved corrective action plan, Seller shall pay to

Buyer liquidated damages of $25,000 per day until such plan is submitted and approved or successfully implemented.

Initial LG

### 8.8 Data and Reporting Failures

If Seller fails to provide operational data, metering records, or compliance reports as required under Article VII, Seller shall pay to Buyer liquidated damages of $10,000 per day for each day such data or reports remain outstanding beyond the applicable deadline.

Initial DR

### 8.9 Aggregate Annual Cap

Initial JW

Notwithstanding any other provision of this Article VIII, the aggregate liquidated damages payable by Seller in any Contract Year (excluding Fuel Diversion Liquidated Damages and amounts recovered through Performance Bond execution) shall not exceed three percent (3%) of the estimated annual contract value.

### 8.10 Payment and Offset

All liquidated damages under this Article VIII shall be due and payable within thirty (30) days of Buyer's written demand. Buyer may, at its option, offset any liquidated damages owed against payments otherwise due to Seller under Article X. Exercise of offset rights shall not require Buyer to provide additional notice or demand beyond the initial determination of the liquidated damage amount. Seller's obligations, including payment of Liquidated Damages, are secured by the Performance Bond.

### 8.11 Relationship to Other Remedies

The liquidated damages set forth in this Article VIII are in addition to, and not in lieu of: (a) Buyer's right to recover actual damages for breaches not covered by liquidated damages provisions; (b) Buyer's right to terminate this Agreement pursuant to Article XV; (c) Buyer's right to execute the Performance Bond pursuant to Exhibit C; (d) Buyer's right to seek injunctive or other equitable relief; and (e) any other remedies available under this Agreement or Applicable Law.

## ARTICLE IX – RISK AND INDEMNITY

### 9.1 General Indemnity During the Performance Period

Throughout the Performance Period, and to the fullest extent permitted by Applicable Law, each Party shall remain solely responsible for damages, losses, liabilities, or claims caused by its own acts, omissions, negligence, or willful misconduct.

The Seller shall indemnify, defend, and hold harmless the Buyer (PREPA), its agents and operators (including Genera PR and LUMA), and their respective officers, directors, employees, and representatives (collectively, the "Buyer Group") from any third-party claim for personal injury, death, property damage, or other loss arising out of or relating to Seller's activities in performing this Agreement, including the installation, operation, maintenance, handling of fuel, and performance of the Temporary Power Generation Units. Such indemnity shall apply only to the extent the claim results from the Seller's acts, omissions, negligence, strict liability, or willful misconduct.

Docusign Envelope ID: 712D28C1-3039-8DE2-82C2-5A0347960378


The Buyer shall indemnify, defend, and hold harmless the Seller and its affiliates (the "Seller Group") from third-party claims for personal injury, death, or property damage arising solely from the operation of PREPA-owned Generation Units or downstream Buyer facilities, and only to the extent such claim results from the Buyer's acts, omissions, negligence, strict liability, or willful misconduct.

Nothing in this Article limits the Buyer's right to seek damages, penalties, shortfall compensation, liquidated damages, offsets, or any other remedy expressly provided elsewhere in this Agreement.

Initial LG

Initial DR

Initial JW

### 9.2 Transfer of Title and Risk

Title to, and risk of loss for, electricity generated under this Agreement shall transfer to the Buyer only at the Delivery Point identified in Exhibit E (the 115 kV or 230 kV switchyard at Aguirre or if applicable any Additional Site).

Until such transfer occurs, the Seller remains fully responsible for all environmental releases, spills, contamination, equipment failure, operational error, or any incident involving Seller's personnel, equipment, or fuel handling.

After the Delivery Point, the Buyer shall assume responsibility solely for events arising from PREPA's downstream infrastructure.

### 9.3 Environmental and Title Indemnity

The Seller shall indemnify the Buyer Group for all environmental damages, regulatory violations, fines, penalties, title defects, and third-party claims arising from Seller's activities prior to the Delivery Point. This includes LNG storage, regasification, fuel handling or delivery, emissions, discharges, or any construction, mobilization, or preparatory works performed by Seller.

The Buyer shall indemnify the Seller Group only for environmental conditions existing at the Project Sites prior to Seller's mobilization, but solely to the extent such conditions were not caused or worsened by Seller's actions or omissions.

MCG

### 9.4 Notice and Defense of Claims

A Party seeking indemnification shall promptly notify the indemnifying Party upon becoming aware of any claim, demand, or proceeding. The indemnifying Party may assume the defense, provided the resolution does not impose obligations, payments, or admissions on the indemnified Party without its prior written consent. The indemnified Party may participate in the defense at its own expense and shall reasonably cooperate.

Failure to provide timely notice shall not relieve the indemnifying Party of its obligations unless the delay materially prejudices the defense of the claim.

### 9.5 Excluded Damages

Neither Party shall be liable to the other for indirect, incidental, special, punitive, or consequential damages, including loss of profits, revenue, or goodwill. These exclusions shall not apply to:

(a) amounts expressly recoverable under Article VI (Seller's Performance Shortfall);

(b) payments required under Article X (Invoicing and Payment);

(c) penalties, liquidated damages, or offsets expressly stated in this Agreement;

(d) indemnification obligations under this Article IX; or

(e) damages arising from willful misconduct or fraud.

Initial LG

The exclusions in this Section do not apply to regulatory fines, FEMA compliance violations, or environmental liabilities attributable to the Seller under Section 9.3.

### 9.6 Third-Party Beneficiaries

Initial DR

Members of the Buyer Group and Seller Group are expressly designated as third-party beneficiaries solely with respect to the indemnity obligations under this Article IX. No other provision of this Agreement confers third-party beneficiary status unless expressly stated.

Initial JW

## ARTICLE X – INVOICING AND PAYMENT

### 10.1 Payment Rate and Measurement

The Buyer shall compensate the Seller at the kWh rates set forth in Exhibit B for the ten (10)-year Term of this Agreement. No additional indexing or adjustment factor shall apply.

All energy delivered by the Seller shall be measured at the metering points located at the 115 kV and/or 230 kV switchyards at the Aguirre Power Plant or if applicable to any Additional Site. All measurements shall be made by metering systems operated by LUMA and validated pursuant to Article VII (Measurement, Testing, and Operations). Only verified and accepted kilowatt-hour (kWh) values shall be eligible for compensation.

Buyer will charge all payments owed under this Agreement to its designated budget account number 01-2321-23235-000-000. Buyer estimates that its total cost under this Agreement will not exceed $5,886,720,000.00. These values are included solely to satisfy Puerto Rico Comptroller requirements and do not modify, limit, or expand any rights or obligations of either Party.

### 10.2 Monthly Invoicing Requirements

The Seller shall submit a Monthly Invoice on or before the tenth (10th) calendar day of each month. Each Monthly Invoice shall reflect the total kWh delivered during the preceding month multiplied by the applicable $/kWh rate in Exhibit B. Each invoice shall include: (a) daily and monthly kWh reports, (b) uptime percentage for the billing period, (c) environmental and regulatory compliance confirmation, and (d) a certification signed by an authorized Seller representative attesting to the accuracy of the invoice and confirming that no public official has received any unauthorized benefit.

Any approved logistics-related charges shall be itemized separately.

### 10.3 Payment Terms and Method

Buyer shall pay all undisputed amounts within thirty (30) calendar days after receipt of a valid Monthly Invoice. Payments shall be made by wire transfer to the bank account designated by Seller in writing.

If Buyer disputes any portion of an invoice, it shall notify Seller in writing within twenty (20) days of receipt, identifying the disputed items. Buyer shall pay all undisputed amounts by the original due date. Once the Parties resolve the disputed amount, Buyer shall pay the

resolved amount within fifteen (15) days of resolution, together with interest at the maximum rate permitted by applicable law accruing from the original invoice date.

### 10.4 Late Payment and Remedies

Initial
LG

Any undisputed amount not paid within thirty (30) days of receipt of a valid invoice shall accrue interest at the maximum rate permitted by applicable law beginning on the day after the due date and continuing until paid in full.

Initial
DR

Initial
JW

If Buyer fails to pay any undisputed amount within five (5) Business Days after receiving written notice of non-payment from Seller, Seller may suspend services until payment is received. If Buyer remains in default for more than sixty (60) days after such notice, Seller may terminate this Agreement; such termination shall be deemed a Termination for Convenience by Buyer, and Buyer shall be obligated to pay the Termination Payment and all other amounts due and owing.

Comptroller Registration Compliance: Pursuant to Law No. 18 of October 30, 1975, as amended, no payments shall be made under this Agreement until the Agreement is duly registered with the Office of the Comptroller of Puerto Rico. Seller shall provide all documentation necessary to complete such registration.

## ARTICLE XI – DUTIES, TAXES AND CHARGES

Each Party shall be responsible for all taxes, duties, charges, licenses, and levies imposed by any Governmental Authority that are attributable to their respective roles and obligations under this Agreement. The Seller shall be solely responsible for all duties, levies, import fees, taxes, and associated charges arising from the importation, mobilization, deployment, operation, repair, or maintenance of the mobile or land-based power generation units. This includes all sales, use, value-added, gross receipt, or excise taxes assessed on the equipment, components, fuel, infrastructure, or labor utilized by the Seller in delivering power to the grid under the Project Site $/kWh rates specified in Exhibit B.

MCO

If the Buyer is required to pay, remit, or withhold any taxes that are legally the Seller's obligation, the Seller shall reimburse the Buyer promptly upon presentation of reasonable evidence of such payment. Both Parties shall cooperate in providing or exchanging the documentation necessary to support tax exemption claims, credit eligibility, incentive program benefits, or regulatory filings under applicable Puerto Rico or U.S. federal tax laws, provided that such cooperation does not impose a material burden on the non-requesting Party.

The Seller represents and warrants that it is the importer of record for all equipment, components, or fuel used in connection with this Agreement and shall comply with all import-related obligations, including filing entries, paying customs duties, maintaining accurate records, and satisfying all reporting requirements under applicable federal and Puerto Rico law.

## ARTICLE XII – FORCE MAJEURE

### 12.1 Definition and Scope

Except for the Buyer's obligation to make payments when due, neither Party shall be liable for any failure or delay in performing its obligations under this Agreement if such failure or delay is caused by a Force Majeure event. A Force Majeure event shall mean an occurrence beyond the reasonable control of the affected Party which could not have been prevented or mitigated through the exercise of a Reasonable and Prudent Operator and which renders performance temporarily impossible rather than merely more expensive or inconvenient. A Force Majeure event includes, as applicable, severe natural disasters such as hurricanes, earthquakes, floods, tsunamis, explosions, acts of war, terrorism, widespread civil unrest, declared epidemics or pandemics, port closures imposed by governmental authorities, or a collapse of Buyer-owned transmission infrastructure that prevents the physical acceptance of power at the Delivery Point at the Aguirre Power Plant or if applicable any Additional Site switchyards. Delays or denials in governmental permits or authorizations qualify only when the affected Party demonstrates that it submitted complete and accurate applications and pursued all reasonable alternatives consistent with the Reasonable and Prudent Operator standard.

### 12.2 Exclusions

A Force Majeure event shall not include economic hardship, fluctuations in market conditions, bankruptcy or inability to pay of a Party or its contractors, breakdown or defect of Seller's equipment or any subcontractor's equipment, failure to secure or maintain permits or approvals except where the Seller demonstrates compliance with all requirements of a Reasonable and Prudent Operator, changes in market prices for fuel or labor, or labor strikes or industrial actions affecting only the Seller or its Affiliates. It shall also not include LNG supply chain disruptions where Seller could reasonably have arranged alternative cargoes, scheduling, or logistics, nor curtailment or dispatch instructions issued by the Buyer or its operator, as these matters are expressly contemplated under Article V. In addition, Seller may not invoke Force Majeure relief with respect to: (a) failure to achieve any milestone set forth in Exhibit G (Commercial Operating Date Milestone Schedule) where such failure results from Seller's lack of diligence in submitting complete and timely permit applications, executing required LNG supply or interconnection agreements, or completing pre-COD construction, installation, or commissioning activities; (b) failure to deploy LNG infrastructure prior to COD as required under Section 2.4; or (c) any Seller Fuel Default as defined herein. Force Majeure relief for pre-COD obligations shall be available only where Seller demonstrates, by clear and contemporaneous documentation, that the affected obligation was rendered impossible — not merely more expensive or inconvenient — by an event meeting all elements of Section 12.1. No Party may invoke Force Majeure if the failure to perform is caused by negligence, poor planning, inadequate staffing, or avoidable equipment failure.

### 12.3 Effect of Force Majeure on Milestones and Schedule

If a Force Majeure Event directly prevents Seller from performing a specific milestone obligation under this Agreement or Exhibit G, the applicable milestone deadline shall be extended solely for the period of actual delay directly caused by such Force Majeure Event, together with any reasonably necessary remobilization period approved by Buyer.

Seller shall not be entitled to automatic or indefinite extensions of milestone deadlines, COD, or other contractual obligations.

Any extension request must:

(a) identify the specific milestone impacted;

(b) demonstrate the direct causal connection between the Force Majeure Event and the delay;

(c) identify all mitigation measures being implemented;

(d) include a recovery plan and revised milestone schedule; and

(e) be supported by reasonable documentation requested by Buyer.

Initial LG

Initial DR

Buyer shall have the right to review, approve, or reasonably reject the requested extension based on the supporting documentation and the operational needs of the Puerto Rico electrical system.

Initial JW

The milestone dates set forth in Exhibit G shall be subject only to approved extensions granted pursuant to Article XII (Force Majeure).

### 12.4 Notice and Mitigation

A Party seeking to invoke Force Majeure shall notify the other Party in writing within ten (10) days after the occurrence of the event or the date the Party becomes aware of it. The notice shall describe the event, identify the affected obligations, state the expected duration of the disruption, and outline the mitigation steps being taken. The affected Party shall continue to provide periodic written updates and shall take all commercially reasonable actions to avoid or minimize the impact of the event, including the implementation of temporary or alternative solutions, and shall resume performance as soon as conditions permit. Failure to comply with these notice and mitigation obligations shall disqualify the Party from Force Majeure relief.

### 12.5 Access, Verification, and Documentation

Upon request by the non-affected Party, the affected Party shall provide reasonable access to facilities impacted by the Force Majeure event, provided that such access is safe and does not violate confidentiality or any third-party restrictions. The non-affected Party may request documentation or independent verification to confirm the existence and impact of the event. If such review determines that the event does not qualify as Force Majeure, the costs of verification shall be borne by the Party seeking relief.

### 12.6 Third-Party Impacts

A Force Majeure event affecting a third party, including LNG suppliers, transporters, or fuel logistics providers, may qualify only if the affected Party demonstrates that the event would have qualified as Force Majeure had it occurred directly to that Party and that the Party exhausted all commercially reasonable alternatives to continue performance, including alternative cargoes, alternative routes, and reasonable operational adjustments. Any event originating in the Seller-controlled LNG logistics chain shall only be considered Force Majeure if the Seller shows that it exercised the diligence and redundancy expected of a Reasonable and Prudent Operator and that the event was not caused by its planning decisions, scheduling errors, or equipment issues.

### 12.7 Duration and Termination Rights

Force Majeure relief shall begin when the event actually prevents performance, regardless of when notice is provided. If Seller is unable to perform its service obligations due to a Force Majeure event for ninety (90) consecutive days, or for sixty (60) days if Seller is not making diligent, good-faith efforts to resolve the disruption, the Buyer may terminate this Agreement without penalty upon written notice. In such case, the Buyer shall only be responsible for undisputed amounts for services actually delivered prior to the effective termination date, and shall not owe demobilization costs, Termination Payment, or other compensation.

Initial LG

Initial DR

Initial JW

### 12.8 Alignment with COD Obligations and Event of Default Triggers

Notwithstanding any other provision of this Article XII, Force Majeure relief shall not operate to defeat or postpone the Event of Default triggers set forth in Article VIII (Liquidated Damages), Article XV (Termination), or Exhibit C ¶ C.3 (Performance Bond Triggering Events) where the underlying event arises from Seller's pre-COD obligations, including but not limited to permitting, interconnection, LNG infrastructure deployment, equipment delivery, or commissioning. Specifically: (i) the Day 150 Deployment Period deadline threshold under Section 8.2 shall be tolled, if at all, only by Force Majeure events that satisfy Section 12.6 and that affect operations beyond Seller's reasonable control; and (ii) Buyer's right to a short fall draw upon the Performance Bond pursuant to Exhibit C ¶ C.3 for failure to achieve COD by Day 150 shall not be impaired by any claim of Force Majeure relief unrelated to the operational obligations of the Facility.

## ARTICLE XIII – REPRESENTATIONS, WARRANTIES, AND LIABILITIES

### 13.1 Representations and Warranties

Each Party represents and warrants, as of the Effective Date and throughout the Term, that it has full legal authority and capacity to execute and perform this Agreement. The Seller represents that it is a corporation or limited liability company duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation, and that it is duly authorized to conduct business in all jurisdictions required for the performance of its obligations under this Agreement.

MCOF

The Buyer, as a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represents that it has obtained all required governmental, statutory, regulatory, and fiscal approvals under applicable law, including approvals required under PROMESA, the Fiscal Agency and Financial Advisory Authority, the Oversight Board, and any applicable Title III requirements. Buyer further represents that all payment obligations under this Agreement constitute "Current Expenses" within the meaning of the PREPA Trust Agreement and standard public utility practice, and are essential for the continued operation of its electrical system.

Each Party represents that the execution, delivery, and performance of this Agreement have been duly authorized and do not violate any applicable law, corporate governance requirement, or contractual obligation. This Agreement constitutes a valid and binding obligation of each Party, enforceable in accordance with its terms.

Notwithstanding any other provision, both Parties expressly acknowledge that all Buyer payment obligations under this Agreement are intended to be treated and classified as "Current Expenses" under the PREPA Trust Agreement and Title III of PROMESA. As a condition precedent to payment, this classification must be validated in writing by the legal

and financial professionals designated by PREPA in its Title III proceeding and by the Oversight Board or their authorized designees. No payment shall become due until such written validation is delivered to the Parties. If such validation is not obtained, or if any payment is subsequently challenged as not constituting a Current Expense, the Parties shall cooperate in good faith to amend this Agreement or take such lawful actions as necessary to preserve the enforceability of Buyer's payment obligations consistent with bankruptcy law requirements.

Initial LG

Initial DR

Initial JW

### 13.2 Title and Delivery Warranty

The Seller warrants that it has good and marketable title to all power delivered under this Agreement at the Delivery Point and that such power is free of all liens, encumbrances, or adverse claims. Seller makes no implied warranties, including merchantability or fitness for a particular purpose, except as specifically set forth in this Agreement. All power delivered must comply with Article IV (Generation Performance and Quality Standards).

### 13.3 Seller Readiness Obligations

The Seller shall take all actions necessary to begin performance promptly after execution of this Agreement and receipt of required authorizations. These obligations include entering into all contracts necessary for the acquisition, lease, or use of the generation equipment and associated systems; securing all applicable federal, Commonwealth, and municipal permits including, without limitation, environmental, interconnection, emissions, and operational approvals; completing all site preparation, construction, mobilization, and installation activities required for deployment of the land-based generation units and all upstream infrastructure necessary to reach the Delivery Point; executing all fuel supply arrangements, transportation and maritime logistics agreements, port access and bunkering arrangements, and fuel storage or contingency supply systems; ensuring continuous availability of fuel to support full-load operation of the units at Aguirre and or if applicable any Additional Site; and coordinating all technical integrations with Buyer, Genera PR, and LUMA to ensure grid readiness.

MCAG

All such readiness obligations shall be performed at Seller's sole cost and risk and in accordance with all timelines established in this Agreement unless otherwise agreed in writing.

### 13.4 Buyer Readiness Obligations

The Buyer, through its operator, shall use commercially reasonable efforts to ensure it is ready to receive power at the start of the Service Period. These efforts include coordinating completion of any required interconnection infrastructure, ensuring the readiness of the grid to accept power at the Delivery Point, and facilitating downstream dispatch preparations. Seller shall timely provide Buyer and LUMA with the technical information necessary to support these activities. At Buyer's request, Seller may assist in facilitating or coordinating any permitting activity related to interconnection or grid readiness; however, such facilitation shall not shift responsibility for compliance with permitting requirements away from Buyer or LUMA.

### 13.5 Limitation of Seller Liability

The Seller's liability for failure to deliver power shall be limited to the compensation and remedies expressly set forth in Article VI (Seller's Performance Shortfall), Article VIII

(Liquidated Damages), and Article X (Invoicing and Payment), except where termination rights are expressly granted under Article XV. This limitation is consistent with the performance-based nature of the Agreement and is intended to provide the Buyer with predictable remedies while ensuring seller accountability for meeting the Power Availability Requirement at Aguirre or if applicable any Additional Site.

## ARTICLE XIV – CONFIDENTIALITY

Each Party (the "Disclosing Party") may disclose to the other Party (the "Receiving Party") confidential, proprietary, or non-public information relating to this Agreement, including technical, commercial, operational, financial, regulatory, or legal information, whether disclosed orally, in writing, electronically, or in any other form ("Confidential Information"). The Receiving Party shall maintain all Confidential Information in strict confidence and shall use such information solely for the purpose of performing its obligations or exercising its rights under this Agreement.

The Receiving Party shall not disclose Confidential Information to any third party without the prior written consent of the Disclosing Party, except to employees, officers, agents, contractors, legal counsel, consultants, financial advisors, or lenders of the Receiving Party who have a legitimate need to know the information for the purposes of this Agreement and who are bound by confidentiality obligations no less protective than those contained herein. The Receiving Party shall be responsible for ensuring that any such persons comply with these confidentiality requirements.

The confidentiality obligations of this Article shall not apply to information that becomes publicly available through no breach of this Agreement by the Receiving Party; information independently developed by the Receiving Party without the use of or reference to the Disclosing Party's Confidential Information; information lawfully obtained from a third party without restriction and without breach of any confidentiality duty; or information that the Receiving Party is required to disclose under applicable law, regulation, subpoena, order of a Governmental Authority, or obligations arising from the Buyer's status as a public instrumentality. In such cases, the Receiving Party shall, to the extent legally permissible, provide prompt written notice to the Disclosing Party to allow an opportunity to seek a protective order or limit the scope of the disclosure.

Nothing in this Article shall restrict Buyer's ability to comply with its transparency obligations as a public corporation, including disclosures required under the Puerto Rico Comptroller Act, PROMESA, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority, or any other applicable regulatory or government body. Buyer's statutory disclosure duties shall supersede any contrary provision in this Agreement.

All confidentiality obligations under this Article XIV shall survive the expiration or termination of this Agreement for a period of five (5) years.

## ARTICLE XV – TERMINATION

### 15.1 Immediate Seller Events of Default

Except to the extent excused under Section 2.5 or Article XII, the occurrence of any of the following shall constitute an immediate Seller Event of Default without opportunity to cure: (i) abandonment or unauthorized cessation of operations; (ii) fraud, corruption, bribery, or

violation of applicable ethics, anti-corruption, or government contracting laws; (iii) unauthorized diversion of LNG, fuel supply, generation capacity, or committed resources; (iv) assignment or transfer of this Agreement in violation of its terms; (v) bankruptcy, insolvency, receivership, liquidation, or similar financial distress proceedings involving Seller; (vi) intentional falsification, manipulation, withholding, or misrepresentation of operational, metering, compliance, or reporting data; (vii) failure to maintain required insurance coverage, permits, licenses, or Performance Bond requirements; (viii) criminal conviction, regulatory disqualification, suspension, debarment, or loss of authority necessary to perform this Agreement; or (ix) any willful misconduct or gross negligence materially threatening grid reliability, public safety, environmental compliance, or the operational integrity of PREPA's electrical system.

Initial LG

Initial DR

Initial JW

Upon the occurrence of any such Event of Default, Buyer may immediately suspend Seller's operations, dispatch rights, interconnection activities, fuel-related activities, or mobilization activities; exercise rights under the Performance Bond; terminate this Agreement pursuant to this Article XV; offset any amounts owed by Seller against amounts otherwise payable under this Agreement; procure replacement power or substitute services; and exercise any other remedies available under this Agreement or Applicable Law.

**15.2 Curable Seller Events of Default**

Except to the extent excused under Section 2.5 or Article XII, the occurrence of any of the following shall constitute a curable Seller Event of Default: failure to comply with the milestone schedule set forth in Exhibit G; failure to achieve COD or any revised COD approved in writing by Buyer (Section 2.5) within the timeframes required under this Agreement; repeated Power Generation Shortfalls or failure to maintain required Power Availability levels; failure to provide operational, metering, compliance, or reporting information required under this Agreement; failure to comply with maintenance, operational, environmental, permitting, or regulatory obligations; failure to implement or comply with an approved corrective action plan; or any other material breach of Seller's operational obligations that does not constitute an immediate Seller Event of Default under Section 15.1.

Upon the occurrence of a curable Seller Event of Default, Buyer shall provide written notice describing the applicable deficiency and Seller shall within five (5) business days commence corrective action and diligently pursue cure within the applicable cure period expressly set forth in this Agreement or, if no specific cure period is stated, within thirty (30) days after receipt of such notice; provided, however, that if the applicable default is not reasonably capable of cure within such period, Seller shall not be deemed in continuing default so long as Seller is diligently pursuing cure and complying with an approved recovery plan acceptable to Buyer.

Failure to timely cure a curable Seller Event of Default may result in Liquidated Damages, suspension rights, Performance Bond remedies, offsets, procurement of replacement power, termination rights, or any other remedies available under this Agreement or Applicable Law.

**15.3 Buyer Events of Default**

Buyer shall be deemed in default under this Agreement only upon: (i) failure to pay undisputed amounts properly invoiced under Article X within thirty (30) days after receipt of written notice of non-payment; or (ii) material breach of a payment obligation expressly required under this Agreement that remains uncured for thirty (30) days after written notice from Seller.

Seller's remedies for a Buyer Event of Default shall be limited solely to: (a) recovery of undisputed amounts properly payable under this Agreement for electric energy actually delivered, metered, accepted, and invoiced prior to termination; and (b) termination rights expressly provided under this Article XV. Seller shall not be entitled to lost profits, future

revenues, stranded investment recovery, financing costs, expectation damages, or any form of make-whole compensation.

### 15.4 Suspension Rights

Upon the occurrence of a Seller Event of Default, Buyer may suspend dispatch, operations, interconnection activities, fuel deliveries, mobilization activities, or other performance obligations upon written notice to Seller. During such suspension, Buyer shall have no liability for reduced dispatch, reduced generation, curtailment, or failure to receive energy from Seller.

If Seller cures the applicable default within the permitted cure period, Buyer may withdraw the suspension notice and restore normal operations without prejudice to any accrued rights, remedies, Liquidated Damages, or offsets.

### 15.5 Termination Rights

This Agreement may be terminated:

(a) by mutual written agreement of the Parties;

(b) by Buyer for convenience upon at least ninety (90) days' prior written notice to Seller;

(c) by Buyer upon the occurrence of an uncured Seller Event of Default;

(d) by Buyer upon the occurrence of an immediate Seller Event of Default under Section 15.1;

(e) by Buyer if a Force Majeure Event continues for more than sixty (60) consecutive days and materially prevents achievement of COD or continued operation of the Facility; or

(f) by Seller solely upon the occurrence of an uncured Buyer Event of Default under Section 15.3.

### 15.6 Remedies Upon Seller Event of Default

Upon the occurrence of a Seller Event of Default, Buyer may exercise one or more of the following remedies: (i) assess Liquidated Damages pursuant to Article VIII; (ii) suspend Seller operations, dispatch rights, interconnection activities, or fuel-related activities; (iii) require corrective action plans and recovery schedules; (iv) offset amounts owed by Seller against payments otherwise due; (v) procure replacement power or substitute services; (vi) execute or draw upon the Performance Bond pursuant to Exhibit C; (vii) terminate this Agreement pursuant to this Article XV; (viii) seek injunctive or equitable relief; and/or (ix) pursue any other remedy available under this Agreement or Applicable Law.

Except where expressly stated otherwise, the remedies set forth in this Agreement shall be cumulative and not exclusive.

### 15.7 Demobilization Upon Termination or Expiration

Upon expiration or termination of this Agreement, Seller shall promptly demobilize and remove its equipment from the Project Sites in accordance with applicable safety, environmental, and operational requirements and any demobilization procedures reasonably established by Buyer.

Seller shall remain responsible for securing the Project Sites, removing Seller-owned equipment and materials, and complying with all applicable environmental and regulatory obligations arising from Seller's activities at the Project Sites.

Initial LG

### 15.8 Survival

Termination or expiration of this Agreement shall not affect any rights, obligations, liabilities, or remedies accrued prior to the effective date of termination, including rights relating to indemnification, confidentiality, regulatory compliance, payment obligations, offsets, Liquidated Damages, Performance Bond rights, audit rights, dispute resolution obligations, or any other provision which by its nature is intended to survive termination.

Initial DR

### 15.9 Exclusive Termination Compensation

Initial JW

Except as expressly provided in this Agreement, including Section 3.1.1(c) with respect to Eligible Demobilization Costs arising from a Buyer Termination for Convenience occurring during the first thirty-six (36) months following COD, upon termination of this Agreement for any reason:

(a) Buyer shall have no obligation to pay for any undelivered energy, unused capacity, future availability, stranded investment, financing costs, return on equity, demobilization costs, or lost profits;

(b) Seller shall only be entitled to payment for electric energy actually delivered, metered, accepted, and invoiced prior to the effective date of termination;

(c) termination shall not relieve Seller of liability for accrued obligations, Liquidated Damages, indemnity obligations, regulatory violations, or other liabilities arising prior to termination; and

(d) the remedies expressly set forth in this Agreement shall govern the Parties' rights and obligations following termination.

MCofa

## ARTICLE XVI – NOVATION AND ASSIGNMENT

No amendment, modification, or change order to this Agreement shall constitute a novation unless such novation is expressly and unequivocally stated in writing and signed by both Parties. A time extension granted by the Buyer, a waiver of any right, or any adjustment to obligations under this Agreement shall never be interpreted as a novation unless expressly identified as such. Any modification shall be binding only to the extent expressly stated in writing, and no modification, waiver, or extension shall alter the fundamental rights, obligations, or liabilities of the Parties unless expressly agreed as a novation.

The Seller shall not assign, transfer, pledge, or otherwise convey any of its rights or obligations under this Agreement without the prior written consent of the Buyer, which may be granted, withheld, or conditioned in the Buyer's sole and absolute discretion. Any attempted assignment without such consent shall be null, void, and without effect. The Buyer may require the Seller to provide all documents necessary to evaluate any assignment request, including financial and legal assurances regarding the proposed assignee.

Notwithstanding the foregoing, the Seller may request Buyer's written consent to assign its rights to receive payments under this Agreement to a lender or financing party (including any

agent or trustee acting on behalf of such financing party) as part of a bona fide financing transaction. Any such assignment shall not relieve the Seller of any of its duties, liabilities, or performance obligations under this Agreement, all of which shall remain solely and exclusively with the Seller.

Initial LG

Nothing in this Article shall limit Buyer's unrestricted right to assign its rights or delegate its obligations, in whole or in part, to any governmental instrumentality, fiscal agent, or operator acting on its behalf, including Genera PR and LUMA Energy, without consent from Seller.

Initial DR

## ARTICLE XVII – CHANGE IN LAW

Initial JW

If any change in applicable law, regulation, rule, directive, permit requirement, governmental mandate, or interpretation thereof occurs during the Term of this Agreement, including changes in environmental, tax, safety, maritime, energy, operational, or procurement regulations, any resulting increase in the cost of performance, compliance, permitting, operation, labor, equipment, or fuel logistics shall be borne solely and exclusively by the Seller. The Buyer shall have no obligation to adjust, increase, or modify the Contract Price, nor shall the Buyer be required to compensate the Seller for any additional expenses, delays, or impacts arising from such changes in law.

The Seller shall remain fully responsible for performing all obligations at the prices and commercial terms agreed upon in this Agreement, without adjustment. No pass-through of costs, surcharges, assessments, or additional fees shall be permitted under this Article or any other provision of this Agreement.

The Seller further agrees that it will not undertake, support, or facilitate any action intended to effect or influence a change in law, regulation, or governmental requirement that could reasonably be expected to increase Seller's cost of performance or otherwise adversely impact Buyer. Any violation of this obligation shall constitute a material breach.

Nothing in this Article shall impair Buyer's right to enforce regulatory compliance or to require Seller to promptly implement all measures necessary to comply with any new or amended legal or regulatory requirements at Seller's sole cost and risk.

## ARTICLE XVIII – APPLICABLE LAW

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Any legal action or proceeding relating to, arising from, or affecting the PREPA Bankruptcy or any matter governed by Title III of PROMESA shall be brought exclusively before the United States District Court for the District of Puerto Rico.

All other actions, claims, or proceedings arising under or relating to this Agreement shall be brought exclusively before the courts of the Commonwealth of Puerto Rico, to whose jurisdiction the Parties irrevocably submit. The Parties expressly waive any objection based on forum non conveniens and irrevocably waive the right to trial by jury in any action or proceeding arising out of or relating to this Agreement.

## ARTICLE XIX – CODE OF ETHICS

### 19.1 Anti-Corruption Controls

Each Party represents and warrants that it maintains internal controls, policies, and compliance procedures designed to ensure adherence to all applicable anti-corruption, anti-fraud, and ethical conduct laws. These controls must prevent the offering, giving, soliciting, or accepting of any improper financial or other benefit in connection with the performance of this Agreement.

### 19.2 Prohibited Conduct

Each Party certifies that it has not offered, promised, or authorized the giving of any financial or other advantage to any public official, candidate for office, or private individual in violation of applicable anti-bribery laws. Compliance with this Article is a material obligation of this Agreement. Any violation shall constitute grounds for termination for cause by the non-breaching Party.

## ARTICLE XX – SETTLEMENT OF DISPUTES

### 20.1 Exclusive Jurisdiction

Any claim, dispute, disagreement, or controversy arising between the Parties relating to this Agreement, except matters expressly designated for Expert determination under Section 20.2, shall be adjudicated exclusively in the United States District Court for the District of Puerto Rico. During the pendency of any dispute, each Party shall continue to perform its obligations under this Agreement, except where such obligations have been validly suspended under the terms herein. The Buyer shall continue paying all undisputed amounts under Article X while any dispute is resolved.

### 20.2 Expert Determination

Disputes limited to the determination of fuel or power quality under Article IV, or to measurement, testing, or operational procedures under Article VII, may be submitted to an independent expert for resolution. Either Party may request Expert determination by providing written notice to the other. The Parties shall jointly select the Expert within ten (10) Days of such notice. If no agreement is reached, either Party may request that the International Centre for Expertise of the International Chamber of Commerce appoint the Expert pursuant to the ICC's Rules for Expertise.

The Expert shall act in a technical, non-arbitral capacity and shall remain impartial at all times. The proceeding shall be conducted in San Juan, Puerto Rico in English. The Parties shall cooperate in good faith to provide any documents, data, personnel, or facility access the Expert reasonably requires. Before issuing a final determination, the Expert shall provide a draft report for comment. The Expert shall endeavor to issue a final determination within thirty (30) Days of appointment, and in no event later than sixty (60) Days. The Expert's final determination shall be binding on both Parties.

### 20.3 Qualification of Experts

No individual may serve as an Expert if the individual: has been an employee of either Party or its Affiliates within the last ten (10) years; has been a consultant or seller to either Party within the last five (5) years; holds a financial interest in either Party; or lacks at least ten

(10) years of relevant professional experience in the North American natural gas or power generation industry. Within two (2) months of the Effective Date, the Parties shall attempt to establish a mutually acceptable list of qualified experts for future reference.

Initial LG

### ARTICLE XXI – NON-WAIVER

Initial DR

Initial JW

No failure or delay by either Party in enforcing any provision of this Agreement, or in exercising any right or remedy arising from a breach, shall be construed as a waiver of such provision, right, or remedy. No waiver shall be effective unless expressly stated in writing and signed by the waiving Party. A waiver of any specific breach or default shall not constitute a waiver of any subsequent or different breach, and no course of dealing or performance shall alter the strict enforcement of this Agreement unless expressly agreed in writing.

### ARTICLE XXII – CONFIDENTIALITY AND CYBERSECURITY OBLIGATIONS

**22.1 Confidential Information**

Each Party (the "Receiving Party") shall maintain the confidentiality of all non-public information disclosed by the other Party (the "Disclosing Party") in connection with this Agreement. Confidential Information includes technical, commercial, operational, financial, legal, or strategic information, regardless of the method of disclosure.

**22.2 Permitted Disclosures**

Confidential Information may be disclosed without prior consent only to: (i) employees, officers, directors, or Affiliates with a need to know; (ii) lenders, auditors, and financial advisors for financing, audit, or compliance purposes; (iii) Governmental Authorities, as required by applicable law; and (iv) consultants or technical service providers involved in this Agreement, provided they are subject to confidentiality obligations no less protective than those set forth herein.

MCofr

**22.3 Third-Party Compliance**

The Receiving Party shall ensure that all third parties receiving Confidential Information comply with confidentiality obligations equivalent to those in this Agreement.

**22.4 Disclosure Required by Law**

If disclosure is required by law, regulation, subpoena, or order of a Governmental Authority, the Receiving Party shall provide prompt written notice to the Disclosing Party (to the extent legally permissible) to allow an opportunity to seek protective measures. Buyer's statutory disclosure duties as a public instrumentality shall prevail over any conflicting confidentiality restriction.

**22.5 Public Announcements**

No public communication regarding this Agreement shall be issued without the prior written approval of the other Party, unless disclosure is legally required.

### 22.6 Cybersecurity Obligations

If Seller accesses PREPA, Genera PR, or LUMA information systems, Seller shall implement and maintain an industry-standard cybersecurity program, including access controls, encryption, intrusion detection, and incident-response protocols. Buyer may audit Seller's cybersecurity controls at any time. Seller shall immediately notify Buyer of any suspected or confirmed cybersecurity incident or data breach.

Initial LG

### 22.7 Remedies

Initial DR

Both Parties retain all legal and equitable remedies, including injunctive relief, to address any actual or threatened breach of this Article. Nothing herein limits Buyer's rights under Articles IX, XX, or any statutory enforcement authority.

Initial JW

## ARTICLE XXIII – NOTICES

All formal notices, approvals, or communications under this Agreement shall be in writing and delivered to the addresses specified in Article XXV (Addresses for Notices). Notices shall be delivered personally, by certified mail, by recognized overnight courier, or electronically with confirmation of receipt. All notices shall be in English unless otherwise agreed in writing. Notice is effective upon confirmed receipt.

## ARTICLE XXIV – CONTINGENT FEES

Seller certifies that it has not engaged or retained any agent, broker, or intermediary to solicit, negotiate, or secure this Agreement based on a contingent fee, commission, percentage, or any other compensation dependent on the award of this Agreement. A breach of this certification constitutes a material breach and entitles Buyer to terminate this Agreement for cause or to reduce compensation owed to Seller by the amount of any such prohibited fee. This prohibition does not apply to bona fide employees or established commercial representatives engaged in ordinary sales operations.

MCZA

## ARTICLE XXV – ADDRESSES FOR NOTICES

### 25.1 Notices

Any notice, request, demand, consent, approval, report, instruction, or other communication required or permitted under this Agreement shall be in writing and shall be deemed properly delivered when delivered personally, sent by nationally recognized courier, transmitted by electronic mail with confirmation of transmission, or deposited in certified United States mail, postage prepaid, addressed as follows:

**If to Buyer (PREPA):**

Puerto Rico Electric Power Authority
Attn: Mary C. Zapata Acosta - Executive Director
PO Box 364267
San Juan, PR 00936-4267
Email: mary.zapata@prepa.pr.gov

**With Copies To:**

Puerto Rico Public-Private Partnerships Authority
Attention: Josué Colón – Executive Director
PO BOX 42001
San Juan, Puerto Rico 00940-2001
Email: Josue.Colon@p3.pr.gov , and Administrator@p3.pr.gov

Initial LG

and

Initial DR

With a copy to (not constituting notice):

Genera PR LLC, agent of PREPA
Fuels Office
Attention: Jose L. Carrasco - Fuels Manager
250 Muñoz Rivera, Ave., Suite 1200 San Juan, Puerto Rico 00918
E-mail: legal@genera-pr.com

Initial JW

**If to Seller (Power Expectations):**

Power Expectations, LLC
Attn: Mr. Eddie Echevarria - Chief Executive Officer
Address: Marginal villamar 9 Manzana CE, Local 1, Carolina PR, 00979
Email: eechevarria@powerexpectations.com

**With Copy To:**

Power Expectations, LLC
Attn: Landon Gallagher - Director of Operations
Address: Marginal villamar 9 Manzana CE, Local 1, Carolina PR, 00979
Email: gallagher@powerexpectations.com

MCofa

Either Party may modify its notice information by written notice delivered in accordance with this Article. Notices delivered by electronic mail shall be effective upon confirmation of successful transmission, provided that a copy is also sent by nationally recognized courier or certified mail within two (2) Business Days.

## ARTICLE XXVI – BUSINESS PRACTICES AND FOREIGN CORRUPT PRACTICES ACT

Each Party shall conduct all activities related to this Agreement in full compliance with all Applicable Laws, including the United States Foreign Corrupt Practices Act (FCPA), Puerto Rico anti-corruption statutes, and any other relevant anti-bribery or ethical conduct laws. Neither Party shall offer, promise, solicit, or authorize any bribe, facilitation payment, kickback, or improper benefit in connection with this Agreement.

No contingent fees shall be paid to brokers, intermediaries, or agents except to bona fide employees or duly established commercial representatives. Each Party shall indemnify and hold harmless the other Party for any fines, penalties, losses, or liabilities arising out of a breach of this Article.

The Seller shall ensure that all subcontractors, representatives, and agents acting on its behalf comply with the same ethical and anti-corruption standards, and any violation by such parties shall be deemed a violation by the Seller.

Initial LG

Initial DR

Initial JW

MCG

### ARTICLE XXVII – TRANSFER OF FUNDS

If the Seller assigns or transfers any right to receive payment under this Agreement, it shall strictly comply with Act 21-2012 and provide prior written notice to the Buyer. The notice shall include a copy of the transfer instrument, the specific amount assigned, and the full contact information of the assignee, including name, address, and telephone and email information. No assignment or transfer shall be effective against the Buyer until such notice is delivered and acknowledged in accordance with Article XXV (Addresses for Notices).

### ARTICLE XXVIII – CONFLICT OF INTEREST

The Seller certifies that neither it nor any of its principals, officers, employees, or representatives involved in the performance of this Agreement is an employee of the Commonwealth of Puerto Rico, any public corporation, or any governmental entity, nor holds any economic interest in this Agreement that would create a prohibited conflict under applicable Puerto Rico law.

The Seller further certifies that it did not obtain confidential evaluation materials, competitor pricing, or any non-public information that would give it an improper advantage in connection with the procurement process. The Seller shall promptly disclose to the Buyer any circumstances arising during the Term that may be reasonably perceived as a conflict of interest. Any failure to disclose may constitute grounds for termination for cause.

### ARTICLE XXIX – UNFAIR LABOR PRACTICE

If the Seller or any of its subcontractors is adjudicated by the Puerto Rico Labor Relations Board or the National Labor Relations Board as having engaged in an unfair labor practice, the Buyer shall withhold all further payments until the violation is remedied. Such determinations shall be binding on the Parties unless reversed or vacated by a court of competent jurisdiction. Withholding of payment under this Article shall not constitute a breach by the Buyer.

### ARTICLE XXX – NON-DISCRIMINATION

The Seller certifies that it is an equal opportunity employer and does not engage in discriminatory practices prohibited by applicable federal or Puerto Rico law, including discrimination based on race, color, religion, political affiliation or beliefs, sex, sexual orientation, gender identity, national origin, age, disability, or any other protected classification. The Seller shall ensure that all subcontractors and agents comply with these requirements. Any violation of this Article shall constitute grounds for termination for cause.

### ARTICLE XXXI – COMPLIANCE WITH COMMONWEALTH CONTRACTING REQUIREMENTS

The Seller shall comply with all laws, regulations, circular letters, executive orders, procurement rules, and fiscal controls applicable to contracting with the Commonwealth of

Puerto Rico, including all certifications required under Exhibit D (Seller Certifications). All such certifications are incorporated into and form part of this Agreement.

If the Puerto Rico Treasury Department, CRIM, the Department of Labor, or any other government entity identifies an outstanding debt or non-compliance attributable to the Seller or its subcontractors, and the Seller fails to cure or resolve the issue within the permitted timeframe, the Buyer may offset such amounts from any payments due under this Agreement. The Seller shall ensure that all subcontractors comply with these requirements and shall provide evidence of such compliance upon request.

Initial LG

Initial DR

Initial JW

## ARTICLE XXXII – PUBLIC OFFICERS AND EMPLOYEES

The Seller certifies compliance with 3 L.P.R.A. § 8615, including the prohibitions against contracting with: (i) any public official or employee who has a direct or indirect personal or economic interest in this Agreement within the preceding four (4) years; or (ii) any former government employee within two (2) years of separation from public service, unless specifically authorized by Puerto Rico law.

Any violation of this Article shall constitute a material breach and may result in immediate termination for cause.

## ARTICLE XXXIII – DISPENSATION

The Seller certifies that all dispensations, special authorizations, or regulatory waivers required from Commonwealth or federal authorities for its participation in this procurement have been obtained and are included in the contract record. No additional dispensations shall be deemed applicable unless granted in writing and approved by the appropriate governmental authority.

## ARTICLE XXXIV – RULES OF PROFESSIONAL ETHICS

The Seller acknowledges its obligation to comply with all professional, technical, and ethical standards applicable to its field of practice, including industry standards and any ethical rules imposed by licensing bodies or regulatory agencies. Failure to comply with such standards shall constitute a material breach of this Agreement.

MCOG

## ARTICLE XXXV – ANTI-CORRUPTION CODE FOR A NEW PUERTO RICO

The Seller agrees to comply fully with the requirements of Act 2-2018 (Anti-Corruption Code for a New Puerto Rico) and Act 14-2004. The Seller affirms that it represents no conflicting interest in connection with this Agreement and certifies that it will use goods produced or distributed in Puerto Rico when such goods are available and meet required specifications, consistent with Puerto Rico law. Violation of this Article shall constitute grounds for termination for cause.

## ARTICLE XXXVI – CONTRACT REVIEW POLICY

The Seller reaffirms its submission of the "Seller Certification Requirement" required under Exhibit D (Seller Certifications). Given the specialized, technical, and non-recurring nature of the services procured under this Agreement, the workforce transfer-of-skills provisions

contained in the Fiscal Plan or related Commonwealth workforce development directives shall not apply.

## ARTICLE XXXVII – INSURANCE

Initial LG

Initial DR

The Seller shall, at its sole cost and expense, procure and maintain the insurance coverages described in this Article from the date of issuance of the Notice to Proceed and continuing throughout the entire Term of this Agreement. The Seller shall not mobilize, deliver equipment, or commence any work unless and until evidence of all required insurance has been delivered to and accepted by the Buyer. All required insurance shall be primary and non-contributory with respect to any insurance maintained by the Buyer, Genera PR LLC, or LUMA Energy LLC.

Initial JW

The Seller shall maintain Worker's Compensation Insurance in accordance with Act No. 45 of April 18, 1935 (the Puerto Rico Worker's Compensation Act), and shall furnish the Buyer with a certificate from the State Insurance Fund confirming full coverage for all personnel engaged in work under this Agreement. Imported technical personnel exempt under Act No. 16 of May 16, 1958 must provide evidence of exemption and a certificate from their insurance carrier.

The Seller shall maintain Commercial General Liability Insurance with limits of not less than one million dollars (US$1,000,000) per occurrence and two million dollars (US$2,000,000) in the aggregate. This coverage shall include contractual liability, explosion, collapse, and underground damages, and products and completed operations. PREPA, Genera PR LLC, and LUMA Energy LLC shall be named as additional insureds.

The Seller shall maintain Automobile Liability Insurance with a combined single limit of not less than one million dollars (US$1,000,000) per occurrence, covering owned, non-owned, and hired vehicles. PREPA, Genera PR LLC, and LUMA Energy LLC shall be named as additional insureds.

The Seller shall maintain Excess Umbrella Liability Insurance with limits of not less than four million dollars (US$4,000,000) per occurrence in excess of the Commercial General Liability Insurance and Automobile Liability Insurance. PREPA, Genera PR LLC, and LUMA Energy LLC shall be named as additional insureds.

Mcora

Beginning on the Commercial Operation Date, the Seller shall maintain All-Risk Physical Damage Property Insurance, including machinery insurance, covering all real and personal property of the Seller (including hurricane and earthquake coverage) at one hundred percent (100%) of replacement cost. This coverage shall apply to property at the Site, property in transit, and property located off-site but associated with the work. Scaffolding, temporary structures, false work, tools, and temporary buildings must also be covered.

If not included in the All-Risk Physical Damage Policy, the Seller shall maintain a separate Equipment Breakdown Policy covering all equipment and machinery used in the performance of the Agreement. PREPA, Genera PR LLC, and LUMA Energy LLC shall be named as additional insureds.

The Seller shall maintain Employer's Liability Insurance with minimum limits of not less than one million dollars (US$1,000,000) for each employee and one million dollars (US$1,000,000) for each accident, covering bodily injury or disease, including death, arising out of and in the course of employment.

The Seller shall maintain Business Interruption Insurance and Cyber Insurance, each on terms consistent with market standards for independent power projects. Such policies shall take effect no later than the Commercial Operation Date.

Initial LG

Initial DR

Initial JW

All required policies, except for Worker's Compensation Insurance, Professional Liability Insurance, or any coverage where inclusion is prohibited by law, shall name the following entities as additional insureds: Puerto Rico Electric Power Authority Risk Management Office, P.O. Box 364267, San Juan, PR 00936-4267; Genera PR LLC, American International Plaza, 250 Avenida Luis Muñoz Rivera, Suite 1200, San Juan, PR 00918; LUMA Energy LLC and LUMA Energy ServCo, LLC, 1250 Avenida de la Constitución, 8th Floor, San Juan, PR 00907.

Each policy shall include a provision requiring the insurer to provide thirty (30) days' prior written notice of cancellation or non-renewal (ten (10) days in the case of non-payment of premium), sent by certified mail to the Seller and copied to the Buyer. Each policy shall include a contractual liability endorsement identifying this Agreement by title, date, and Parties; a waiver of subrogation in favor of PREPA, Genera PR LLC, and LUMA Energy LLC; and a provision stating that breach of warranties or conditions by the Seller shall not prejudice the rights of PREPA.

The Seller shall ensure that its subcontractors maintain insurance policies consistent with the coverages described in this Article. The Seller shall remain responsible for any deficiency in subcontractor insurance coverage.

## ARTICLE XXXVIII – GENERAL PROVISIONS

The Parties acknowledge that they have actively participated in the drafting and negotiation of this Agreement, including all Exhibits, Annexes, Schedules, attachments, and documents incorporated by reference. All such materials form an integral and binding part of this Agreement and shall have the same force and effect as if fully set forth herein.

In the event of any conflict between the provisions of the body of this Agreement and any Exhibit, Annex, or Schedule, the provisions of the Agreement shall govern unless expressly stated otherwise in writing.

This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall together constitute one and the same instrument. Electronic signatures shall be deemed valid and enforceable for all purposes under applicable law.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**Puerto Rico Electric Power Authority**

By: ______________________ June 10, 2026

Mary C. Zapata Acosta
Executive Director
Tax ID: 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
mary.zapata@prepa.pr.gov

**Power Expectations, LLC**

Signed by:
By: Landon Gallagher
72E4BEE1F60140B...

Landon Gallagher
COO- Director of Operations
Tax ID: 66-1050556
Email: lgallagher@powerexpectations.com

**Enchanted Rock, LLC**

Signed by:
By: Jhoby Weaks
3A2D27502BF24E6...

Jhoby Weaks
COO-Caribbean Operations
Tax ID: 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
Email: joby@enchantedrockpr.com

**Reyes Contractor, LLC**

Signed by:
By: Dennys Reyes
1AC0BF99BE22418...

Name: Denis Reyes
Title: President
Tax ID: 66-0697182
Email: reyescontractorgroup@gmail.com

# EXHIBIT A

### Scope of Generation Facilities, Operational Obligations, and Energy Delivery Requirements

Initial LG

Initial DR

Initial JW

The Seller shall perform all obligations under this Agreement in a manner consistent with the standards, expectations, and deliverables of a performance-based service contract. The Seller acknowledges and agrees that the Buyer's payment obligations are strictly tied to the actual delivery of services, results, and performance outcomes described in this Agreement, and not merely to the Seller's efforts or attempts to perform.

Accordingly, the Seller shall comply with the following general obligations:

**1. Delivery of Contracted Services**

The Seller shall deliver the power generation services, outputs, and operational capabilities required under this Agreement in accordance with the operational schedules, technical specifications, and performance expectations established herein and in all applicable Exhibits and Schedules. The Seller shall ensure continuous readiness and the ability to deliver power to the Delivery Points at all times except where expressly excused under the terms of this Agreement.

**2. Performance-Based Accountability**

The Seller's entitlement to compensation is conditioned on achieving the service results and performance outcomes required by this Agreement. Failure to deliver required performance shall result in adjustments, reductions, offsets, or other remedies available to the Buyer under Article VI (Power Generation Shortfall), Article VIII (Liquidated Damages), Article X (Invoicing and Payment), and Article XV (Termination), without limiting any other rights.

**3. Operational Readiness and Reliability**

MCOG

The Seller shall maintain all equipment, facilities, systems, and personnel necessary to ensure reliable operation, including fuel management, equipment availability, maintenance, and compliance with interconnection requirements. The Seller shall ensure proper staffing, training, and qualification of all personnel involved in the performance of this Agreement.

**4. Compliance with Laws and Standards**

The Seller shall comply with all applicable federal, Commonwealth, and municipal laws, rules, regulations, permits, and standards, including but not limited to environmental, safety, operational, interconnection, electrical, and permitting requirements. The Seller remains solely responsible for obtaining, maintaining, and complying with all required permits and authorizations.

**5. Reporting, Monitoring, and Verification Obligations**

The Seller shall provide the Buyer with full and uninterrupted access to operational data, monitoring equipment, metering systems, and all information required for the Buyer to verify performance under this Agreement. All records, reports, and operational logs shall be prepared accurately and in compliance with all requirements in Article VII and Exhibit G. The Buyer may conduct audits or inspections at any time.

### 6. Coordination with Buyer and System Operator

The Seller shall coordinate closely and continuously with the Buyer, Genera PR, LUMA Energy, and any authorized system operator to ensure safe, reliable, and compliant integration of the power generation systems. The Seller shall provide operational updates, notifications of outages, emergency information, and incident reporting as required.

### 7. Continuous Improvement and Corrective Action

Upon notice from the Buyer of any shortfall, deficiency, non-compliance, or operational issue, the Seller shall immediately initiate corrective actions and shall implement measures to prevent recurrence. Corrective actions shall not relieve the Seller of performance obligations or financial responsibilities associated with such shortfalls.

### 8. No Interruption Except as Permitted

The Seller shall not interrupt, reduce, divert, or curtail power generation or fuel supply dedicated to this Agreement, except to the extent expressly permitted under Force Majeure or Buyer-directed reductions. Unauthorized diversion of power or fuel constitutes a material breach.

### 9. Protection of Buyer's Interests

The Seller shall act at all times in a commercially reasonable manner, consistent with the standards of a prudent operator, and shall not take actions that compromise the Buyer's operational, financial, or regulatory interests. The Seller shall provide immediate written notice if it becomes aware of any condition that may jeopardize the performance of this Agreement.

### 10. Integration With Performance-Based Payment Structure

The Seller accepts that payment is based on actual delivered service results and acknowledges that failure to perform, delays, operational deficiencies, or non-compliance may result in payment adjustments, offsets, withholdings, or termination under Article XV.

# EXHIBIT B

## PRICE PROPOSAL AND RATE SCHEDULE

Initial LG

Initial DR

### B.1 LNG-Based Contract Rate

The price for power generated using LNG fuel is $0.224 per kWh for the entire ten (10)-year Term of this Agreement. This rate is inclusive of all fuel costs, operation and maintenance costs, and overhead. No indexing, escalation, or adjustment shall apply to this rate.

Initial JW

### B.2 Diesel Compensation Schedule

The following compensation provisions apply when diesel fuel is utilized pursuant to Sections 2.4.1 through 2.4.3 of this Agreement:

| Scenario | Compensation Calculation | Payment Direction |
|---|---|---|
| Buyer-Elected Diesel (No Seller Default) | $0.160/kWh (Operational Rate) | Buyer pays Seller only Operational Rate. |
| Seller Fuel Default: Diesel More Expensive than LNG | Actual Diesel Cost Rate (Seller reimburses differential) | Seller reimburses Buyer for the documented cost of diesel fuel used during the applicable Seller Fuel Default period. |

### B.3 Diesel Price Index

Delivered Diesel Price per Gallon shall be determined as follows:

MCOG

(a) EIA Weekly Retail On-Highway Diesel Price (Gulf Coast PADD 3) × 1.12 Puerto Rico Delivery Adjustment Factor; or

(b) Actual invoiced delivered cost if Buyer procures diesel directly, with supporting documentation.

### B.4 Estimated Contract Value

Based on the Contract Rate of $0.224/kWh, 400 MW COP capacity, 95% availability factor, and 8,760 hours per year:

- Estimated Annual Value: $588,672,000
- Estimated 10-Year Contract Value: $5,886,720,000

*Note: Actual payments will be based on metered kWh delivered and accepted at the Delivery Points.*

# EXHIBIT C

## FORM OF PERFORMANCE BOND

Initial LG

Initial DR

Initial JW

### C.1 Bond Amount and Term

Seller shall deliver to Buyer, no later than fifteen (15) Business Days after Contract execution, an irrevocable standby letter of credit or on demand performance bond in an amount equal to one hundred percent (100%) of the projected construction-phase contract value ($1,180,000,000). Upon completion of the construction phase and commencement of operations, the required amount of such irrevocable standby letter of credit or performance bond shall be reduced to an amount equal to twenty percent (20%) of the projected annual contract value ($117,734,400). The letter of credit or bond shall remain in effect throughout the Term of this Agreement and for ninety (90) days following expiration or termination.

### C.2 Qualifying Issuers

All bonds (including Bid, Performance, and Payment Bonds) must be issued by a surety or insurance company authorized to do business in Puerto Rico by the Office of the Insurance Commissioner and rated no less than "BB+" by A.M. Best. Bonds must be submitted in the form of a guarantee from such an approved surety.

### C.3 Performance Bond Triggering Events

Buyer shall be entitled to call or execute the Performance Bond upon the occurrence of any of the following events:

1. Failure to achieve the Commercial Operation Date within one hundred fifty (150) days or any revised Commercial Operation Date approved in writing by Buyer (Section 2.5) following Contract execution; provided, however, that:

(i) On or before Day one hundred forty-five (145), Seller shall submit a detailed written status report demonstrating construction progress, commissioning readiness, permitting status, interconnection progress, and a reasonably achievable path to Commercial Operation within the Deployment Period;

(ii) Failure to achieve Commercial Operation by Day one hundred fifty (150) or any revised Commercial Operation Date approved in writing by Buyer (Section 2.5) shall constitute a Performance Bond Triggering Event entitling Buyer, in its sole discretion, to draw upon or execute the Performance Bond assess Deployment Delay Liquidated Damages pursuant to Article VIII, terminate this Agreement pursuant to Article XV, and exercise any other remedies available under this Agreement or Applicable Law.

2. Seller abandonment of service for more than five (5) consecutive days without substantial efforts to resume operations;

3. Power Availability falling below eighty percent (80%) of Continuous Operating Power for sixty (60) consecutive days or Seller's repeated failure to satisfy the minimum Power Availability requirements established under this Agreement;

4. Seller's failure to pay any Liquidated Damages, Availability Penalties, reimbursement obligations, offsets, or other amounts due under Article VIII or Section 2.4 within the applicable cure period set forth in this Agreement;

5. Seller Fuel Default resulting in diesel operation and Seller's failure to reimburse Buyer for Actual Diesel Costs or other reimbursement obligations required under Section 2.4;

Initial LG

6. Seller's failure to submit, maintain, or implement a corrective action plan required under Articles IV, V, VI, or VIII;

7. Seller's Insolvency or filing of bankruptcy; or

Initial DR

8. Any material violation of Applicable Law that remains uncured after written notice and cure period, and that:

i. materially affects Seller's ability to perform its obligations under this Agreement;

Initial JW

ii. exposes Buyer, the System, or the Government of Puerto Rico to material regulatory, financial, or operational risk; or

iii. results in the suspension, revocation, or material limitation of any permit, license, or authorization required for the Project.

**C.4 Bond Execution Procedure**

Prior to executing the Performance Bond, Buyer shall:

(a) Provide Seller with written notice identifying the specific Triggering Event and the amount to be drawn;

(b) Allow Seller five (5) Business Days to cure the Triggering Event;

(c) If the Triggering Event remains uncured, submit a draw request to the issuing bank or surety with a certification that the Triggering Event has occurred and remains uncured.

MCOG

**C.5 Replenishment Obligation**

If Buyer draws upon the Performance Bond, Seller shall replenish the bond to its full original amount within fifteen (15) Business Days of each draw. Failure to replenish the bond shall constitute an additional Event of Default.

**C.6 Bond**

*PERFORMANCE BOND TO BE ATTACHED*

# EXHIBIT D

## SELLER CERTIFICATIONS AND REQUIRED DECLARATIONS

Initial LG

Initial DR

Initial JW

Proponent's Initials: LG____

**EXHIBIT D – CERTIFICATIONS AFFIDAVIT**

**NON-CONFLICT OF INTEREST CERTIFICATION**

**Emergency Temporary Power Generation**
**RFP 3PPO-0314-20-TPG2**

I, Landon Gallagher, in my personal capacity and in representation of Power Expectations LLC ("Proponent"), Tax I.D. Number 66-1050556, of legal age, with profession: COO of Power Expectations LLC; marital status: Married, and resident of Puerto Rico, for the procurement process referenced in the title of this document ("Procurement Process"). In such regard, I hereby certify that:

1. No public official or employee of P3, 3PPO and/or PREPA possesses any financial interest with any Proponent participating in this Procurement Process, and that, likewise, has had no direct or indirect financial interest with these for the past four (4) years.

2. No public official or employee of P3, 3PPO and/or PREPA has solicited or accepted, directly or indirectly, by means of any person or entity with interest in this Procurement Process, including the Proponent, any goods of any value -including, gifts, gratuities, contributions, services, donations, loans, and/or any other item of monetary value- for themselves and/or for any member of their immediate family, and/or relatives, and/or for any person, as a form of compensation for performing the duties and responsibilities of their position in connection with this Procurement Process.

3. No public official or employee of P3, 3PPO and/or PREPA has solicited or accepted, directly or indirectly, by means of any person or entity with interest in this Procurement Process, including the Proponent, any goods of any value - including, gifts, gratuities, contributions, services, donations, loans, and/or any other item of monetary value- for themselves and/or for any member of their immediate family, and/or relatives, and/or for any person, in exchange for their actions being an influence in the end result of this Procurement Process.

4. I do not have a kindred relationship within the fourth (4th) degree of consanguinity and/or second (2nd) degree of affinity with public official or employee of P3, 3PPO and/or PREPA that participates or influences -or has the capacity to do so- in the institutional decisions of PREPA.

PREPA is highly committed to management excellence and promotes the effective use of the government resources to benefit the people of Puerto Rico. Thus, PREPA will support and comply with the provisions of Act 2-2018, known as the Anti-Corruption Code for the New Puerto Rico, as amended, including Title III, Code of Ethics for Contractors, Suppliers, and Applicants for Economic Incentives of the Government of Puerto Rico.

MCOG

Initial LG

Initial DR

Initial JW

Considering the above, I, the Proponent's Authorized Representative, also certify that:

I agree to comply with the applicable provisions of Act 2-2018, known as the Anti-Corruption Code for the New Puerto Rico, as amended, including Title III, Code of Ethics for Contractors, Suppliers and Applicants for Economic Incentives of the Government of Puerto Rico and recognize that this is an essential requirement in order to execute transactions or to set up agreements with PREPA.

---

**NON-CONFLICT OF INTEREST CERTIFICATION ON EXISTING OR PENDING CONTRACTS**

I, Landon Gallagher, of legal age, of marital status (married/single), and a resident of Puerto Rico, have been designated as the authorized representative of Power Expectations LLC ("the Proponent") for the procurement process referenced in the title of this document ("Procurement Process"). In such regard, I hereby certify that:

1. There are no relevant facts or circumstances that could give rise to an organizational or personal conflict of interest for the Proponent or its staff with respect to the Procurement Process with PREPA. Nonetheless, the Proponent recognizes that situations may arise that may appear to be, or are, conflicts -or potential conflicts- of interest. The term "potential conflict" means reasonably foreseeable conflict of interest.

2. That there are no present or currently planned interest related to the work to be performed under the proposed contract that would create an actual or apparent conflict of interest or organizational conflict of interest with PREPA.

3. The Proponent will disclose to PREPA any relevant information of an apparent, potential, or actual conflict of interest that may appear to exist regardless of their opinion that such information would not impair their objectivity.

4. As per 2 C.F.R. § 200.318(c)(1), a conflict of interest would arise when "the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract". Therefore, I understand that conflicts of interest may arise in, but are not limited to, the following situations:

   a) **Unequal access to information.** A potential contractor, subcontractor, employee, or consultant has access to non-public information through its performance on a government contract for disaster recovery services in Puerto Rico.
   b) **Biased ground rules.** A potential contractor, subcontractor, employee, or consultant has worked with a government contract or program with the basic structure or ground rules of another government contract for disaster recovery services in Puerto Rico.
   c) **Impaired objectivity.** A potential contractor, subcontractor, employee, or consultant, or member of their immediate family (spouse, parent, or child) has financial interests, or others, that would impair, or give the

MCG

Initial LG

Initial DR

Initial JW

appearance of impairing, impartial judgment in the evaluation of government programs in offering advice or recommendations to the government, or in providing technical assistance or other services to recipients of Federal funds as part of its contractual responsibility.

5. In the case in which the Proponent discloses to PREPA an apparent, potential, or actual conflict of interest, PREPA will take the appropriate measures to address the disclosure by taking the following actions, which include but are not limited to, eliminating, mitigating or neutralizing the apparent, potential or actual conflict, when appropriate, through such means as ensuring a balance of views, disclosure with the appropriate disclaimers, or by restricting or modifying the work to be performed to avoid or reduce the apparent, potential, or actual conflict.

6. If an apparent, potential, or actual conflict of interest is discovered by the Proponent after the Procurement Process concludes, it will make a full disclosure in writing to the contracting officer. This disclosure shall include a description of actions the Proponent has taken or proposes to take to avoid, mitigate, or neutralize the apparent, potential, or actual conflict of interest.

7. The Proponent has no present or currently planned interests (financial, contractual, organizational, or otherwise) relating to the contract or task order that may result from this Procurement Process that would create any apparent, actual, or potential conflict of interest (including conflicts of interest for immediate family members: spouses, parents, children) that would impinge on its ability to render impartial, technically sound, and objective assistance or advice or result in it being given an unfair competitive advantage.

8. The Proponent has exercised and will continue to exercise due diligence in avoiding, identifying, removing, or mitigating any apparent, potential, or actual conflicts of interest to PREPA's satisfaction.

---

**LIMITED DENIAL OF PARTICIPATION (LDP)/SUSPENSION OR DEBARMENT STATUS AFFIDAVIT**

Mcga

By signing this Certification, the Proponent certifies that the firm, business or person submitting the proposal has not been LDP, suspended, debarred or otherwise lawfully precluded from participating in any public procurement activity with any Federal, State or local government. Signing this Certification without disclosing all pertinent information about a debarment or suspension shall result in rejection of the proposal or cancellation of a contract. PREPA may also exercise any other remedy available by law.

---

**CERTIFICATION REGARDING DEBARMENT, SUSPENSION, INELIGIBILITY, AND VOLUNTARY EXCLUSION**

The Proponent certifies, by submission of this Certification, that:

(I) Neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any Federal department or agency.

Initial LG

Initial DR

Initial JW

(2) It will provide immediate written notice to whom this Certification is submitted if at any time the Proponent learns its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.
(3) It shall not knowingly enter any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction unless authorized by the department or agency with which this transaction originated.
(4) It will include the clause titled Certification Regarding Debarment, Suspension, Ineligibility, and Voluntary Exclusion—Lower Tier Covered Transactions, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions.
(5) The certifications herein are a material representation of fact upon which reliance was placed when this transaction was entered; and
(6) Where the Proponent is unable to certify to any of the statements in this certification, such Proponent shall attach an explanation to this Certification.

---

**ENTITY PRIOR PERFORMANCE CERTIFICATION**

1. Has the Proponent been notified with a "Letter of Concern", which refers to any written communication from a government entity notifying the Proponent's wariness or caution about the Proponent's performance under a contract to provide services?

☐ Yes | ☒ No | ☐ Other

If other, specify: N / A

If **yes**, provide a copy of every "Letter of Concern" received from and as a contractor of a government entity.

2. Has the Proponent been found in default of contract terms with any contracting entity?

☐ Yes | ☒ No

If **yes**, indicate below if a Performance Bond or other means was issued to resolve the default issue:

☐ Yes | ☒ No | ☐ Other

MCAGA

Initial LG

Initial DR

Initial JW

If Other, specify: N/A

Name of Surety Company: N/A

Telephone of Surety Company: N/A

Contact Person of Surety Company:

Provide an explanation regarding the circumstances that created the need for the contracting entity to invoke the terms of the Performance Bond, or other means, to include the status of the

N/A

**NON-COLLUSIVE AFFIDAVIT (NON-COLLUSION CERTIFICATION)**

The Proponent certifies that in relation to the procurement process referenced in the title of this document:

1. The prices in the offer have been arrived at independently without directly or indirectly mediating any type of consultation, communication or agreement with any other competitor relating to i) prices, ii) intention to submit an offer, or iii) the methods or factors used to calculate the proceed offered.
2. Prices in the offer have not been and will not be knowingly disclosed by the Proponent, directly or indirectly, to any other Proponent or competitor before bid opening or contract award unless otherwise required by law.
3. No attempt has been made or will be made by the Proponent to induce any other competitor to/not to submit an offer for the purpose of restricting competition.

The signatory below (select one):

☒ Is the person in the Proponent's organization responsible for determining the prices being offered, and has not participated and will not participate in any action contrary to paragraphs (1) through (3) above?

☐ Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated and will not participate in any action contrary to

Initial LG

Initial DR

Initial JW

paragraphs (1) through (3) above?

| Name 1 | Position 2 | Name 3 | Position |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | | | |
| | | | |
| | | | |

As an authorized agent, the Signatory does certify that the principals named above have not participated, and will not participate, in any action contrary to paragraphs (1) through (3) above. As an agent, the Signatory has not personally participated and will not participate in any action contrary to paragraphs (1) through (3) above.

---

**ANTI-LOBBYING CERTIFICATION**

The undersigned certifies, to the best of his or her knowledge and belief, that:

(1) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence and officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for making lobbying contracts to an office or employee of any agency, a Member of Congress, and officer or employee of Congress, or an employee of a Member of Congress in connection with the Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form – LLL, "Disclosure Form to Report Lobbying", in accordance with its instructions.

(3) The undersigned shall require that the language of this certification is included in the award documents for all subawards at all tiers (including subcontractors, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of the fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering this transaction imposed by 31 U.S.C. 1352 (as amended by the Lobbying Act of 1995). Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each failure.

The Proponent Power Expectations LLC certifies or affirms the truthfulness and accuracy of each statement of its certification and disclosure, if any. In addition, the Proponent understands and agrees that the provisions of 31 U.S.C. sec. 3801 et seq., apply to this certification and disclosure, if any.

Initial LG

Initial DR

Initial JW

**SWORN STATEMENT**
**Act 2-2018, Anticorruption Code for the New Puerto Rico**

I, Landon Gallagher, in my personal capacity and in representation of Power Expectations LLC ("Proponent"), Tax I.D. Number 66-1050556, of legal age, with profession: COO of Power Expectations LLC, marital status: Married, and resident of Puerto Rico, do hereby solemnly swear as follows:

1. My name and personal circumstances are as stated above.
2. As of the date of execution of this sworn statement, neither the undersigned nor the Proponent, or its president, vice president, director, executive director, member of Board of officers or directors, or any persons performing equivalent functions on Proponent's behalf, has been convicted or has pleaded guilty in state or federal court, or in any other jurisdiction of the United States, for any of the following crimes: (a)aggravated misappropriation; (b) extortion; (c) sabotage of essential public services; (d) forgery of documents; (e) fraud; (f) electronic fraud; (g) construction fraud; (h) fraudulent use, possession or transfer of cards with electronic bands; (i) illicit enrichment; (j) illicit enrichment by public official; (k) unjustified enrichment; (l) illicit enrichment of public work or services; (m) improper intervention in government operations; (n) negotiation incompatible with the exercise of public office; (p) false certifications; (q) bribery, in all its modalities; (r) undue influence; (s) embezzlement of public funds; or (t) money laundering.
3. As of the date of execution of this sworn statement and **for the twenty (20) years** prior, neither the undersigned nor the Proponent, or any of its officers, including its president, vice president, director, executive director, member of board of officers or directors, or any person performing equivalent functions on Proponent's behalf, has been convicted or has pleaded guilty in the state or federal forum, or in any other jurisdiction of the United States, for any of the following crimes: (a) aggravated damage; (b) property retention; (c) alteration or mutilation of property; (d) filing of false documents or data; (e) illegal possession and use of tax information, receipts and payment vouchers; (f) illegal purchase and sale of goods for the payment of taxes; (g) filing false writings; (h) illegal possession of tax receipts; (i) falsification of entries in registers; (j) forgery of stamps; (k) ideological falsehood; (l) forgery of license, certificates and other documents; (m) forgery in the exercise of professions or occupations; (n) possession and transfer of forged documents; (o) possession of counterfeit instruments; (p) preparation of false writings.
4. As of the date of execution of this sworn statement and **for the eight (8) years** prior, neither the undersigned nor the Proponent, or any of its officers, including its president, vice president, director, executive director, member of board officers or directors, or any person performing equivalent functions on Proponent's behalf, has been convicted or has pleaded guilty in the state or federal forum, or in any other jurisdiction of the United States, for any of the following crimes: (a) omission in the fulfillment of duty; (b) illegal sale of goods; (c) breach of duty; (d) negligence in the fulfillment of duty; (e) usurpation of public office; or (f) preventing the inspection of records and documents
5. As of the date of execution of this sworn statement and **for the ten (10) years prior**, neither the undersigned nor the Proponent, or any of its officers, including its president, vice president, director, executive director, member of board officers or directors, or any person performing equivalent functions on Proponent's behalf, has been convicted or has pleaded guilty in the state or federal forum, or in any other jurisdiction of the United States, for crimes against the exercise of public office or public funds as defined in the Puerto Rico Penal Code; Law No. 1-2012, as amended, the Government Ethics Office Enabling Act; or any other crime defined in Law 2-2018.
6. I accept and acknowledge my obligation to inform of any change or modification to this statement during the contracting process or the term of the contract as the result of a guilty

MCG

Initial LG

Initial DR

Initial JW

plea or conviction for any of the above-mentioned crimes or any other conduct prohibited by the "Code of Ethics for Contractors, Suppliers of Goods and Services and Applicants for Economics Incentives of the Executive Agencies of the Government of Puerto Rico", Title III, Law 2-2018.

7. I accept and acknowledge that a conviction for any of the crimes specified in the above paragraphs will result, in addition to any other penalties, in the immediate termination of any contract in force at the time of conviction, between the undersigned, the Proponent, and any government entity, public corporation or municipality at the date of conviction or guilty plea.

8. The undersigned and/or the Proponent, as the case may be, commits to complying with the "Code of Ethics for Contractors, Suppliers of Goods and Services and Applicants for Economics Incentives of the Executive Agencies of the Government of Puerto Rico", Title III, Law 2-2018.

9. I execute this sworn statement pursuant to Law 2-2018 and the terms and provisions of this RFP.

10. I execute this sworn statement so that any government entity, public corporation, or municipality has knowledge of what is herewith declared and for any administrative and/or legal purpose in relation thereto.

---

## AFFIDAVIT OF GOOD STANDING FOR PUBLIC CONTRACTING PURPOSES

I, Landon Gallagher, the duly authorize COO (title) of Power Expectations LLC (Company Name) (the "Applicant"), being first duly sworn, hereby affirm and state as follows:

**Definitions**

For purposes of this affidavit, the term "Applicant" shall include the Company named above and all its officers, directors, owners, agents, and representatives, including the undersigned in his/her official capacity. The term "undersigned" refers to me, the Affiant, in my capacity as a representative of the Applicant.

**Legal and Ethical Representations**

After diligent inquiry and thorough verification, and to the best of my knowledge, information, and belief, as of the date of this affidavit, neither the Applicant nor the undersigned has been convicted of, or entered a plea of guilty or nolo contendere to, any of the following offenses under the laws of the United States, Puerto Rico, or any other jurisdiction:

- Any crime involving violence or threat, including without limitation assault, battery, domestic violence, or sexual offense.
- Any threats, intimidation, or retaliation against any public official or any person acting on behalf of a governmental entity.
- Obstruction of justice, witness tampering, or any offense committed in an attempt to impede an official proceeding.
- Fraud, theft, embezzlement, bribery, forgery, or falsification of records, including any offense related to obtaining, attempting to obtain, or performing any contract or agreement.
- Any offense involving moral turpitude or deceit (e.g., perjury, fraud) or any other act that reflects adversely on the Applicant's or the undersigned's moral character or professional integrity.
- Any criminal violation of laws or regulations governing public contracts, procurement, grants, or financial assistance.
- No plea of nolo contendere or any other plea in lieu of conviction has been entered by the Applicant or the undersigned for any of the offenses listed above.
- Neither the Applicant nor the undersigned is currently the subject of any pending indictment, criminal charge, or investigation related to any of the offenses listed above.

**Government Contracting Eligibility**

Initial LG

Initial DR

Initial JW

Neither the Applicant nor the undersigned has ever been debarred, suspended, or otherwise declared ineligible to participate in any federal, state, territorial, or local government contract, procurement process, grant, or program. Neither the Applicant nor the undersigned has been found in breach of any contract or agreement with a government agency, nor have they knowingly made any material misrepresentation or omission in connection with any public procurement, contract bid, or grant application.

**Disclosure of Convictions or Offenses**

If any conviction, plea, or adjudication described above has been entered against the Applicant or the undersigned, the details (including date, jurisdiction, and nature of the offense) are provided below. If none of the above-described events have occurred, write "None." below.

Disclosure: N/A

**Use of Information**

The undersigned understands that the information provided in this affidavit may be used by the Agency in its pre-award evaluation, risk assessment, and contracting process in accordance with applicable laws, regulations, and procurement policies. All statements in this affidavit are provided voluntarily for those purposes.

**Certification**

I certify under penalty of perjury and other applicable laws that the foregoing statements and any information provided in this affidavit are true, complete, and correct to the best of my knowledge and belief. I understand that knowingly providing false, incomplete, or misleading information in this affidavit may subject the Applicant and/or the undersigned to civil and criminal penalties, and may result in disqualification of the Applicant from contracting, debarment from future contracts, or termination of any contract awarded on the basis of this affidavit.

MCAG

Name of Applicant: Landon Gallagher

By (Signature): Landon Gallagher

Printed Name of Signatory:

Title: COO of Power Expectations LLC

Date: August 6, 2025

Affidavit #1067

Subscribed and sworn to before me in the City of San Juan, Puerto Rico, on this 6 day of August, 20, by Landon Gallagher, COO (Title) of Power Expectations (Company Name) (the Applicant), who is personally known to me or who has presented satisfactory evidence of identity.

Notary Public

ABRAHAM ... ABOGADO-NOTARIO

Initial LG

Initial DR

Initial JW

**Gobierno de Puerto Rico**
**Administración de Servicios Generales**
*Registro Único de Licitadores*

# CERTIFICADO DE ELEGIBILIDAD

| FECHA DE EXPEDICIÓN | NÚMERO DE CERTIFICACIÓN | FECHA DE VENCIMIENTO |
|---|---|---|
| 19 *de* mayo *de* 2026 | 202668693 | 19 *de* mayo *de* 2027 |

**Nombre del Licitador:** Power Expectations LLC

**Numero de Licitador:** 54748

**Dirección Postal:** Po Box 4983 Carolina, PR 00984

**Teléfono:** (561) 827-8405

**Correo Electrónico:** loutelvi@icloud.com

| PERSONAS AUTORIZADAS A FIRMAR | |
|---|---|
| NOMBRE Y APELLIDOS | TÍTULO QUE OSTENTA |
| Eddie Echevarria | Presidente |

MCG

Será responsabilidad de cada Agencia Ejecutiva, Corporación Pública o Municipio validar la elegibilidad del licitador antes de adjudicar cualquier procedimiento de adquisición, órdenes de compra u otorgar contratos. Así como, el de garantizar que el licitador puede proveer los bienes y servicios, y que las certificaciones aquí incluidas estén vigentes conforme las normas que lo regulan.

**ADVERTENCIA:** Cualquier alteración anula este certificado y podría ser sancionado criminalmente conforme a las disposiciones aplicables del Código Penal de Puerto Rico

GOBIERNO DE PUERTO RICO

**Validación:** https://validacion.pr.gov/, debe usar el número de certificado como código de validación

Printed Date : 05/19/2026 01:54 PM

RV20220729

Initial LG

Initial DR

Initial JW

## Gobierno de Puerto Rico

**Administración de Servicios Generales**

*Registro Único de Licitadores*

# CERTIFICADO DE ELEGIBILIDAD

| FECHA DE EXPEDICIÓN | NÚMERO DE CERTIFICACIÓN | FECHA DE VENCIMIENTO |
|---|---|---|
| 2 *de* diciembre *de* 2025 | 202563375 | 2 *de* diciembre *de* 2026 |

Nombre del Licitador: REYES CONTRACTOR GROUP INC

Numero de Licitador: 9792

Unique Entity ID (SAM.gov): HWK2FDS9E677

Dirección Postal: Calle Carazo #66 Altos Guaynabo, PR 00969

Teléfono: (787) 216-4006

Correo Electrónico: reyescontractorgroup@gmail.com

| PERSONAS AUTORIZADAS A FIRMAR | |
|---|---|
| NOMBRE Y APELLIDOS | TÍTULO QUE OSTENTA |
| DENNYS R REYES VEGA | PRESIDENTE/SECRETARIO |

MCOA

Será responsabilidad de cada Agencia Ejecutiva, Corporación Pública o Municipio validar la elegibilidad del licitador antes de adjudicar cualquier procedimiento de adquisición, órdenes de compra u otorgar contratos. Así como el de garantizar que el licitador puede proveer los bienes y servicios no profesionales conforme las normas que lo regulan.

**ADVERTENCIA:** Cualquier alteración anula este certificado y podría ser sancionado criminalmente conforme a las disposiciones aplicables del Código Penal de Puerto Rico

Validación: https://validacion.pr.gov/, debe usar el número de certificado como código de validación

Printed Date : 12/02/2025 03:36 PM

RV.20220729

Initial
LG

DEPARTMENT OF
STATE
GOVERNMENT OF PUERTO RICO

Initial
DR

Initial
JW

## CERTIFICATE OF GOOD STANDING

I, **Rosachely Rivera Santana, Secretary of State** of the Government of Puerto Rico,

**CERTIFY:** That, **REYES CONTRACTOR GROUP, INC.**, register number **171370**, a **for profit domestic** corporation, organized under the laws of Puerto Rico on **April 10, 2007**, has complied with the filing of its Annual Reports.

GREAT SEAL OF PUERTO RICO

**IN WITNESS WHEREOF**, the undersigned by virtue of the authority vested by law, hereby issues this certificate and affixes the Great Seal of the Government of Puerto Rico, in the City of San Juan, Puerto Rico, today, **January 28, 2026.**

**Rosachely Rivera Santana**
Secretary of State

To validate this certificate go to: https://estado.pr.gov/

This certificate is valid for one (1) year from issue date (Regulation 8668, Art. 26). However, it is subject to faithful compliance with the provisions of Chapter XV and Chapter XXI of Act 164-2009, as applicable.

Certificate Validation Number: **896693-62919894**

Docusign Envelope ID: 712D28C1-3039-8DE2-82C2-5A0347969379



Modelo SC 2942 A
Rev. 01 mar. 17

**Gobierno de Puerto Rico**
**DEPARTAMENTO DE HACIENDA**
**Área de Rentas Internas**

Initial LG

**Certificación de Radicación de Planillas**

Initial DR

REYES CONTRACTOR GROUP INC
URB CERRO GORDO HLS
22 CALLE RAUL JULIA
VEGA ALTA PR 00692-9002

| | |
|---|---|
| Fecha: | 13 mayo 2026 |
| ID de Contribuyente: | 17439-96928 |
| ID de Correspondencia: | L0975192864 |

Initial JW

Este comerciante **ha cumplido** con la radicación de sus Planillas Mensuales de Impuesto sobre Ventas y Uso y/o Planilla Mensual de Impuesto sobre Importaciones.

ADVERTENCIA:

De no estar de acuerdo con esta información, deberá presentar su reclamación acompañada de la evidencia correspondiente en uno de nuestros Centros de Servicio al Contribuyente (SAC). Para conocer la localización de los SAC, puede acceder a www.hacienda.pr.gov. Si tiene preguntas relacionadas a este documento, puede comunicarse al Centro de Contacto Hacienda Responde al (787) 622-0123.

MCRF

VALIDACIÓN

Para verificar si este Certificado es válido, acceda https://suri.hacienda.pr.gov y presione el enlace de "Validar Certificados y Licencias".

**Vigencia: Este Certificado es válido hasta 30 días después de la fecha de emisión.**

Período de Conservación: Seis (6) años o una intervención del Contralor, lo que ocurra primero

LO09
14

Modelo SC 6096
Rev. 10 oct. 25

Initial LG

**Gobierno de Puerto Rico**
**DEPARTAMENTO DE HACIENDA**
**Área de Rentas Internas**

**Certificación de Deuda**

Initial DR

REYES CONTRACTOR GROUP INC
URB CERRO GORDO HLS
22 CALLE RAUL JULIA
VEGA ALTA PR 00692-9002

| | |
|---|---|
| Fecha: | 13 mayo 2026 |
| ID de Contribuyente: | 17439-96928 |
| ID de Correspondencia: | L0880968480 |

Initial JW

Certifico que el contribuyente identificado en la parte superior de este documento no tiene deudas por ningún concepto incluyendo contribución sobre ingresos al día 13 mayo 2026 en nuestro sistema.

**Advertencia:** Este documento incluye un detalle de deuda de contribuciones asociadas a su cuenta con balances adeudados, incluyendo intereses, recargos, penalidades, multas y otros, a la fecha de emis ón del mismo . Además, esta certificación no incluye deudas pendientes de tasar o en proceso de investigación a la fecha de emisión .

VALIDACIÓN:

Para verificar si este Certificado es válido, acceda https://suri.hacienda.pr.gov y presione el enlace de "Validar Certificados y Licencias".

**Vigencia: Este Certificado es válido hasta 30 días después de la fecha de emisión.**

Periodo de Conservación: Seis (6) años o una intervención del Contralor, lo que ocurra primero.

6U22
20

Docusign Envelope ID: 712D28C1-3039-8DE2-82C2-5A0347969379



Modelo SC 6088
Rev. 07 ene. 21

**Gobierno de Puerto Rico**
**DEPARTAMENTO DE HACIENDA**
**Área de Rentas Internas**

Initial LG

**Certificación de Radicación de Planillas**

Initial DR

REYES CONTRACTOR GROUP INC
URB CERRO GORDO HLS
22 CALLE RAUL JULIA
VEGA ALTA PR 00692-9002

| | |
|---|---|
| Fecha: | 13 mayo 2026 |
| ID de Contribuyente: | 17439-96928 |
| ID de Correspondencia: | L0781468448 |

Initial JW

**Contribución sobre Ingresos - Entidad Jurídica**

| Año Contributivo | Estatus |
|---|---|
| 2025 | Prórroga sometida |
| 2024 | Planilla radicada |
| 2023 | Planilla radicada |
| 2022 | Planilla radicada |
| 2021 | Planilla radicada |

Advertencia:

De no estar de acuerdo con esta información, deberá presentar su reclamación acompañada de la evidencia correspondiente en uno de nuestros Centros de Servicio al Contribuyente (SAC). Para conocer la localización de los SAC, puede acceder a www.hacienda.pr.gov. Si tiene preguntas relacionadas a este documento, puede comunicarse al Centro de Contacto Hacienda Responde al (787) 622-0123.

VALIDACIÓN

Para verificar si este Certificado es válido, acceda a https://suri.hacienda.pr.gov y presione el enlace de "Validar Certificados y Licencias".

Mcaga

Período de Conservación: Seis (6) años o una intervención del Contralor, lo que ocurra primero

1L027
6

Initial LG

Initial DR

Initial JW

FONDO DEL SEGURO DEL ESTADO

261905DZAM015514
**Código verificación electrónica**
Electronic verification code

## CERTIFICACIÓN DE DEUDA
### CERTIFICATE OF DEBTS

**Número de Certificación:** 261905DZAM015514
Certificate Number

**Fecha de Certificación:** 13/05/2026
Certificate Date (DD/MM/YYYY)

**Propósito:** Contrato con el Gobierno de Puerto Rico
Purpose

**Fecha de Expiración:** 30/06/2026
Expiration Date (DD/MM/YYYY)

**Emitido por:** Portal de Servicios
Emitted by

**De acuerdo a nuestros registros al día:** 13/05/2026
According to our records as of (DD/MM/YYYY)

**El patrono:** REYES CONTRACTOR GROUP INC
The employer XXX-XX-7182

**No tiene una deuda con la Corporación del Fondo del Seguro del Estado.**
You do not have a debt with the State Insurance Fund Corporation.

MCofa

**Esta certificación no será válida sin el sello de oficial de verificación electrónica.**
This Certification is not valid without the official stamp or electronic verification code

**No representa un relevo de responsabilidad por deudas con la CFSE pendientes de ser procesadas al momento de la emisión de este documento debido a la constante actualización de nuestras bases de datos, dilación o errores en la información provista por patronos y/o lesionados y/o dilación o errores en el proceso de recopilación y publicación de datos.**
It does not represent a release for any pending debts with the SIFC waiting to be processed at the time of issuance of this document due to the constant updating of our databases, delays or errors in the information provided by employers and or injured workers and or delays or errors in the process of data collection and publication

**Tampoco constituye una emisión de la certificación de vigencia de la póliza para llevar a cabo trabajos de su negocio.**
Nor does it constitute an issuance of the policy's validity certification to carry out work of your business.

CFSE-0566
*Mayo 2018*

**Generado Electrónicamente**
Generated electronically

13/05/2026 02:31 PM
**Fecha de Emisión**
*Issued Date*
(DD/MM/YYYY)

Pag 1 de 1

Initial LG

Initial DR

Initial JW

ADMINISTRACIÓN PARA EL SUSTENTO DE MENORES
ASUME
GOBIERNO DE PUERTO RICO

## CERTIFICACIÓN PATRONAL DE CUMPLIMIENTO

*EMPLOYER COMPLIANCE CERTIFICATE*

| | |
|---|---|
| **Fecha de emisión:** *Issue date:* | **5/13/2026** |
| **Nombre del patrono:** *Company name:* | **REYES CONTRACTOR GROUP INC** |
| **Dirección:** *Address:* | **HC 06 BOX 13239** |
| | **COROZAL, PR 007830000** |
| **Número patronal federal:** *FEIN:* | **660697182** |
| **Número de participante:** *Participant number:* | **0002272692** |

Se ha efectuado una búsqueda en nuestro sistema de manejo de casos y nuestro registro de pagos refleja que el cumplimiento de la persona jurídica que antecede es:
*A search in our case management system and payment registry reflects that the above named legal entity compliance status is:*

- [ ] Está cumpliendo con la(s) orden(es) de retención de ingreso según establecida(s) en todos los casos. *It is complying with all the income withholding orders as established in all cases.*
- [X] Al presente, NO existe ninguna orden de retención de ingresos activa que lo obligue como patrono. *There is no active income withholding order to comply with, at present.*

Este documento resume la información contenida en el sistema mecanizado (PRACSES) de la Administración para el Sustento de Menores. De la búsqueda en nuestro registro de pagos recibidos se desprende que la información que antecede es correcta. La información de este documento es válida por treinta (30) días, a partir de la fecha de su emisión.
*This document summarizes the information contained in the Administration for Child Support Enforcement automated system (PRACSES). A search in our received payments registry shows that the information above is correct. The information contained in this document is valid for thirty (30) days from its issue date.*

NOTA DE CONFIDENCIALIDAD: La información contenida en este documento y cualquier anejo del mismo es confidencial y privilegiada y tiene el propósito de que sólo sea utilizado por la persona identificada en el mismo.
*CONFIDENTIALITY NOTE: The information contained in this document and any attachment is confidential and privileged and has the purpose of being used only by the person identified in it.*

**20260430202605306l6944**

MCofr

Para validar la información contenida en este certificado, favor acceder a http://serviciosenlinea.pr.gov/validacionelectronica/
To validate the information contained here in use link http://serviciosenlinea.pr.gov/validacionelectronica/

REV 02/15

Initial LG

Initial DR

Initial JW

DEPARTAMENTO DEL TRABAJO Y RECURSOS HUMANOS
DTRH
GOBIERNO DE PUERTO RICO

Sra. María Del Pilar Vélez Casanova
SECRETARIA

# CERTIFICACIÓN

Yo, MARIA M GARCIA PARRILLA, Investigador(a) del Seguro Social para Choferes del Programa de Seguro Social para Choferes y Otros Empleados del Departamento del Trabajo y Recursos Humanos CERTIFICO:

Que se ha realizado una búsqueda en los archivos deexpedientes de la Sección de Determinación de Patronos y Cobros de Cuentas Atrasadas y de la misma surge que el patrono:

**REYES CONTRACTOR GROUP INC con el número de cuenta patronal 0300063557 tiene pago hasta el primer trimestre del 2026 en este programa.**

En testimonio de lo cual expido la presente CERTIFICACIÓN bajo mi firma y sello del Departamento del Trabajo y Recursos Humanos, en Hato Rey, Puerto Rico a los 30 días de abril del 2026.

MCGP

MARIA M GARCIA PARRILLA
Investigador(a) del Seguro Social para Choferes

DIGNIDAD Y JUSTICIA POR EL TRABAJO

Programa de Seguro Social para Choferes y Otros Empleados
505 edificio Prudencio Rivera Martínez, Ave. Muñoz Rivera, Hato Rey PR 00918
P O Box 195540, San Juan, PR00919-5540
Tel. (787) 754-5284 Fax (787) 754-9224 www.trabajo.pr.gov

Docusign Envelope ID: 712D28C1-3039-8DE2-82C2-5A0347969379



Initial LG

Initial DR

Initial JW

DEPARTAMENTO DEL TRABAJO Y RECURSOS HUMANOS GOBIERNO DE PUERTO RICO

GOBIERNO DE PUERTO RICO
DEPARTAMENTO DEL TRABAJO Y RECURSOS HUMANOS

**-CERTIFICACION-**

**LA UNIDAD DE EMPLEO: REYES CONTRACTOR GROUP INC**

**REGISTRADO CON EL NÚMERO DE CUENTA: 3480370006 Y EIN: 660697182**

**EFECTIVO EL: 08 DE JUNIO DE 2007**

**NO TIENE DEUDA PARA LOS PROGRAMAS DE SEGURO POR DESEMPLEO Y SEGURO POR INCAPACIDAD HASTA EL TRIMESTRE TERMINADO EL 31 DE MARZO DE 2026**

**EN SAN JUAN, PUERTO RICO HOY 30 DE ABRIL DE 2026.**

Lourdes M. Carrillo
**LOURDES M. CARRILLO**

**SECCION DE CONTRIBUCIONES**

NEGOCIADO DE SEGURIDAD DE EMPLEO – SECCION DE CONTRIBUCIONES – DPTO. DEL TRABAJO

MCO

NEGOCIADO DE SEGURIDAD DE EMPLEO | DIVISION DE CONTRIBUCIONES
DEPARTAMENTO DEL TRABAJO Y RECURSOS HUMANOS | [illegible] AVENIDA MUÑOZ RIVERA MARTÍNEZ, PISO [illegible], HATO REY, PUERTO RICO [illegible]
GOBIERNO DE PUERTO RICO | BOX [illegible], SAN JUAN, PUERTO RICO [illegible]

Initial LG

Initial DR

Initial JW

**ACT 2-2018 ANTI-CORRUPTION CODE SWORN STATEMENT**

I, Dennys R. Reyes Vega, of legal age, single, and resident of Vega Alta, PR, in my capacity as President of Reyes Contractor Group Inc., a corporation duly organized and existing under the laws of Puerto Rico, with Federal Employer Identification Number 66-0697182, after being duly sworn, hereby state and certify as follows:

1. My name and personal circumstances are as stated above.
2. I am the President of Reyes Contractor Group Inc. and I am duly authorized to execute this sworn statement on behalf of the corporation.
3. I provide this sworn statement in accordance with the provisions established in Act No. 2 of January 4, 2018, as amended, known as the "Anti-Corruption Code for a New Puerto Rico," which imposes the obligation on every natural or legal person who wishes to participate in the awarding of a bid or the granting of a contract with any agency or instrumentality, public corporation, municipality, or with the Legislative Branch or Judicial Branch, to submit a sworn statement informing whether they have been convicted or found guilty of the crimes listed in Section 6.8 of Act No. 8-2017, as amended, known as the "Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico."
4. In relation to the provisions of Act No. 2-2018, as amended, I certify that neither the undersigned, nor Reyes Contractor Group Inc., nor any president, vice president, director, executive director, partner, member of a board of officers or board of directors, or person performing equivalent functions for Reyes Contractor Group Inc., has been convicted or found guilty of any of the offenses enumerated in Section 6.8 of Act No. 8-2017, as amended.
5. I further certify that neither the undersigned, nor Reyes Contractor Group Inc., nor any president, vice president, director, executive director, partner, member of a board of officers or board of directors, or person performing equivalent functions for Reyes Contractor Group Inc., has been convicted or found guilty of any of the offenses enumerated in Act No. 2-2018, as amended.
6. For purposes of federal jurisdiction, the jurisdiction of the states or territories of the United States of America, or any other country, the prohibition contained in this sworn statement shall apply in cases of conviction for offenses whose elements are equivalent to those referred to in the preceding paragraphs.
7. I acknowledge that Reyes Contractor Group Inc. has a continuing duty to inform during all stages of the contracting process and execution of the Agreement if the undersigned, Reyes Contractor Group Inc., or any president, vice president, director, executive director, partner, member of a board of officers or board of directors, or person performing equivalent functions for Reyes Contractor Group Inc., is convicted of or pleads guilty to any of the offenses referred to in Section 6.8 of Act No. 8-2017, as amended, or any of the offenses contained in Act No. 2-2018, as amended.
8. I certify that neither Reyes Contractor Group Inc., nor any of its officers, directors, managers, board members, employees, agents, representatives, or persons acting on its

Initial LG

Initial DR

Initial JW

behalf, have made or promised any commission, bonus, payment, gift, benefit, compensation, or thing of value to any public official or government employee involved in the procurement.

9. I certify that neither Reyes Contractor Group Inc., nor any of its officers, directors, managers, board members, employees, agents, representatives, or persons acting on its behalf, have engaged in prohibited influence, improper conduct, undue pressure, coercion, favoritism, bribery, or any other improper conduct during the procurement or negotiation of the Agreement.
10. I acknowledge that I have the duty, and I commit and oblige myself and Reyes Contractor Group Inc., which I represent, to immediately inform if the undersigned, or any president, vice president, director, executive director, partner, member of a board of officers or board of directors, or person performing equivalent functions for Reyes Contractor Group Inc., is ever convicted of, found guilty of, pleads guilty to, or becomes subject to any investigation or proceeding for acts related to the offenses contained in Section 6.8 of Act No. 8-2017, as amended, or any of the offenses contained in Act No. 2-2018, as amended.
11. I execute this sworn statement for all legal and administrative purposes, including compliance with the documentation requirements applicable to the Agreement.

IN WITNESS WHEREOF, I sign this sworn statement in San Juan, PR this 14 day of May 2026.

Dennys R. Reyes Vega
President
Reyes Contractor Group Inc.

AFFIDAVIT NO. 9801

MCAG

Sworn and subscribed before me by Dennys R. Reyes Vega, of the personal circumstances stated above, and in his/her capacity as President of Reyes Contractor Group Inc., whom I personally know, in San Juan, PR this 14 day of May 2026.

NOTARY PUBLIC

Lcdo. Franklin Padilla Ortiz
Abogado - Notario

Docusign Envelope ID: 712D28C1-3039-8DE2-82C2-5A0347969379



Initial
LG

Initial
DR

Initial
JW

Initial LG

Initial DR

Initial JW

representatives or subcontractors, has required, directly or indirectly, any third person to take any action with the purpose of influencing any public official or employee in connection with the procurement, negotiation, or execution of the proposed contract, in contravention of applicable law.

7. The undersigned acknowledges that this certification is based on the information known and available as of the date of execution. Reyes Contractor Group Inc. shall promptly supplement or update this certification if any material information required herein changes before execution or during the performance of the proposed contract, to the extent required by the FOMB Policy: Review of Contracts or applicable law.
8. Reyes Contractor Group Inc. acknowledges and agrees that any incorrect, incomplete, or false statement made by its representative as part of this certification shall cause the nullity of the proposed contract, and Reyes Contractor Group Inc. must reimburse immediately to the Commonwealth of Puerto Rico any amounts, payments, or benefits received from the Commonwealth under the proposed contract.
9. I hereby certify under penalty of perjury that the foregoing is complete, true and correct.

IN WITNESS WHEREOF, I sign this sworn statement in San Juan, PR this 14 day of May 2026.

Dennys R. Reyes Vega
President
Reyes Contractor Group Inc.

**AFFIDAVIT NO.** 9798

Sworn and subscribed before me by Dennys R. Reyes Vega, of the personal circumstances stated above, and in his/her capacity as President of Reyes Contractor Group Inc., whom I personally know, in San Juan, PR this 14 day of May 2026.

NOTARY PUBLIC

Lcdo. Franklin Padilla Ortiz
Abogado - Notario

Initial LG

Initial DR

Initial JW

## CORPORATE RESOLUTION AND OFFICER AUTHORIZATION

I, Dennys R. Reyes Vega, of legal age, single, and resident of Vega Alta, PR, in my capacity as President of Reyes Contractor Group Inc., a corporation duly organized and existing under the laws of Puerto Rico, with Federal Employer Identification Number 66-0697182, after being duly sworn, hereby state and certify as follows:

1. My name and personal circumstances are as stated above.
2. The undersigned is the President of Reyes Contractor Group Inc. and has authority to issue this Corporate Resolution and Officer Authorization on behalf of the corporation.
3. On the 13th day of May 2026, at Guaynabo, Puerto Rico, the Board of Directors of Reyes Contractor Group Inc. held a duly called meeting, with the required quorum present, and adopted the following resolution:

RESOLVED, that Reyes Contractor Group Inc. hereby authorizes Dennys R. Reyes Vega, in his capacity as President, to represent the corporation in any and all matters related to the Agreement, including, without limitation, communications, submissions, certifications, sworn statements, compliance documents, tax liability statements, CRIM statements, corporate documents, forms, notices, representations, acknowledgments, and any other documents or matters required in connection with the review, approval, execution, implementation, or administration of the Agreement.

FURTHER RESOLVED, that the authorized representative is authorized to make factual representations, certifications, declarations, and acknowledgments required in connection with the Agreement and its related compliance documentation, provided that such representations are based on the corporation's records and information available to the authorized representative.

FURTHER RESOLVED, that all acts previously taken by the authorized representative in connection with the Agreement and the related compliance documentation are hereby ratified, confirmed, and approved as acts of Reyes Contractor Group Inc.

Initial LG

Initial DR

Initial JW

FURTHER RESOLVED, that this authorization shall remain in full force and effect unless and until revoked in writing by Reyes Contractor Group Inc.

4. The foregoing resolution has not been amended, modified, rescinded, or revoked and remains in full force and effect as of the date of this certification.

IN WITNESS WHEREOF, I sign this Corporate Resolution and Officer Authorization in San Juan, PR this 14 day of May 2026.

Dennys R. Reyes Vega
President
Reyes Contractor Group Inc.

**AFFIDAVIT NO.** 9800

Sworn and subscribed before me by Dennys R. Reyes Vega, of the personal circumstances stated above, and in his/her capacity as President of Reyes Contractor Group Inc., whom I personally know, in San Juan, PR this 14 day of May 2026.

NOTARY PUBLIC

Lcdo. Franklin Padilla Ortiz
Abogado - Notario

MCR

Initial LG

Initial DR

Initial JW

**CRIM SWORN STATEMENT**

I, Dennys R. Reyes Vega, of legal age, single, and resident of Vega Alta, PR, in my capacity as President of Reyes Contractor Group Inc., a corporation duly organized and existing under the laws of Puerto Rico, with Federal Employer Identification Number 66-0697182, after being duly sworn, hereby state and certify as follows:

1. My name and personal circumstances are as stated above.
2. I am the President of Reyes Contractor Group Inc. and I am duly authorized to execute this sworn statement on behalf of the corporation.
3. The physical business address of Reyes Contractor Group Inc. is 66 Calle Carazo (Altos), Guaynabo, PR 00969, and its mailing address is Urb. Cerro Gordo Hills, 22 Calle Raúl Juliá, Vega Alta, Puerto Rico 00692.
4. Reyes Contractor Group Inc. does not own real property in Puerto Rico.
5. Reyes Contractor Group Inc. owns personal property in Puerto Rico used in connection with its operations.
6. Accordingly, Reyes Contractor Group Inc. is required to file municipal personal property tax returns with the Centro de Recaudación de Ingresos Municipales, commonly known as CRIM.
7. Reyes Contractor Group Inc. has filed its municipal personal property tax returns with CRIM for the last five years.
8. Reyes Contractor Group Inc. is current and in good standing with its municipal personal property tax filing and payment obligations before CRIM for the last five years.
9. I make this sworn statement for all legal purposes and specifically to comply with the CRIM Sworn Statement requirement applicable to the Agreement.

IN WITNESS WHEREOF, I sign this sworn statement in San Juan, PR this 14 day of May 2026.

Dennys R. Reyes Vega
President
Reyes Contractor Group Inc.

**AFFIDAVIT NO.** 9799

Sworn and subscribed before me by Dennys R. Reyes Vega, of the personal circumstances stated above, and in his/her capacity as President of Reyes Contractor Group Inc., whom I personally know, in San Juan, PR this 14 day of May 2026.

NOTARY PUBLIC

Ledo. Franklin Padilla Ortiz
Abogado - Notario

Initial LG

Initial DR

Initial JW

*Last updated by JOSEPHINE BURGOS on Nov 06, 2025 at 11:47 AM* REYES CONTRACTOR GROUP, INC

SAM.GOV

# REYES CONTRACTOR GROUP, INC

| | | |
|---|---|---|
| Unique Entity ID<br>**HWK2FDS9E677** | CAGE / NCAGE<br>**8GZU0** | Purpose of Registration<br>**All Awards** |
| Registration Status<br>**Active Registration** | Expiration Date<br>**Nov 6, 2026** | |
| Physical Address<br>**Guaynabo Pueblo 66 Calle Carazo #ALTOS**<br>**Guaynabo, Puerto Rico 00969**<br>**United States** | Mailing Address<br>**Guaynabo Pueblo 66 Calle Carazo #ALTOS**<br>**Guaynabo, Puerto Rico 00969**<br>**United States** | |

**Business Information**

| | | |
|---|---|---|
| Doing Business as<br>**(blank)** | Division Name<br>**(blank)** | Division Number<br>**(blank)** |
| Congressional District<br>**Puerto Rico 98** | State / Country of Incorporation<br>**Puerto Rico / United States** | URL<br>**(blank)** |

**Registration Dates**

| | | |
|---|---|---|
| Activation Date<br>**Nov 13, 2025** | Submission Date<br>**Nov 6, 2025** | Initial Registration Date<br>**Feb 13, 2020** |

**Entity Dates**

| | |
|---|---|
| Entity Start Date<br>**Apr 10, 2007** | Fiscal Year End Close Date<br>**Dec 31** |

**Immediate Owner**

| | |
|---|---|
| CAGE<br>**(blank)** | Legal Business Name<br>**(blank)** |

**Highest Level Owner**

| | |
|---|---|
| CAGE<br>**(blank)** | Legal Business Name<br>**(blank)** |

**Executive Compensation**

In your business or organization's preceding completed fiscal year, did your business or organization (the legal entity to which this specific SAM record, represented by a Unique Entity ID, belongs) receive both of the following: 1. 80 percent or more of your annual gross revenues in U.S. federal contracts, subcontracts, loans, grants, subgrants, and/or cooperative agreements and 2. $25,000,000 or more in annual gross revenues from U.S. federal contracts, subcontracts, loans, grants, subgrants, and/or cooperative agreements?
**No**

Does the public have access to information about the compensation of the senior executives in your business or organization (the legal entity to which this specific SAM record, represented by a Unique Entity ID, belongs) through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986?
**Not Selected**

**Proceedings Questions**

Is your business or organization, as represented by the Unique Entity ID on this entity registration, responding to a Federal procurement opportunity that contains the provision at FAR 52.209-7, subject to the clause in FAR 52.209-9 in a current Federal contract, or applying for a Federal grant opportunity which contains the award term and condition described in 2 C.F.R. 200 Appendix XII?
**No**

Does your business or organization, as represented by the Unique Entity ID on this specific SAM record, have current active Federal contracts and/or grants with total value (including any exercised/unexercised options) greater than $10,000,000?
**Not Selected**

Within the last five years, had the business or organization (represented by the Unique Entity ID on this specific SAM record) and/or any of its principals, in connection with the award to or performance by the business or organization of a Federal contract or grant, been the subject of a Federal or State (1) criminal proceeding resulting in a conviction or other acknowledgment of fault, (2) civil proceeding resulting in a finding of fault with a monetary fine, penalty, reimbursement, restitution, and/or damages greater than $5,000, or other acknowledgment of fault; and/or (3) administrative proceeding resulting in a finding of fault with either a monetary fine or penalty greater than $5,000 or reimbursement, restitution, or damages greater than $100,000, or other acknowledgment of fault?
**Not Selected**

**Exclusion Summary**

*Nov 13, 2025 01:21:58 PM GMT*
*https://sam.gov/entity/HWK2FDS9E677/coreData?status=null* *Page 1 of 4*

Initial LG

Initial DR

Initial JW

Active Exclusions Records?
**No**

**SAM Search Authorization**

I authorize my entity's non-sensitive information to be displayed in SAM public search results:
**Yes**

**Entity Types**

**Business Types**

Entity Structure
**Corporate Entity (Not Tax Exempt)**

Entity Type
**Business or Organization**

Organization Factors
**(blank)**

Profit Structure
**For Profit Organization**

**Socio-Economic Types**

**Minority-Owned Business**
**Self Certified Small Disadvantaged Business**
**Hispanic American Owned**

**Check the registrant's Reps & Certs, if present, under FAR 52.212-3 or FAR 52.219-1 to determine if the entity is an SBA-certified HUBZone small business concern. Additional small business information may be found in the SBA's Dynamic Small Business Search if the entity completed the SBA supplemental pages during registration.**

**Financial Information**

Accepts Credit Card Payments
**Yes**

Debt Subject To Offset
**No**

EFT Indicator
**0000**

CAGE Code
**8GZU0**

**Electronic Funds Transfer**

Account Type
**Checking**

Routing Number
*********69**

Lock Box Number
**(blank)**

Financial Institution
**COOP. A/C LA SAGRADA FAMILIA**

Account Number
*********21**

**Automated Clearing House**

Phone (U.S.)
**7878592850**

Email
**(blank)**

Phone (non-U.S.)
**(blank)**

Fax
**(blank)**

**Remittance Address**

**Reyes Contractor Group Inc**
**#22 Raul Julia Urb Cerro Gordo Hills**
**Vega Alta, Puerto Rico 00692**
**United States**

**Taxpayer Information**

EIN
*******7182**

Type of Tax
**Applicable Federal Tax**

Taxpayer Name
**Reyes Contractor Group Inc**

Tax Year (Most Recent Tax Year)
**2024**

Name/Title of Individual Executing Consent
**Administrative Assistant**

TIN Consent Date
**Nov 6, 2025**

Address
**Guaynabo Pueblo 56 Calle Carazo #ALTOS**
**Guaynabo, Puerto Rico 00969**

Signature
**Josephine Burgos**

**Points of Contact**

**Accounts Receivable POC**

**Josephine Burgos**

reyescontractorgroup@gmail.com
7872228753

**Electronic Business**

| | |
|---|---|
| Josephine Burgos<br>reyescontractorgroup@gmail.com<br>7872228753 | Guaynabo Pueblo 66 Calle Carazo #ALTOS<br>Guaynabo, Puerto Rico 00969<br>United States |
| Ada Oliveras<br>reyescontractorgroup@gmail.com<br>7872201032 | #22 Raul Julia Urb Cerro Gordo Hills<br>Vega Alta, Puerto Rico 00692<br>United States |

Initial LG

Initial DR

Initial JW

**Government Business**

| | |
|---|---|
| Dennys R Reyes Vega<br>reyescontractorgroup@gmail.com<br>7872164006 | Guaynabo Pueblo 66 Calle Carazo #ALTOS<br>Guaynabo, Puerto Rico 00969<br>United States |
| Ada Oliveras<br>reyescontractorgroup@gmail.com<br>7872201032 | #22 Raul Julia Urb Cerro Gordo Hills<br>Vega Alta, Puerto Rico 00692<br>United States |

**Past Performance**

| | |
|---|---|
| Josephine Burgos<br>reyescontractorgroup@gmail.com<br>7872228753 | 66 Calle Carazo Segundo Nivel<br>Guaynabo, Puerto Rico 00969<br>United States |

**Service Classifications**

**NAICS Codes**

| Primary | NAICS Codes | NAICS Title |
|---|---|---|
| Yes | 238220 | Plumbing, Heating, And Air-Conditioning Contractors |
| | 236115 | New Single-Family Housing Construction (Except For-Sale Builders) |
| | 236117 | New Housing For-Sale Builders |
| | 236118 | Residential Remodelers |
| | 236210 | Industrial Building Construction |
| | 236220 | Commercial And Institutional Building Construction |
| | 237310 | Highway, Street, And Bridge Construction |
| | 238210 | Electrical Contractors And Other Wiring Installation Contractors |
| | 238350 | Finish Carpentry Contractors |
| | 238990 | All Other Specialty Trade Contractors |

MCaf

**Size Metrics**

**IGT Size Metrics**

Annual Revenue (from all IGTs)
(blank)

**Worldwide**

| Annual Receipts (in accordance with 13 CFR 121) | Number of Employees (in accordance with 13 CFR 121) |
|---|---|
| $11,871,678.00 | 60 |

**Location**

| Annual Receipts (in accordance with 13 CFR 121) | Number of Employees (in accordance with 13 CFR 121) |
|---|---|
| (blank) | (blank) |

**Industry-Specific**

| Barrels Capacity | Megawatt Hours | Total Assets |
|---|---|---|

Initial LG

*Last updated by JOSEPHINE BURGOS on Nov 06, 2025 at 11:47 AM* *REYES CONTRACTOR GROUP, INC*

| | | |
|---|---|---|
| **(blank)** | **(blank)** | **(blank)** |

**Electronic Data Interchange (EDI) Information**

This entity did not enter the EDI information

Initial DR

**Disaster Response**

Yes, this entity appears in the disaster response registry.

Yes, this entity require bonding to bid on contracts.

Initial JW

| Bonding Levels | Dollars |
|---|---|
| **Construction Aggregate** | **$50,000,000.00** |
| **Construction Per Contract** | **$50,000,000.00** |

| States | Counties | Metropolitan Statistical Areas |
|---|---|---|
| **Any** | **(blank)** | **(blank)** |

MCM

Docusign Envelope ID: 712D28C1-3039-8DE2-82C2-5A0347969379



# EXHIBIT E

## TECHNICAL SPECIFICATIONS AND DELIVERY POINTS

Initial

Initial

Initial

| AGUIRRE GENERATION | CAPACITY (COP-MW)* | QTY | INSTALLED CAP (COP-MW)* |
|---|---|---|---|
| SGT-800 | 49.691 | 3 | 149 |
| TM-2500 | 31.304 | 8 | 250 |
| *all capacities delivered at HV | | | 400 |

POWER EXPECTATIONS CONFIDENTIAL INFORMATION DO NOT DISCLOSE WITHOUT WRITTEN AUTHORIZATION

R1 JAF 11/03/2025

AGUIRRE POWER PLANT

COVER SHEET

POWER EXPECTATIONS

R1




UNIT #1
550MVA
24.5kV / 230kV
50MVA
13.2kV / 24.9kV
TURBINE 1
SGT-800
(50MW)
2304 FLA
40kA (5.75%Z)
(95 P.F.)
TURBINE 2
SGT-800
(50MW)
2304 FLA
40kA (5.75%Z)
(95 P.F.)
TURBINE 3
SGT-800
(50MW)
2304 FLA
40kA (5.75%Z)
(95 P.F.)
POWER EXPECTATIONS CONFIDENTIAL INFORMATION DO NOT DISCLOSE WITHOUT WRITTEN AUTHORIZATION
INITIAL RELEASE
R1
JAF
PR HV SUBSTATION ONELINES
400MW – 24.9/230kV – UNIT #1 – SITE B
POWER EXPECTATIONS
R1


INTERCONNECT POINT TO 230kV TRANSMISSION LINE
STAG 2
STAG 1
230kV
50MW
13.8kV
POWER EXPECTATIONS CONFIDENTIAL INFORMATION DO NOT DISCLOSE WITHOUT WRITTEN AUTHORIZATION
INITIAL RELEASE
R1
JAF
PR HV SUBSTATION ONELINES
AGUIRRE 13.2kV–230kV COMB. CYC. 1-LN
POWER EXPECTATIONS
R1

Docusign Envelope ID: 712D28C1-3039-8DE2-82C2-5A0347969379





# EXHIBIT F

## LIQUIDATED DAMAGES SUMMARY SCHEDULE

Initial LG

This Exhibit summarizes the liquidated damages provisions set forth in Article VIII of this Agreement:

Initial DR

Initial JW

| Category | Rate | Reference |
|---|---|---|
| Deployment Delay | $5,000/day | Section 8.2 |
| Availability Penalty | $250/MW/day below 380 MW | Section 8.3 |
| Fuel Diversion | 150% of diverted fuel/power value | Section 8.4 |
| Abandonment | $1,000,000 one-time | Section 8.5 |
| Regulatory Violation | $50,000/day | Section 8.6 |
| Corrective Action Failure | $25,000/day | Section 8.7 |
| Data/Reporting Failure | $10,000/day | Section 8.8 |

*Note: Liquidated damages may be offset against payments due to Seller. The aggregate annual cap excludes Fuel Diversion LDs and Performance Bond draws.*

mcorf

# EXHIBIT G

## COMMERCIAL OPERATING DATE SCHEDULE

Initial LG

Initial DR

Initial JW

MCOFG

### AGUIRRE 400MW INSTALLATION SCHEDULE

5/15/2026
ENG. LUIS ORTIZ

Power Expectations

| NO. | TASK | START | FINISH | DURATION | RESOURCE |
|---|---|---|---|---|---|
| | | 05/15/26 | 10/14/26 | 150 | |
| 1 | Notice to Proceed | 05/15/26 | 05/15/26 | 1 | 3 PREPA, 3PPO, PR GOV |
| 2 | Booking the Vessel | 05/20/26 | 05/19/26 | 0 | 1 FE |
| 3 | Permitting Process | 05/18/26 | 06/02/26 | 15 | |
| 3.1 | Permit Matrix/ Agency Identification | 05/19/26 | 05/25/26 | 6 | 1 FE |
| 3.2 | Pre-Application Meetings/ Agency Coordination | 05/25/26 | 05/30/26 | 6 | 1 FE |
| 3.3 | Site Demarcation / Site Access Approval | 05/18/26 | 05/21/26 | 4 | |
| 3.3.1 | PREPA Site Access Approval | 05/18/26 | 05/19/26 | 2 | 1 PREPA |
| 3.3.2 | Define Project Boundaries | 05/19/26 | 05/20/26 | 2 | 1 FE |
| 3.3.3 | Identify Laydown areas | 05/20/26 | 05/21/26 | 2 | 1 FE |
| 3.3.4 | Identify Temporary Offices / Workshops | 05/20/26 | 05/21/26 | 2 | 1 FE |
| 3.3.5 | Define Access Routes For Crane, Trucks, Fuel Delivery, And Personnel | 05/20/26 | 05/21/26 | 2 | 1 FE |
| 3.3.6 | Identify Exclusion zones And Shared-use Areas | 05/20/26 | 05/21/26 | 2 | 1 FE |
| 3.4 | Civil / Construction Permit | 05/20/26 | 05/29/26 | 10 | 1 FE |
| 3.5 | Electrical / Interconnection Approval | 05/20/26 | 05/26/26 | 7 | 1 FE |
| 3.6 | LNG / Fuel System Permit | 05/20/26 | 06/02/26 | 14 | 1 FE |
| 4 | Engineering | 05/18/26 | 07/18/26 | 62 | |
| 4.1 | Basic | 05/18/26 | 06/04/26 | 18 | 1 FE |
| 4.2 | Approval - Basic | 06/03/26 | 06/08/26 | 6 | 2 PREPA, LUMA |
| 4.3 | Relay and Protection Design | 05/20/26 | 06/10/26 | 22 | |
| 4.3.1 | Confirm Point Of Interconnection (115 & 230)Kv | 05/20/26 | 05/21/26 | 2 | 1 LUMA |
| 4.3.2 | LUMA Interconnection Coordination | 05/22/26 | 05/26/26 | 5 | 1 LUMA |
| 4.3.3 | System Impact/ Protection Review | 05/26/26 | 06/10/26 | 16 | 1 LUMA |
| 4.4 | Approval - Relay and Protection Design | 06/10/26 | 06/20/26 | 11 | 1 LUMA |
| 4.5 | Detail | 06/21/26 | 07/06/26 | 16 | 1 FE |
| 4.6 | Approval - Detail | 07/07/26 | 07/18/26 | 12 | 2 LUMA, PREPA |
| 5 | Mobilization | 05/25/26 | 07/10/26 | 47 | |
| 5.1 | Setting Project Offices | 05/25/26 | 06/10/26 | 17 | 2 REYES, FE |
| 5.2 | Set-up dedicated Workshops Mechanical / Electrical | 06/11/26 | 06/29/26 | 19 | 2 REYES, FE |
| 5.3 | Setting up Lay-down areas | 06/30/26 | 07/10/26 | 11 | 2 REYES, FE |
| 5.4 | Concrete Pad Locations Identifications for Equipment and BOP | 06/13/26 | 06/17/26 | 5 | 2 REYES, FE |
| 6 | Turbine and BOP Shipment Arrival | 05/18/26 | 10/03/26 | 137 | |
| 6.1 | Turbine Shipment - Arriving to Port | 05/18/26 | 08/16/26 | 90 | 1 FE |
| 6.2 | Transport From Port To Plant | 07/14/26 | 10/02/26 | 80 | 2 FE, REYES |
| 6.3 | BOP Shipment - Arriving to Port | 06/15/26 | 09/12/26 | 90 | 1 FE |
| 6.4 | BOP Transportation to Plant | 06/30/26 | 09/17/26 | 80 | 2 FE, REYES |
| 7 | Material Procurement | 06/09/26 | 07/31/26 | 53 | |
| 7.1 | Mechanical | 06/09/26 | 07/17/26 | 39 | 2 REYES, FE |
| 7.2 | Electrical | 06/19/26 | 07/31/26 | 43 | 2 REYES, FE |
| 8 | LNG Regasification Station | 06/08/26 | 10/13/26 | 127 | |
| 8.1 | Engineering Basing Drawings | 06/09/26 | 06/26/26 | 18 | 2 MISTAR, FE |
| 8.2 | Drawings Approval | 06/28/26 | 07/16/26 | 19 | 2 PREPA, PR GOV |
| 8.3 | LNG Permit | 07/17/26 | 08/04/26 | 19 | 2 FE |
| 8.4 | Construction | 07/17/26 | 10/13/26 | 89 | 2 REYES, FE |
| 9 | Turbines Installation and Commissioning | 06/07/26 | 10/10/26 | 126 | |
| 9.1 | Gas Turbine at Site | 06/07/26 | 06/28/26 | 22 | 2 FE, REYES |
| 9.2 | Gas Turbine BOP at Site | 06/16/26 | 07/01/26 | 16 | 2 FE, REYES |
| 9.3 | Civil Works Completions | 06/22/26 | 08/05/26 | 45 | 2 FE, REYES |
| 9.4 | BOP Construction | 06/10/26 | 09/22/26 | 105 | |
| 9.4.1 | Preliminary Works | 06/10/26 | 07/31/26 | 52 | 2 FE, REYES |
| 9.4.2 | BOP Equipment Installation | 08/01/26 | 09/22/26 | 53 | 2 FE, REYES |
| 9.5 | Gas Turbine Installation | 06/26/26 | 10/10/26 | 107 | |
| 9.5.1 | Turbine Modules Installation | 07/13/26 | 10/10/26 | 91 | |
| 9.5.1.1 | 50MW Ready at Existing PREPA/Genera ACC Transformers | 07/14/26 | 07/28/26 | 15 | 2 FE, REYES |
| 9.5.1.2 | 100MW Ready at Existing PREPA/Genera ACC Transformers | 07/27/26 | 08/12/26 | 17 | 2 FE, REYES |
| 9.5.1.3 | 400MW | 08/12/26 | 10/10/26 | 60 | 2 FE, REYES |
| 9.5.2 | Medium Voltage Works | 06/26/26 | 08/30/26 | 66 | 2 FE, REYES |
| 9.5.3 | Pre-Commissioning Inspection | 09/01/26 | 10/06/26 | 36 | 2 FE, REYES |
| 9.5.4 | Customer Backfeed and Fuel Available Luma And PREPA Acceptance | 09/01/26 | 10/01/26 | 30 | 2 FE, REYES |
| 9.5.5 | Relay and Protection Testing and Acceptance by LUMA | 10/04/26 | 10/06/26 | 3 | 2 FE, REYES |
| 10 | Plant Commissioning PREPA And LUMA Acceptance | 10/09/26 | 10/12/26 | 4 | 4 PREPA, LUMA, FE, REYES |
| 11 | Project Completion | 10/14/26 | 10/14/26 | 1 | |



Failure by Seller to comply with the milestone schedule, reporting obligations, permitting obligations, interconnection obligations, commissioning requirements, or any other material requirement set forth in this Exhibit G shall constitute a failure to satisfy the Deployment Period requirements under this Agreement and may trigger the assessment of Deployment Delay Liquidated Damages pursuant to Section 8.2, in addition to any other remedies available under this Agreement.